# EXHIBIT A

STATE OF CALIFORNIA

# CALIFORNIA LAW REVISION COMMISSION

## RECOMMENDATION AND STUDY

### *relating to*

## Liquidated Damages

December 1973

CALIFORNIA LAW REVISION COMMISSION
School of Law
Stanford University
Stanford, California 94305

# THE CALIFORNIA LAW REVISION COMMISSION

## COMMISSION MEMBERS

JOHN D. MILLER
*Chairman*

NOBLE K. GREGORY
*Member*

MARC SANDSTROM
*Vice Chairman*

JOHN N. McLAURIN
*Member*

ROBERT S. STEVENS
*Member of the Senate*

THOMAS E. STANTON, JR.
*Member*

ALISTER McALISTER
*Member of the Assembly*

HOWARD R. WILLIAMS
*Member*

JOHN J. BALLUFF
*Member*

GEORGE H. MURPHY
*Ex Officio*

## COMMISSION STAFF

### Legal

JOHN H. DeMOULLY
*Executive Secretary*

NATHANIEL STERLING
*Staff Counsel*

JACK I. HORTON
*Assistant Executive Secretary*

STAN G. ULRICH
*Legal Counsel*

### Administrative-Secretarial

ANNE JOHNSTON
*Administrative Assistant*

VIOLET S. HARJU
*Secretary*

KRISTINE A. POWERS
*Secretary*

## NOTE

This pamphlet begins on page 1201. The Commission's annual reports and its recommendations and studies are published in separate pamphlets which are later bound in permanent volumes. The page numbers in each pamphlet are the same as in the volume in which the pamphlet is bound. The purpose of this numbering system is to facilitate consecutive pagination of the bound volumes. This pamphlet will appear in Volume 11 of the Commission's *Reports, Recommendations, and Studies.*

This recommendation includes an explanatory Comment to each section of the recommended legislation. The Comments are written as if the legislation were enacted since their primary purpose is to explain the law as it would exist (if enacted) to those who will have occasion to use it after it is in effect.

STATE OF CALIFORNIA

# CALIFORNIA LAW REVISION COMMISSION

## RECOMMENDATION AND STUDY

*relating to*

## Liquidated Damages

December 1973

CALIFORNIA LAW REVISION COMMISSION
School of Law
Stanford University
Stanford, California 94305

STATE OF CALIFORNIA                                    RONALD REAGAN, *Governor*

## CALIFORNIA LAW REVISION COMMISSION

SCHOOL OF LAW—STANFORD UNIVERSITY
STANFORD, CALIFORNIA 94305
(415) 321-2300, EXT. 2479

JOHN D. MILLER
  *Chairman*
MARC SANDSTROM
  *Vice Chairman*
SENATOR ROBERT S. STEVENS
ASSEMBLYMAN ALISTER McALISTER
JOHN J. BALLUFF
NOBLE K. GREGORY
JOHN N. McLAURIN
THOMAS E. STANTON, JR.
HOWARD R. WILLIAMS
GEORGE H. MURPHY
  *Ex Officio*

November 30, 1973

*To:* THE HONORABLE RONALD REAGAN
  *Governor of California* and
  THE LEGISLATURE OF CALIFORNIA

The California Law Revision Commission was authorized by Resolution Chapter 224 of the Statutes of 1969 to study whether the law relating to liquidated damages should be revised.

The Commission herewith submits its recommendation and a background study relating to this topic. The study was prepared by the Commission's consultant, Professor Justin Sweet, Boalt Hall, University of California, Berkeley. It was previously published in the *California Law Review* and is republished here with permission. Only the recommendation (as distinguished from the background study) expresses the views of the Commission.

Respectfully submitted,
JOHN D. MILLER
*Chairman*

5  3  85

# CONTENTS

*Page*

RECOMMENDATION ............................................................ 1207

INTRODUCTION................................................................. 1207

RECOMMENDATIONS .......................................................... 1209
   General Principles Governing Liquidated Damages.. 1209
   Real Property Leases ......................................................... 1210
   Land Purchase Contracts; "Earnest Money"
      Deposits ...................................................................... 1210
   Late Payment Charges on Loans Secured by Real
      Property...................................................................... 1211
      Background................................................................... 1211
      Policy Considerations.................................................... 1213
      Recommendations.......................................................... 1214
         Installment payment $500 or more ......................... 1215
         Installment payment less than $500 ........................ 1215

PROPOSED LEGISLATION ....................................................... 1216
   Business & Professions Code § 10242.5 (repealed) ...... 1217
   Civil Code
      § 1670     (repealed) .................................................. 1217
      § 1671     (repealed) .................................................. 1218
      § 1951.5   (amended) .................................................. 1218
      § 2954.6   (new) ......................................................... 1218
      § 3319     (new) ......................................................... 1222
      § 3320     (new) ......................................................... 1225
      § 3358     (amended) .................................................. 1227

BACKGROUND STUDY........................................................... 1229

(A detailed Table of Contents for the study begins on page 1229)

5  3  90

# RECOMMENDATION
## INTRODUCTION

Existing California law permits the parties to a contract, in some circumstances, to agree on the amount or the manner of computation of damages recoverable for breach.[1] Two requirements must be satisfied. Sections 1670 and 1671 of the Civil Code [2] permit the enforcement of a liquidated damages provision only where the actual damages "would be impracticable or extremely difficult to fix." In addition, the courts have developed a second requirement that the provision must reflect a "reasonable endeavor" to estimate actual damages.[3] The judicial decisions interpreting and applying these requirements, however, provide inadequate guidance to contracting parties and severely limit the use of liquidated damages provisions.[4] Unlike the Civil Code sections which reflect a traditional hostility to liquidated damages provisions, recently enacted statutes such as Section 2718 of the Commercial Code [5] encourage the use of such provisions.[6]

---

[1] For a discussion of the varying forms a liquidated damages clause may take, see background study, Sweet, *Liquidated Damages in California, infra,* reprinted from 60 CAL. L. REV. 84 (1972) (hereinafter referred to as "background study").

[2] Sections 1670 and 1671, which were enacted in 1872 and have not since been amended, read:

    1670.   Every contract by which the amount of damage to be paid, or other compensation to be made, for a breach of an obligation, is determined in anticipation thereof, is to that extent void, except as expressly provided in the next section.

    1671.   The parties to a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage.

[3] McCarthy v. Tally, 46 Cal.2d 577, 584, 297 P.2d 981, 986 (1956); Better Foods Mkts., Inc. v. American Dist. Tel. Co., 40 Cal.2d 179, 187, 253 P.2d 10, 15 (1953). See also Garrett v. Coast & S. Fed. Sav. & Loan Ass'n, 9 Cal.3d 731, 511 P.2d 1197, 108 Cal. Rptr. 845 (1973); Clermont v. Secured Investment Corp., 25 Cal. App.3d 766, 102 Cal. Rptr. 340 (1972).

[4] See background study *infra.*

[5] The pertinent portion of Section 2718 provides:

    2718.   (1) Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

[6] For provisions authorizing liquidated damages in marketing contracts, see CORP. CODE § 13353; FOOD & AGRI. CODE § 54264. For provisions authorizing late payment charges, see CIVIL CODE §§ 1803.6 (retail installment sales), 2982 (automobile sales finance act); FIN. CODE §§ 14852 (credit unions), 18667 (a) (5) and 18934 (industrial loan companies), 22480 (personal property brokers). See also GOVT. CODE § 54348 (services of local agency enterprise); PUB. RES. CODE § 6224 (failure to pay State Lands Commission); STS. & HWYS. CODE § 6442 (Improvement Act of 1911).

( 1207 )

A liquidated damages provision may serve useful and legitimate functions.[7] A party to a contract may seek to control his risk exposure for his own breach by use of a liquidated damages provision. Such control is especially important if he is engaged in a high risk enterprise. A party also may desire to specify the damages for his own breach because he is unwilling to rely on the judicial process to determine the amount of damages. He may, for example, be fearful that the court will not give sufficient consideration to legitimate excuses for nonperformance, that the court may be unduly sympathetic to the claim of the opposing party that all his losses should be paid by the breaching party, or that the court may manifest prejudice against contract breach to the extent of assessing damages on a punitive basis.

A nonbreaching party may use a liquidated damages provision because on occasion a breach will cause damage, but the amount of the damage cannot be proved under damage rules normally used in a judicial proceeding. He may fear that, without an enforceable provision liquidating the damages, the other party will lack incentive to perform since any damages he causes will not be sufficiently provable to be collected. There is also a danger that, without a liquidated damages provision, the breaching party may recover the full contract price because the losses are not provable.

Liquidated damages provisions may also be used to improve upon what the parties believe to be a deficiency in the litigation process—the cost and difficulty of judicially proving damages. Through a liquidated damages provision, the parties attempt by contract to settle the amount of damages involved and thus improve the normal rules of damages. Also, when the provision is phrased in such a way as to indicate that the breaching party will pay a specified amount if a particular breach occurs, troublesome problems involved in proving causation and foreseeability may be avoided. Finally, the parties may feel that, if they truly agree on damages in advance, it is unlikely that either will later dispute the amount of damages recoverable as a result of breach.

Use of liquidated damages provisions in appropriate cases also may improve judicial administration. Enforcement of liquidated damages provisions will encourage greater use of such provisions, will result in fewer breaches, fewer law suits,

---

For provisions authorizing liquidated damages in certain public construction contracts, see GOVT. CODE §§ 14376, 53069.85; STS. & HWYS. CODE §§ 5254.5, 10503.1.

[7] The following discussion draws heavily upon the background study. See background study *infra.*

and fewer or easier trials, and in many cases will provide as just a result as a court trial.

While liquidated damages provisions may serve these and other useful and legitimate functions, there are dangers inherent in their use. There is the risk that a liquidated damages provision will be used oppressively by a party able to dictate the terms of an agreement. And there is the risk that such a provision may be used unfairly against a party who does not fully appreciate the effect of the provision.

The Commission believes that the use of liquidated damages provisions is beneficial and should be encouraged, subject to limitations to protect against the oppressive use of such provisions.

## RECOMMENDATIONS

Having concluded that the existing law does not permit the use of a liquidated damages provision in many cases where it would serve a useful and legitimate function, the Commission makes the following recommendations.

### General Principles Governing Liquidated Damages

Sections 1670 and 1671 of the Civil Code should be replaced by a statute that applies to liquidated damages provisions in contracts generally (absent a specific statute that applies to the particular type of contract) and that implements the following basic principles:

(1) A contractual stipulation of damages should be valid unless found to be unreasonable. This rule would reverse the basic disapproval of such provisions expressed in Sections 1670 and 1671 and in the judicial decisions but would still enable courts to invalidate such provisions in situations where they are oppressive.

(2) Reasonableness should be judged in light of the circumstances confronting the parties at the time of the making of the contract and not by the judgment of hindsight. To permit consideration of the damages actually suffered would defeat one of the purposes of liquidated damages, which is to avoid litigation of the amount of actual damages.

(3) The party seeking to invalidate a liquidated damages provision should have the burden of pleading and proving that it is unreasonable. If the party seeking to rely on the provision were required to prove its reasonableness, he would lose one of the significant benefits of the use of a liquidated damages

provision, which is to simplify any litigation that may arise out of a breach of the contract.

## Real Property Leases

The concurrent resolution directing the Law Revision Commission to study liquidated damages referred specifically to the use of liquidated damages provisions in real property leases.[8] The Commission has concluded that no special rules applicable to real property leases are necessary; the general rules recommended above will deal adequately with any liquidated damages problems in connecton with such leases.

## Land Purchase Contracts; "Earnest Money" Deposits

The parties to a contract to purchase real property may desire to include in the contract a provision liquidating the damages if the purchaser fails to complete the purchase. In some cases, the parties may agree that an "earnest money" deposit constitutes liquidated damages if the purchaser fails to complete the sale. The validity of such provisions under existing law is uncertain.[9]

The Commission recommends the adoption of the following special rules to govern the validity of a provision in a contract to purchase real property [10] which provides for liquidated damages if the purchaser fails to complete the sale:

(1) A provision liquidating the damages to the vendor if the purchaser fails to satisfy his obligation to purchase the property should be valid only if the provision is separately signed or initialed by each party to the contract. This requirement will alert the purchaser to the fact that the liquidated damages clause is included in the contract.

(2) Where a separately signed or initialed provision makes an "earnest money" deposit liquidated damages if the purchaser fails to complete the sale, the provision should be deemed to be valid if the amount of such liquidated damages does not exceed five percent of the purchase price of the property. This should not, however, preclude the parties from agreeing on a larger amount as liquidated damages—whether

---

[8] See Cal. Stats. 1972, Res. Ch. 22 at 3223 (directing the Commission to study whether "the law relating to liquidated damages in contracts and, particularly, in leases, should be revised").

[9] See background study *infra* at 1229, 1242–1247.

[10] Liquidated damages provisions in real property sales contracts (commonly called installment land contracts) as defined in Civil Code Section 2985 would be governed by the general principles governing the validity of liquidated damages provisions and not by the special rules recommended here for contracts for the purchase of real property.

LIQUIDATED DAMAGES—RECOMMENDATION            1211

or not the amount is deposited as "earnest money"—if such amount satisfies the rules for liquidated damages generally.

The Commission's recommendation would generally conform to existing practice. The Standard Real Estate Purchase Contract and Receipt for Deposit, approved in form only for use in "simple transactions" by the California Real Estate Association and the State Bar of California, contains the following provision:

> 7.  If Buyer fails to complete said purchase as herein provided by reason of any default of Buyer, Seller shall be released from his obligation to sell the property to Buyer and may proceed against Buyer upon any claim or remedy which he may have in law or equity; provided, however, that by placing their initials here (    ) (    ), Buyer and
> Buyer    Seller
> Seller agree that it would be impractical or extremely difficult to fix actual damages in case of Buyer's default, that the amount of the deposit is a reasonable estimate of the damages, and that Seller retain the deposit as his sole right to damages.

It should be noted that use of a liquidated damages clause makes retention of the deposit the seller's sole right to damages. Theoretically, the seller still has the alternative remedy of specific performance,[11] but in most instances the difficulties in obtaining specific performance make it an unsatisfactory and unused remedy.[12]

## Late Payment Charges on Loans Secured by Real Property

**Background**

Proposal of a general rule that a liquidated damages provision is valid unless shown to be unreasonable requires examination of the amount of late payment charges which may be assessed in connection with a loan secured by real property.[13] Until recently, the amount of the late payment charge on a loan

---

[11] CIVIL CODE § 3389. See also CALIFORNIA REAL ESTATE SECURED TRANSACTIONS, Hetland, *Land Contracts* § 3.21 (Cal. Cont. Ed. Bar 1970).

[12] See CALIFORNIA REAL ESTATE SALES TRANSACTIONS, Bernhardt, *Liability for Breach* §§ 11.62–11.67 (Cal. Cont. Ed. Bar 1967); CALIFORNIA REAL ESTATE SECURED TRANSACTIONS, Hetland, *Land Contracts* §§ 3.21–3.33, 3.52–3.57 (Cal. Cont. Ed. Bar 1970).

[13] Late payment charges provisions have been held to be liquidated damages provisions. See Garrett v. Coast & S. Fed. Sav. & Loan Ass'n, 9 Cal.3d 731, 511 P.2d 1197, 108 Cal. Rptr. 845 (1973); Clermont v. Secured Investment Corp., 25 Cal. App.3d 766, 102 Cal. Rptr. 340 (1972).

secured by real property was not significantly regulated by state statute.[14] However, in response to well documented abuses and overreaching by some lenders,[15] legislation was introduced at the 1973 session of the Legislature to regulate late payment charges. The Legislature enacted Business and Professions Code Section 10242.5 [16] which allows mortgage loan brokers to impose a charge for late payment of an installment due on a loan secured by a mortgage or deed of trust on real property equal to no more than 10 percent of the principal and interest portions of the installment due or five dollars, whichever is greater. Assembly Bill 105, also introduced at the 1973 session, would similarly regulate late payment charges on loans secured by a mortgage or deed of trust on single family, owner-occupied dwellings.[17]

In the absence of such statutory regulation, the validity of many late payment charges imposed on delinquent installments on loans secured by real property is uncertain. In *Garrett v. Coast & Southern Federal Savings & Loan Ass'n,* [18] the California Supreme Court held that: [19]

> a charge for the late payment of a loan installment which is measured against the unpaid balance of the loan must be deemed to be punitive in character. It is an attempt to coerce timely payment by a forfeiture which is not reasonably calculated to merely compensate the injured lender. We conclude, accordingly, that because the parties failed to make a reasonable endeavor to estimate a fair compensation for a loss which would be sustained on the default of an installment payment, the provision for late charges is void.

The court held open the possibility that a lender could show the "impracticability of prospectively fixing its actual damages"; in such a case, a liquidated damage provision "resulting from the reasonable endeavors of the parties to fix a fair compensation"

---

[14] Late payment charges are regulated by provisions applicable to credit unions (FIN. CODE § 14852), to certain loans made by industrial loan companies (FIN. CODE §§ 18667, 18934), and to certain loans made by personal property brokers (FIN. CODE § 22480).

[15] See Assembly Interim Committee on Finance and Insurance, Late Payment Fees 6–9 (mimeographed, May 20, 1970).

[16] Cal. Stats. 1973, Ch. 641, § 3, effective January 1, 1974.

[17] At the time of this writing, A.B. 105 is in conference committee. A.B. 105 would not be applicable to credit unions, industrial loan companies, personal property brokers, or real estate brokers.

[18] 9 Cal.3d 731, 511 P.2d 1197, 108 Cal. Rptr. 845 (1973).

[19] 9 Cal.3d at 740, 511 P.2d at 1203, 108 Cal. Rptr. at 851. The charge involved in *Garrett* was two percent per annum for the period of delinquency assessed against the unpaid principal balance of the loan obligation.

LIQUIDATED DAMAGES—RECOMMENDATION          1213

would be upheld. [20]

In light of the incomplete legislation governing late payment charges on loans secured by real property and the uncertainty concerning the validity of such charges under judicial tests, the Commission recommends that a more comprehensive regulatory scheme be enacted.

### Policy Considerations

The regulation of late payment charges on loans secured by real property is a matter involving conflicting policy considerations. An Assembly Committee report states: [21]

> From the lenders [ *sic* ] point of view, the imposition of a substantial late payment charge serves the purpose of reducing the institution of foreclosure proceedings when a borrower is tempted to use his funds to meet obligations other than his mortgage payment. Without such delinquency charges at relatively high levels, a borrower may let his mortgage payment slide while making other pressing debt payments. However, generally, a mortgagee or trustee will only allow no more than 60 days to elapse from the date of payment before filing notice of a delinquency and instituting foreclosure proceedings. It is important that borrowers be made to feel the impact of potential late payment charges. If foreclosure proceedings start, it will be much more expensive to cure than would the cost of any reasonable late charge.

> Most lenders would agree that late fees should not be a source of extra profit to the lender. The fee should be adequate, however, to defray any additional expense involved in processing a late payment as well as compensating for lost interest which could have been earned if the payment were made on time. In addition, there should be a "motivation factor" included. This would be a sum reasonably designed to encourage prompt payment of the installment without amounting to an exorbitant or unconscionable charge.

> At the time a promissory note is executed by a borrower, he will usually pay little attention to late payment provisions or various penalty provisions. His main interest on real property loan transactions is the interest rate, the term of the loan and his monthly payments. Since most

---

[20] 9 Cal.3d at 741–742, 511 P.2d at 1204, 108 Cal. Rptr. at 852.
[21] Assembly Interim Committee on Finance and Insurance, Late Payment Fees 11-13 (mimeographed, May 20, 1970).

debtors, at the time of borrowing, do not intend to make payments late, they are not inclined to actively negotiate over delinquency payment clauses. Nor are they likely to compute out the actual amount which would be due if a penalty of 1% of the original balance of a loan were assessed.

The Commission has considered a suggestion that restrictions on late payment charges for real property loans should be comparable to those imposed under Civil Code Sections 1803.6 (retail installment sales) and 2982 (automobile sales finance act). Both sections in substance limit the late payment charge to five percent of the delinquent installment. In addition, Section 1803.6 limits the late payment charge to a maximum of five dollars. The Commission has also noted the FHA charge of two percent and the VA charge of four percent of the delinquent installment. The Commission has concluded that such strict limitation of late payment charges on loans secured by real property could operate to the detriment of both borrowers and lenders. If the lender is forced to use foreclosure proceedings because the late payment charge is insufficient to encourage borrowers to make their mortgage payments when due, the cost to the borrower of curing the default will be much higher than the cost of a reasonable late payment charge. [22] On the other hand, a foreclosure procedure often is not useful as a practical matter if the lender has only a second mortgage or trust deed, and such a lender would benefit from the enactment of legislation authorizing a reasonable late payment charge.

**Recommendations**

The Commission has concluded that a statutory provision should be enacted to regulate late payment charges on loans secured by real property. [23] Such a provision would eliminate the uncertainty that now exists as to the validity of such late payment charges and would protect against the collection of

---

[22] Section 2924c of the Civil Code provides that, after the recording of the notice of default, the borrower may cure the default by paying "the entire amount then due . . . (including costs and expenses actually incurred in enforcing the terms of such obligation, deed of trust or mortgage, and trustee's or attorney's fees actually incurred not exceeding one hundred dollars ($100) in case of a mortgage and fifty dollars ($50) in case of a deed of trust or one-half of one per cent of the entire unpaid principal sum secured, whichever is greater) . . . ."

[23] The recommended provision should not apply to a loan made by a credit union, industrial loan company, or personal property broker. Specific statutes now regulate late payment charges on most of these loans. See FIN. CODE §§ 14852 (credit unions), 18667(a)(5) and 18934 (industrial loan companies), 22480(a)(5) (personal property brokers). *But see* FIN. CODE §§ 18649 and 18669.2 (exceptions to Section 18667), 22053 (exception to Section 22480).

unreasonably high charges.

The amount permitted to be charged under such a statutory provision would be a maximum. The enactment of such a provision would not require lenders to impose a late payment charge equal to this maximum amount, and the Commission anticipates that many lenders will continue to impose a late payment charge that is less than the maximum permitted.

**Installment payment $500 or more.**   Where the delinquent installment is $500 or more, the validity of a late payment charge should be determined under the general rules relating to liquidated damages.[24] Thus, the late payment charge provision will be valid unless the party seeking to invalidate it establishes that it was unreasonable under the circumstances existing at the time of the making of the contract. This general standard gives the parties considerable freedom to negotiate a provision appropriate to the circumstances but permits a court to invalidate an unreasonable provision.

**Installment payment less than $500.**   Where an installment payment is less than $500, the need to avoid the expense to the parties of litigating the reasonableness of a late payment charge requires that the imposition of the charge be specifically regulated by statute. Litigation will then be unnecessary if the charge is no greater than the maximum permitted by the statute and otherwise satisfies statutory requirements.[25]

Where the delinquent installment is less than $500, the following rules should apply:

(1) A late payment charge may be imposed if the borrower fails to pay the full amount of the installment. (For this purpose, "installment" includes principal, interest, and the amount to be allocated to impound accounts for property taxes, special assessments, and insurance.)

(2) No late payment charge should be permitted on an installment which is paid in full within 10 days after its scheduled due date even though an earlier maturing installment, or a late payment charge on an earlier installment, may not have been paid in full. Payments should be applied first to current installments and then to delinquent installments.[26] An installment should be considered paid as of the date it is received by the lender.

---

[24] See discussion *supra* under "General Principles Governing Liquidated Damages."

[25] *E.g.*, CIVIL CODE § 2954.5 (general prerequisites to imposition of a late payment charge on loan secured by real property).

[26] This rule would apply unless the borrower otherwise directs at the time the payment is made.

(3) The amount of the late payment charge should not exceed 10 percent of the amount of principal and interest included in the delinquent installment. [27] However, where the amount of principal and interest included in the delinquent installment is less than $50, a charge not to exceed five dollars or 20 percent of the principal and interest included in the delinquent installment, whichever is the lesser amount, should be permitted. [28] The borrower is in default if he fails to pay in full the amount required by the contract, which may include amounts to be allocated to impound accounts. Although it is appropriate to impose a late payment charge if the borrower is in default because he has failed to make the full payment required, it would be unfair to include the amount to be allocated to impound accounts in computing the amount of the late payment charge since this amount is in substance a prepayment by the borrower. [29]

(4) The lender should be given the option to add the amount of the late payment charge to the principal and charge interest on it at the contract rate if the charge is not paid within 40 days from the scheduled due date of the delinquent installment for which the late payment charge was imposed.

## PROPOSED LEGISLATION

The Commission's recommendation would be effectuated by enactment of the following measure:

*An act to repeal Section 10242.5 of the Business and Professions Code, and to amend Sections 1951.5 and 3358 of, to add Sections 2954.6, 3319, and 3320 to, and to repeal Sections 1670 and 1671 of, the Civil Code, relating to liquidation of damages.*

*The people of the State of California do enact as follows:*

---

[27] The 10-percent limit is in accord with new provision regulating mortgage loan brokers. BUS. & PROF. CODE § 10242.5 (Cal. Stats. 1973, Ch. 641, § 3, effective January 1, 1974). This provision would be superseded by the recommended provision.

[28] Business and Professions Code Section 10242.5 in effect allows a flat five-dollar charge where the principal and interest portion of the installment is less than $50 regardless of how small the payment is. The Commission's proposal would be fairer to borrowers since, where the principal and interest portion is under $25, a maximum charge of 20 percent (less than five dollars) is allowed.

[29] It should be noted that the lender would be permitted to impose a late payment charge computed on the entire delinquent installment (including amounts to be allocated to impound accounts) if the charge does not exceed the maximum amount computed under the formula proposed above.

## Business & Professions Code § 10242.5 (repealed)

SECTION 1.  Section  10242.5  of  the  Business  and Professions Code is repealed.

~~10242.5.   (a)  A charge which may be imposed for late payment of an installment due on a loan secured by a mortgage or deed of trust on real property shall not exceed the  equivalent  of  10  percent  of  the  installment  due, provided that a minimum charge of five dollars ($5) may be imposed when the late charge permitted by this section would otherwise be less than such minimum charge.~~

~~The charge permitted by this section may be assessed only as a percentage of the principal and interest part of any installment due.~~

~~(b)  No charge may be imposed more than once for the same late payment of an installment. No late charge may be imposed on any installment which is paid or tendered in full within 10 days after its scheduled due date, even though an earlier maturing installment or a late charge on an earlier installment may not have been paid in full. For purposes  of  this  subdivision,  a  payment  or  tender  of payment made within 10 days of a scheduled installment due date shall be considered to have been made or tendered for payment of such installment.~~

Comment.  Section 10242.5 is superseded by Civil Code Section 2954.6.

## Civil Code § 1670 (repealed)

SEC. 2.   Section 1670 of the Civil Code is repealed.

~~1670.   Every contract by which the amount of damage to be paid, or other compensation to be made, for a breach of an obligation, is determined in anticipation thereof, is to that extent void, except as expressly provided in the next section.~~

Comment.   Sections 1670 and 1671 are superseded by Section 3319. See also Sections 2954.6 and 3320.

1218            CALIFORNIA LAW REVISION COMMISSION

## Civil Code § 1671 (repealed)

SEC. 3.   Section 1671 of the Civil Code is repealed.

~~1671.   The parties to a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage.~~

**Comment.**   See Comment to Section 1670.

## Civil Code § 1951.5 (amended)

SEC. 4.   Section 1951.5 of the Civil Code is amended to read:

1951.5.   ~~Sections 1670 and 1671~~ *Section 3319*, relating to liquidated damages, ~~apply~~ *applies* to a lease of real property.

**Comment.**   Sections 1670 and 1671 are superseded by Section 3319.

## Civil Code § 2954.6 (new)

SEC. 5.   Section 2954.6 is added to the Civil Code, to read:

2954.6.   (a)  As used in this section:

(1)  "Late payment charge" means a charge, whether or not characterized in the loan contract as interest, that is imposed for late payment of an installment payment due on a loan secured by a mortgage or deed of trust on real property.

(2)  "Installment payment" means that portion of a periodic payment that comprises any one or more of the following: principal, interest, and funds to be allocated to impound accounts for property taxes, special assessments, and insurance.

(b)  Except as provided in subdivision (c), a provision in the loan contract imposing a late payment charge is valid if it satisfies the requirements of Sections 2954.5 and 3319.

(c)  Where each of a majority of the installment payments is less than five hundred dollars ($500), a provision in the loan contract imposing a late payment charge is valid if it satisfies the requirements of Section 2954.5 and both of the following conditions:

(1) No late payment charge may be collected on an installment payment which is tendered or paid in full within 10 days after its scheduled due date even though an earlier maturing installment payment, or a late payment charge on an earlier installment payment, may not have been paid in full. For the purposes of this subdivision, an installment payment shall be considered paid as of the date it is received by the lender and, unless the borrower otherwise directs at the time the installment is paid, payments shall be applied first to current installment payments and then to delinquent installment payments.

(2) The amount of the late payment charge shall not exceed 10 percent of the amount of principal and interest included in the installment payment except that, where · the amount of principal and interest included in the installment payment is less than fifty dollars ($50), a charge not to exceed five dollars ($5) or 20 percent of the amount of principal and interest included in the installment payment, whichever is the lesser amount, may be made.

(d) If the late payment charge referred to in subdivision (c) is not paid within 40 days from the scheduled due date of the delinquent installment payment for which the charge was imposed, the lender may, at his option, add the late payment charge to the principal and thereafter charge interest on it at the contract rate. If the lender elects to add the late payment charge to principal, he cannot thereafter treat the failure to pay the late payment charge as a default.

(e) This section limits only the obligation of a borrower to pay a late payment charge. Nothing in this section excuses or defers the borrower's performance of any other obligation incurred in the loan transaction, nor does this section impair or defer the right of the lender to enforce any other obligation including but not limited to the right to recover costs and expenses incurred in any enforcement proceeding authorized by law.

(f) This section does not apply to loans made by a credit union subject to the provisions of Division 5 (commencing with Section 14000) of the Financial Code, by an industrial loan company subject to the provisions of Division 7

(commencing with Section 18000) of the Financial Code, or by a personal property broker subject to the provisions of Division 9 (commencing with Section 22000) of the Financial Code.

**Comment.** Section 2954.6 regulates the amount of a late payment charge that may be imposed for late payment of an installment payment on a loan secured by real property and, therefore, is a statutory exception to Section 3302 ("The detriment caused by the breach of an obligation to pay money only, is deemed to be the amount due by the terms of the obligation, with interest thereon."). Section 2954.6 supplements Section 2954.5 which states the prerequisites to imposition of such a late payment charge.

The primary purpose of Section 2954.6 is to provide a clear and certain rule where the installment payments are less than $500. Under prior law, the validity of late payment charges on loans secured by real estate was uncertain. See *Garrett v. Coast & S. Fed. Sav. & Loan Ass'n,* 9 Cal.3d 731, 511 P.2d 1197, 108 Cal. Rptr. 845 (1973); *Clermont v. Secured Investment Corp.,* 25 Cal. App.3d 766, 102 Cal. Rptr. 340 (1972), and cases cited therein.

*Subdivision (a).* The definition of "late payment charge" in subdivision (a)(1) makes clear that the provisions of Section 2954.6 cannot be avoided by characterizing the charge as interest. Compare *Walsh v Glendale Fed. Sav. & Loan Ass'n,* 1 Cal. App.2d 578, 81 Cal. Rptr. 804 (1969), and *O'Connor v. Richmond Sav. & Loan Ass'n,* 262 Cal. App.2d 523, 68 Cal. Rptr. 882 (1968) (disapproved in *Garrett v. Coast & S. Fed. Sav. & Loan Ass'n, supra*). See also discussion in *Clermont v. Secured Investment Corp., supra.* Also, because of the definition of "late payment," the compounding of interest as a sanction for late payment is subject to the limitations imposed by Section 2954.6 as well as any other applicable limitations. See *Heald v. Friis-Hansen,* 52 Cal.2d 834, 345 P.2d 457 (1959).

As subdivision (e) makes clear, Section 2954.6 has no effect on such rights of the lender as the right to accelerate or the right to recover attorney's fees and other costs, expenses, and fees in event of a default. These rights are not embraced within the term "late payment charge."

The definition of "installment payment" in paragraph (2) of subdivision (a) makes clear that the amount that must be paid in full to avoid imposition of a late payment charge is computed using the total of the amounts of the items listed in the paragraph to the extent they are included in the payment and excluding the amounts of any other items included in the

payment. Contrast subdivision (c) (2), which limits the amount of the late payment charge to a specified percentage of the *principal and interest* included in the delinquent installment payment.

*Subdivision (b).* Subdivision (b)—which applies where the installments are $500 or more (see subdivision (c))—makes clear that a late payment charge is subject to the requirements of Sections 2954.5 (prerequisites to imposition) and 3319 (general rule governing validity of liquidated damages provision). Section 2954.5 provides that, before a late payment charge may be assessed, the lender shall give the borrower either written notice of the delinquency and six days from mailing within which to cure it or a notice sent when each payment is due which indicates the date after which the charge will be assessed. Assuming that these requirements of Section 2954.5 are satisfied, the late payment charge provision will be valid "unless the party seeking to invalidate the provision establishes that it was unreasonable under the circumstances existing at the time of the making of the contract." See Section 3319.

*Subdivision (c).* Subdivision (c) is designed to avoid litigation as to the validity of a late payment charge where the installment payment is less than $500. Where the payments are less than $500, the need to avoid the expense to the parties of litigating the validity of the amount of the late payment charge necessitates the adoption of a statutory standard for such charges. (Subdivision (c) is phrased in recognition of the fact that the loan may require a balloon payment or a smaller final payment.)

The amount of a late payment charge permitted under subdivision (c) is a maximum. Nothing requires that the lender impose a late payment charge equal to this maximum amount, and the practice of many lenders is to impose a late payment charge that is less than the maximum permitted by subdivision (c). See *Recommendation and Study Relating to Liquidated Damages,* 11 CAL. L. REVISION COMM'N REPORTS 1201, 1211–1216 (1973).

It should be noted that the amount of the late payment charge authorized by this section is a specified percentage of the amount of principal and interest included in the installment payment. Compare subdivision (a) (2) (defining "installment payment").

*Subdivision (d).* Subdivision (d) gives the lender the option of continuing to carry the late payment charge as a default or adding the late payment charge to principal after the 40-day

period has expired. Adding the late payment charge to principal does not, of course, affect the lender's right to treat the failure to pay the delinquent installment payment as a default if it has not been paid.

*Subdivision (e).* Subdivision (e), which is comparable to subdivision (e) of Section 2954.5, makes clear that Section 2954.6 restricts only late payment charges. The section has no effect on the other rights of the lender including but not limited to such rights as the right to accelerate (*but see* limitation in Section 2924.5) and the right to record notice of default under Section 2924 and recover costs, expenses, and fees under Section 2924c if the debtor cures the default.

*Subdivision (f).* Subdivision (f) makes Section 2954.6 not applicable to loans made by credit unions, industrial loan companies, or personal property brokers. Specific statutes now govern late payment charges in most of these loans. See FIN. CODE §§ 14852 (credit union), 18667(a)(5) and 18934 (industrial loan companies), 22480(a)(5) (personal property brokers). See also Section 3319 and Comment. It should be noted, however, that some loans exempted by subdivision (f) may not be subject to the specific statutes governing late payment charges referred to above. For example, mortgage bankers can be licensed as industrial loan companies but are not subject to the late charge limitations of Section 18667. See FIN. CODE § 18669.2 (declaring Section 18667 not applicable to a mortgage banker or to a loan made by a mortgage banker). Accordingly, the validity of late payment charges imposed by such mortgage bankers is determined under Section 3319, not under Section 2954.6 or Financial Code Section 18667. See also FIN. CODE §§ 18649 (exception to Section 18667), 22053 (exception to Section 22480).

## Civil Code § 3319 (new)

SEC. 6.   Section 3319 is added to the Civil Code, to read:

3319.   (a) Except as otherwise provided by statute, a provision in a contract liquidating the damages for breach of a contractual obligation is valid unless the party seeking to invalidate the provision establishes that it was unreasonable under the circumstances existing at the time of the making of the contract.

(b) Subdivision (a) does not apply to provisions included in public contracts pursuant to Section 14376 or 53069.85 of the Government Code.

**Comment.** Section 3319, providing that a liquidated damages provision is valid unless shown to be unreasonable, reflects a policy that favors the use of such provisions. See *Recommendation and Study Relating to Liquidated Damages,* 11 Cal. L. Revision Comm'n Reports 1201 (1973).

Subdivision (a) of Section 3319 limits the circumstances that may be taken into account in the determination of reasonableness to those existing "at the time of the making of the contract." Accordingly, the amount of damages actually suffered has no bearing on the validity of the liquidated damages provision. The validity of the provision depends upon its reasonableness at the time the contract was made. To permit consideration of the damages actually suffered would defeat one of the legitimate purposes of the clause, which is to avoid litigation on the damages issue. Contrast Com. Code § 2718.

Relevant considerations in the determination whether the amount of liquidated damages is so high or so low as to be unreasonable include but are not limited to such matters as the relative equality of the bargaining power of the parties, the anticipation of the parties that proof of actual damages would be costly or inconvenient, the range of damages that reasonably could have been anticipated by the parties, and whether the liquidated damages provision is included in a form contract provided by one party. Thus, for example, there is little likelihood that a specially drafted liquidated damages provision in a contract executed by informed parties represented by attorneys after proper negotiation would be held invalid under Section 3319. On the other hand, where the liquidation of damages provision is in a form contract, the court should carefully consider the circumstances existing at the time of the making of the contract to assure that the provision does not unreasonably benefit the party who prepared the contract. In this connection, it should be noted also that nothing in Section 3319 affects the power of a court to modify or nullify terms in a contract of adhesion. See discussion in 1 B. Witkin, Summary of California Law *Contracts* § 13 at 35–36 (8th ed. 1973).

To further implement the policy favoring liquidated damages provisions, Section 3319 places on the party seeking to avoid the provision the burden of pleading and proving that the liquidated damages provision is invalid.

Section 3319 supersedes former Civil Code Sections 1670 and 1671. Section 1671 permitted liquidated damages only where the actual damages "would be impracticable or extremely difficult to fix." This ambiguous limitation failed to provide guidance to the contracting parties and unduly limited the use

of liquidated damages provisions. In addition, the courts developed a second requirement under Sections 1670 and 1671—the provision must reflect a "reasonable endeavor" to estimate the probable damages. See *McCarthy v. Tally,* 46 Cal.2d 577, 584, 297 P.2d 981, 986 (1956); *Better Foods Mkts., Inc. v. American Dist. Tel. Co.,* 40 Cal.2d 179, 187, 253 P.2d 10, 15 (1953). Section 3319 does not limit the use of liquidated damages provisions to cases where damages would be difficult to fix or where the amount selected by the parties reflects a reasonable effort to estimate the probable amount of actual damages. Instead, the parties are given considerable leeway to determine damages for breach. *All* the circumstances existing at the time of the making of the contract are considered including but not limited to the relationship the damages provided bear to the range of harm that reasonably could be anticipated at the time of the making of the contract.

Instead of promising to pay a fixed sum as liquidated damages in case of a breach, a party to a contract may provide a deposit as security for the performance of his contractual obligations, to be forfeited in case of a breach. If the parties intend that the deposit be liquidated damages for breach of a contractual obligation, the question whether the deposit may be retained in case of breach is determined just as if the amount deposited were promised instead of deposited, and the standard provided in Section 3319 controls this determination. *But see, e.g.,* Section 3320. On the other hand, the deposit may be nothing more than a fund to secure the payment of actual damages if any are recovered; and, in such case, the deposit is not considered as liquidated damages. See CIVIL CODE § 1950.5 (payment or deposit to secure performance of rental agreement). Compare CIVIL CODE § 1951.5 (liquidation of damages authorized in real property lease).

The introductory clause of subdivision (a) makes clear that the subdivision does not affect the statutes that govern liquidation of damages for breach of certain types of contracts. *E.g.,* COM. CODE § 2718. For late payment charge provisions, see, *e.g.,* CIVIL CODE §§ 1803.6 (retail installment sales), 2954.6 (real estate loans), 2982 (automobile sales finance); FIN. CODE §§ 14852 (credit unions), 18667 (a) (5) and 18934 (industrial loan companies), 22480 (personal property brokers); GOVT. CODE § 54348 (services of local agency enterprise). These other statutes—not Section 3319—govern the situations to which they apply. Of course, where there are exceptions to the coverage of some provision governing liquidated damages in certain types of contracts, Section 3319 does apply. *E.g.,* FIN. CODE §§ 18649

and 18669.2 (exceptions to Section 18667), 22053 (exception to Section 22480). Compare Section 3320(b), which establishes an amount of earnest money deposit that is deemed to satisfy Section 3319 but does not preclude the parties from providing for a different amount of deposit if such amount satisfies the requirements of Section 3319. Government Code Sections 14376 (requiring state public works contract to contain a charge for late completion) and 53069.85 (allowing cities, counties, and districts to include charge for late completion in contract) remain unaffected by subdivision (a).

### Civil Code § 3320 (new)

SEC. 7.   Section 3320 is added to the Civil Code, to read:

3320.   (a) Subject to subdivision (b), a provision in a contract for the sale of real property liquidating the damages to the vendor if the purchaser fails to satisfy his obligation to purchase the property is valid only if such provision is separately signed or initialed by each party and is valid under Section 3319.

(b) If the parties to a contract for the sale of real property provide by a provision separately signed or initialed by each party that all or any part of a deposit that actually is made by the purchaser shall constitute liquidated damages to the vendor if the purchaser fails to satisfy his obligation to purchase the property, the amount so specified by the parties as liquidated damages shall be deemed to be reasonable and valid under Section 3319 if it does not exceed five percent of the total purchase price in the contract. For the purposes of this section, "deposit" includes but is not limited to a check (including a postdated check), note, or other evidence of indebtedness.

(c) The validity of the provision for liquidated damages is determined under subdivision (a) rather than under subdivision (b), and nothing in subdivision (b) affects the validity of the liquidated damages provision, in each of the following cases:

(1) Where the amount specified as liquidated damages exceeds five percent of the total purchase price in the contract.

(2) Where no deposit is made by the purchaser.

1226            CALIFORNIA LAW REVISION COMMISSION

(3) Where the deposit actually made by the purchaser is less than the amount specified as liquidated damages in the contract.

(d) Nothing in this section affects the validity of any provision in a contract for the sale of real property other than a provision liquidating the damages to the vendor if the purchaser fails to satisfy his obligation to purchase the property.

(e) This section does not apply to real property sales contracts as defined in Section 2985.

**Comment.**  Section 3320 makes clear that the parties to a contract to purchase real property may provide for liquidated damages for the buyer's failure to satisfy his obligation to purchase the property. Such a provision is valid if separately signed or initialed by the parties "unless the party seeking to invalidate the provision establishes that it was unreasonable under the circumstances existing at the time of the making of the contract." See Section 3319 and Section 3320(a).

Subdivision (b) is included to avoid dispute in a case where an "earnest money" deposit has been made and the amount specified as liquidated damages does not exceed the five-percent limitation.

Subdivision (c) makes clear that subdivision (b) does not preclude the parties from providing for liquidated damages under subdivision (a) where no "earnest money" deposit is made or where the deposit is less than the damages specified in the contract; nor does subdivision (b) preclude the parties from providing that an amount in excess of the five-percent limitation shall constitute liquidated damages. In these cases, the validity of the provision for liquidated damages is determined under subdivision (a).

Subdivision (d) makes clear, for example, that Section 3320 does not deal with the validity of a provision giving the buyer a right to recover liquidated damages; the validity of such a provision or any other provision not covered by subdivision (a) or (b) of Section 3320 is determined under Section 3319.

Subdivision (e) makes clear that liquidated damages provisions in real property sales contracts (commonly called installment land contracts) as defined in Section 2985 are not governed by Section 3320.

5   3   505

### Civil Code § 3358 (amended)

SEC. 8.   Section 3358 of the Civil Code is amended to read:

3358.   ~~Notwithstanding the provisions of this Chapter, no person can~~ *Nothing in this chapter authorizes a person to* recover a greater amount in damages for the breach of an obligation than he could have gained by the full performance thereof on both sides, except in the cases specified in the Articles on Exemplary Damages and Penal Damages, and in Sections 3319, *3320,* 3339, and 3340.

# A STUDY RELATING TO LIQUIDATED
# DAMAGES IN CALIFORNIA *

## CONTENTS

*Page*

I. POLICY CONSIDERATIONS AND TRENDS IN PARTY
AUTONOMY ................................................................ 1232
   A. Reasons for Liquidated Damages Provisions .......... 1233
   B. Judicial Responses to Liquidated Damages
      Provisions ............................................................ 1235

II. TYPES OF CONTRACTUAL CLAUSES CONTROLLING
DAMAGES................................................................... 1237
   A. Genuine Liquidated Damages Clauses ................... 1237
   B. Agreed Valuations............................................... 1238
   C. Penalty ............................................................... 1239
   D. Limitation of Liability ......................................... 1239
   E. Security Deposits................................................. 1240
   F. Alternative Performances ..................................... 1241

III. THE CALIFORNIA CASES ............................................. 1241
   A. Land Transactions................................................ 1242
   B. Leases of Real and Personal Property..................... 1247
   C. Goods Transactions.............................................. 1252
      1. Seller-Breach Cases ......................................... 1252
      2. Buyer-Breach Cases.......................................... 1253
      3. The Commercial Code ...................................... 1255
   D. Service Contracts ................................................ 1256
      1. Oil Exploration Contracts ................................. 1256
      2. Real Estate Brokerage Contracts........................ 1257
      3. Legal Services Contracts ................................... 1258
      4. Salesman Commission Contracts ........................ 1259
      5. Agricultural Services Contracts .......................... 1260
      6. Utility Service Contracts .................................. 1260
      7. News Service Contracts .................................... 1261
      8. Alarm Service Contracts ................................... 1262
      9. Educational Services Contracts .......................... 1263
   E. Construction Contracts ........................................ 1263
      1. Owner Breaches................................................ 1264
      2. Contractor Breaches ......................................... 1265
         a. Defective performance.................................. 1265

---

* This study is reprinted with permission from 60 *California Law Review* 84 (1972).

5  3  515

*Page*

    b. Failure to enter into a contract when
      awarded ................................................ 1265
    c. Unexcused delay.................................... 1267
  F. Covenants Not to Compete ......................... 1271
  G. Associational Transactions ........................ 1272
  H. Contracts to Lend Money ......................... 1275
  I. Miscellaneous Contracts ............................ 1276
    1. Litigation Settlement Agreements ........ 1276
    2. Partnership Contribution Ageements.... 1276
    3. Insurance Contracts.................................. 1277
    4. Goodwill ................................................ 1278
IV. CRITERIA FOR ENFORCEABILITY................... 1278
  A. Type of Harm .......................................... 1278
    1. Contract Orientation or Trial Orientation? ........ 1278
    2. What Damages Are "Impracticable or
      Extremely Difficult to Fix"? .............. 1280
  B. Process By Which Stipulated Amount Is
    Determined ............................................. 1283
  C. Actual Damages......................................... 1285
  D. Other Criteria for Enforceability ............. 1286
  E. Alternative Performances........................... 1288
  F. Availability of Specific Performance ......... 1288
V. LEGISLATIVE REFORMS ............................... 1288

CONCLUSION.................................................... 1292

Copyright © 1972 by California Law Review, Inc.

# Liquidated Damages in California†

## Justin Sweet*

The extent of party autonomy[1] given contracting parties depends upon the particular transaction and, to a degree, the subject of the particular contract clause in question. This Article examines the amount of autonomy given contracting parties to "liquidate"[2] or fix the amount of damages for contract breach. Part I discusses the basic policy considerations and trends in party autonomy; part II considers the various types of contractual clauses controlling damages; part III is an overview of the California cases considering the enforceability of liquidation clauses; part IV explains what criteria are articulated by courts in these cases and what criteria are actually used; and part V suggests legislative reform of the present system.

---

† This Article was prepared to provide the California Law Revision Commission with background information for its study of various aspects of contracts. The author's opinions, conclusions, and recommendations contained herein do not necessarily represent the views of the commission.

* Professor of Law, University of California, Berkeley. B.A. 1951, LL.B. 1953, University of Wisconsin. James M. Crawford, a recent graduate of the School of Law, University of California, Berkeley, provided invaluable research assistance.

1. The term "party autonomy" is used rather than the more commonly used "freedom of contract," because I believe the former more accurately expresses the power given by the state to parties to make their own rules and determine how risks will be allocated between them. The latter, strictly speaking, expresses only that parties have the power to make contracts.

2. A liquidated damages clause is one that attempts to make certain the amount of damages recoverable. Sometimes the term "agreed damages" is used. See, e.g., MacNeil, Power of Contract and Agreed Remedies, 47 CORNELL L.Q. 495 (1962). In a sense this is more accurate than "liquidated damages," because clauses controlling damages often go beyond "liquidating" damages in the sense of specifying an amount or a mathematical formula. Yet "agreed damages" suggests two different meanings: it can mean that the parties have agreed that this amount or this formula will be used to compute damages for the breach in question or it can mean that the parties have agreed that the damages are likely to be a designated amount. If it is used in the first sense, the term "agreed damages" may be even more accurate than "liquidated damages." However, if it is used in the second sense, it overdignifies the estimation-of-damages process, for, as we shall see, agreement does not occur in many situations. Another term used is "stipulated damages," which means that the parties in a negotiated contract (or the dominant party in an adhesion contract) have specified that a certain amount is to be paid in the event a particular breach occurs. This is more accurate than the other terms, because they place too great an emphasis upon the amount as a true attempt to estimate what the damages are likely to be. However, because the term "liquidated damages" has received almost universal usage, it is used in this Article.

# I

## POLICY CONSIDERATIONS AND TRENDS IN PARTY AUTONOMY

The question of how much autonomy the law should give parties to employ clauses that control the amount of damages recoverable for contract breach is part of the general issue of party autonomy. Even in periods of maximum party autonomy, there have been some controls on contractmaking, such as the Statute of Frauds, capacity requirements, legality requirements, and usury laws. Also, the consideration doctrine limited pure contractual freedom by not enforcing gift promises and by balancing extremely unequal bargaining power through the mutuality concept. Until the 20th century, however, the general norm was party autonomy.

The most important reason for the modern trend away from autonomy is that much of 19th-century contract law was predicated upon the model of a contract between two parties of relatively equal bargaining power who negotiate and conclude a mutually acceptable agreement. Instead, the bulk of contracts today are various forms of adhesion contracts, the mass-produced, nonnegotiated contracts pioneered by the insurance, utilities, and transportation industries.[3] The consent in these adhesion contracts is a fiction. The party handed a form usually has no time to read it, would not understand it if he took the time, would not be able to find anyone with authority to change it if he wished to, and very likely would not be able to make the transaction if he insisted upon a change from the standard form.[4]

Largely because of adhesion contracts, the past 20 years have seen a proliferation of legal controls on contracts. There is more judicial intervention through the back door of interpretation[5] and, increasingly now, direct intervention through refusal to enforce contracts that courts think are unjust.[6] There is also more control of standardized contracts by state and federal regulatory agencies;[7] sec-

---

3. *See generally* Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contract,* 43 COLUM. L. REV. 629 (1943); Slawson, *Standard Form Contracts and Democratic Control of Lawmaking Power,* 84 HARV. L. REV. 529 (1971).

4. *See* La Sala v. American Sav. and Loan Ass'n, 5 Cal. 3d 864, 489 P.2d 1113, 97 Cal. Rptr. 849 (1971); English v. Ford, 17 Cal. App. 3d 1038, 1050 n.10, 95 Cal. Rptr. 501, 508 n.10 (2d Dist. 1971); Bauer v. Jackson, 15 Cal. App. 3d 358, 93 Cal. Rptr. 43 (4th Dist. 1971).

5. *See* Steven v. Fidelity & Cas. Co., 58 Cal. 2d 862, 377 P.2d 284, 27 Cal. Rptr. 172 (1962).

6. *See* Tunkl v. Regents of University of California, 60 Cal. 2d 92, 383 P.2d 441, 32 Cal. Rptr. 33 (1963); Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 236 A.2d 843 (1967); Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960).

7. *See* Davidian v. Pacific Tel. & Tel. Co., 16 Cal. App. 3d 750, 94 Cal. Rptr. 337 (2d Dist. 1971); Product Research Associates v. Pacific Tel. & Tel. Co., 16 Cal.

tion 2-302 of the Uniform Commercial Code directly invites courts to police the worst aspects of all standardized sales contracts and a proliferation of legislation controls contracts and contractmaking in particular situations.[8] This increased legal control, however, must be seen against the backdrop of a large residue of party autonomy. We have moved from the 19th century of relatively free autonomy to a mixed system in the 20th century: now some transactions are highly regulated, while others still have minimal legal control.

### A.  Reasons for Liquidated Damages Provisions

As the norm has changed from negotiated contract to adhesion contract, the reasons for employing liquidated damages clauses have changed, and accompanying this has been a change in judicial attitude toward enforcement.  First, consider the use of liquidation clauses in the model of a negotiated contract.  Both contracting parties often wish to control their risk exposure, and permitting them to do so encourages risk-taking.  The performing party[9] may also wish to avoid the feared irrationality of the judicial process in determining actual damages.  He may also be fearful that the court will give insufficient consideration to legitimate excuses for nonperformance, that the court may be unduly sympathetic to plaintiff's claim that any loss he incurred should be paid for by the party whose nonperformance caused the loss, or that the court may consider contract breach an immoral act.

There are also reasons why the nonperforming party as well may wish to use a liquidated damages clause.  Sometimes a breach will cause damage, but the amount of damages cannot be proven under damage rules.  For example, in wartime procurement contracts it may be impossible to establish the damages caused by delayed or defective performance by the contractor.  Without an enforceable clause purporting to liquidate damages, the nonperforming party may fear that the performing party will have insufficient incentive to perform if the latter realizes that damages he has caused are not sufficiently provable to be collected.  Such a clause is a penalty in that its principal func-

---

App. 3d 651, 94 Cal. Rptr. 216 (1st Dist. 1971); Bauer v. Jackson, 15 Cal. App. 3d 358, 93 Cal. Rptr. 43 (4th Dist. 1971).

8.  *See, e.g.,* CAL. CIV. CODE §§ 1801 *et seq.* (West 1970) (retail installment sales); *id.* §§ 1812.50 *et seq.* (dance studio contracts); *id.* §§ 1812.80 (health studio contracts); *id.* §§ 1725 *et seq.* (swimming pool construction); *id.* §§ 1718-19 (credit cards); CAL. ANN. BUS. & PROF. CODE §§ 22250 *et seq.* (West 1964) (television and radio repairs); *id.* § 9842 (electronic repairs).

9.  In a sense each party to a contract is a "performing party," but in this discussion "performing party" means the party whose failure to perform is the basis of invoking the liquidated damages clause.  Usually the performing party agrees to transfer ownership or possession or to render services in exchange for money, but sometimes the performing party promises to pay money, such as in a loan or lease.

tion is to coerce performance. Yet if it is reasonable—not disproportionate to actual, although unprovable, damages or to the contract price—it will be enforced.[10] Without a liquidated damages clause there is also a danger the contractor may recover the full contract price despite a breach that caused some unprovable losses. Thus while the nonperforming party may be motivated principally by the penalty aspects of the clause, he may to a lesser degree be motivated by the desire to prevent what appears to him to be unjust enrichment.

Liquidated damages clauses may also be inserted to improve upon what the parties believe to be a deficiency in the litigation process: the cost and difficulty of judicially proving damages. Through a liquidation clause the parties attempt to use contract to settle the amount of damages involved and thus improve the normal rules of damages.[11] Also, when the clause is phrased in such a way as to indicate that the breaching party will pay a specified amount if a particular breach occurs, troublesome problems involved in proving causation and foreseeability may be avoided. This was extremely helpful, for example, in wartime procurement contracts, where not only was it almost impossible to establish the amount of damages, but it was equally impossible to establish that delayed or defective performance by the contractor caused any particular loss and that the loss was reasonably foreseeable at the time the contract was made.[12] Finally, the parties may feel that if they truly agree on damages in advance, it is unlikely that either would later dispute the amount of damages recoverable as the result of his breach.

In the adhesion contract situation there are some similarities in objectives; the desire to control the irrationality and expense of the litigation process and the need to know the extent of risk exposure are still involved. There are, however, obvious additional objectives of the stronger party. He can dictate the terms of the contract; if he is the performing party, he is likely to use the contract clause to limit his exposure almost to the vanishing point, and if he is the nonperforming party, he may try to use a penalty clause to coerce performance, or he may try to use a genuine liquidation clause to make vindication of his legal rights as convenient and inexpensive as possible. In the adhesion context, then, the stronger party may try to limit his own liability and to set an agreed amount that is sufficiently high to coerce performance. In the event performance is not rendered, the clause may obtain a settlement or win the case.

---

10. *See, e.g.,* United States v. Bethlehem Steel Co., 205 U.S. 105 (1907).

11. *See* Garden State Plaza Corp. v. S.S. Kresge Co., 78 N.J. Super. 485, 189 A.2d 448 (App. Div. 1963); 1 J. WIGMORE, EVIDENCE § 7a (3d ed. 1940).

12. *See* United States v. Bethlehem Steel Co., 205 U.S. 105 (1907).

LIQUIDATED DAMAGES—STUDY                    1235

## B.   *Judicial Responses to Liquidated Damages Provisions*

Moving from the reasons why liquidated damages clauses are used by the parties, let us consider what motivates courts to uphold or reject these clauses.   Some courts undoubtedly are persuaded by the argument that the parties have paid their money and taken their chances.[13]   Since the parties have assumed certain risks, courts often see no particular reason to relieve them from the risks they have taken.[14] Treating the liquidated damages clauses as any other, such courts uphold the clauses to reward the party who has guessed best on the question of damages.   Other courts enforce these clauses because they believe that protecting the reasonable expectations of the contracting parties encourages risk-taking and assists in planning.[15]   Still other courts look at the contract as a package and enforce the liquidation clause because they feel that the party attacking the clause has re-ceived benefits under the contract.   This is especially likely when such a clause is directly related to the contract price.   For example, in one important case,[16] a gun manufacturer offered to supply guns at different prices depending upon when delivery had to be made.   The government chose the quickest delivery at the highest price.   Nonen-forcement of the delay-damage liquidation clause in this case would have disturbed the package arrangement and created unjust enrichment.

Courts also enforce these clauses because they believe liquidated damages clauses help the courts achieve just results.   Sometimes the computation of damages in litigation is no better than a guess; as long as the amount selected by the parties is within a reasonable range, the courts feel that enforcing the amount selected is likely to be as fair as any amount determined by the court.   Furthermore, courts believe that if such agreements are enforced, at least in theory the use of such clauses should expand, resulting in fewer breaches, fewer law suits, fewer or easier trials, and in many cases, at least as just a result.[17]

---

13.   *See* 5 A. CORBIN, CORBIN ON CONTRACTS § 1060 (1964) [hereinafter cited as CORBIN].

14.   *See* Southwest Eng'r Co. v. United States, 341 F.2d 998 (8th Cir. 1965); Broderick Wood Prods. Co. v. United States, 195 F.2d 433 (10th Cir. 1952); Streeter v. Rush, 25 Cal. 67 (1864).   It is interesting to note that this hard attitude is most often reflected in government procurement contract cases.   Undoubtedly, some of this is traceable to the feeling that government contractors should know what they are doing and can take care of themselves.   *See also* Bethlehem Steel Corp. v. City of Chicago, 350 F.2d 649 (7th Cir. 1965).

15.   *See* Better Foods Mkts. Inc. v. American Dist. Tel. Co., 40 Cal. 2d 179, 253 P.2d 10 (1953); Fleischer v. Cosgrove, 145 Cal. App. 2d 14, 301 P.2d 911 (1st Dist. 1956).   *See also* Bailey v. Manufacturers' Lumber Co., 224 F. 806 (S.D.N.Y. 1915).

16.   United States v. Bethlehem Steel Co., 205 U.S. 105 (1907).

17.   *Cf.* 5 CORBIN § 1057.

Finally, courts recognize that enforcement of these clauses can cure defects in the litigation process. For example, the requirements as to certainty may seem too restrictive. A court may enforce a liquidation clause to ensure that a party will get a just recovery that might otherwise be denied him because he cannot establish the loss with sufficient certainty.

Many purported liquidated damages clauses, however, are not enforced. The traditional rationale for nonenforcement is that courts will not aid in coercion, oppression,[18] or unjust enrichment;[19] courts seek only to compensate, and enforcement of penalty clauses is contrary to that purpose.[20] Thus, enforcement of a clause not based upon an estimate of proper compensation would cause an unconscionable result.[21]

Refusal to enforce these clauses may recognize the protection contracting parties need from their own unfortunate optimism and their failure to consider in advance the possibility that subsequent events may affect their performance.[22] Like the doctrines of consideration, frustration, impossibility, and mistake, not enforcing a liquidation clause reflects the idea that the performing party should not be held strictly to his promise. The refusal to enforce a liquidation clause does not preclude the plaintiff from recovering actual damages. This method of relieving a party from his contractual promise gives the judge the comfortable feeling that he is not upsetting traditional law but merely putting the plaintiff to his proof of damages. Courts have therefore employed nonenforcement as an equitable compromise and corrective device in various situations, such as where the performing party had a good, but not legally sufficient, case for reformation,[23] where a party's delay should have been excused,[24] and where the legality of the contract was doubtful.[25]

Moreover, modern courts are beginning to look at the realities of the contractmaking process. They realize that if the clause is part of an adhesion contract, some of the reasons for permitting and encouraging party autonomy do not apply. When one party is under great compulsion and has no choice, it is not likely that the amount is fair risk assumption. Party autonomy is less attractive in such a context, espe-

---

18. *See* Mente & Co. v. Fresno Compress & Whse. Co., 113 Cal. App. 325, 298 P. 126 (4th Dist. 1931) (goods transaction).

19. *See* Muldoon v. Lynch, 66 Cal. 536, 6 P. 417 (1885).

20. *See id.*

21. *See* Escondido Oil and Dev. Co. v. Glaser, 144 Cal. 494, 77 P. 1040 (1904).

22. *See* C. McCormick, Damages § 147 (1935) [hereinafter cited as McCormick].

23. Eva v. McMahon, 77 Cal. 467, 19 P. 872 (1888).

24. Muldoon v. Lynch, 66 Cal. 536, 6 P. 417 (1885).

25. Pacific Factor Co. v. Adler, 90 Cal. 110, 27 P. 36 (1891).

cially when enforcing the clause would do violence to a damages rule that the court believes to be salutary.[26]   In the famous *Henningsen v. Bloomfield Motors, Inc.* case,[27] for example, the court noted that to enforce the warranty clause would frustrate what the court had just announced as an advanced and modern principle of manufacturer's liability for defective products.

## II

### Types of Contractual Clauses Controlling Damages

#### A.   *Genuine Liquidated Damages Clauses*

A liquidated damages clause can take varying shapes.   In its simplest form, it may specify that for a particular breach the breaching party will pay a designated lump sum.   The clause may provide a formula that will determine damages by an arithmetic computation.[28]   For example, a marketing association member might agree to pay a designated sum for every unit he sells in violation of the marketing agreement,[29] a lessor who promises to make his land cultivatable might promise to pay a designated sum per acre for crops lost due to his breach,[30] or a contractor might contract to pay a designated sum for each day of unexcused delay.[31]   Similarly, delay in delivery of goods might be liquidated by multiplying the number of days of unexcused delay by a designated percentage of the selling price of the goods,[32] and if overhead is a recoverable item, a percentage of the contract or sale price might be specified as a liquidated amount.[33]

---

26.   Mente & Co. v. Fresno Compress & Whse. Co., 113 Cal. App. 325, 298 P. 126 (4th Dist. 1931).

27.   32 N.J. 358, 161 A.2d 69 (1960).

28.   A distinction must be made between a formula set forth in a contract that is part of the promised performance and a formula that is to be applied for determining damages in the event of breach.   For example, a cost-type construction contract often specifies recoverable costs.   This is not an attempt to liquidate; it is the promised performance.   Even if the clause went further and stated that the contractor could recover a designated percentage of his administrative overhead as part of an allowable cost, it would still not be a liquidated damages clause.   But suppose the contract were for a fixed price and the owner unjustifiably terminated it.   A clause specifying that in the event of breach the contractor would be able to recover a designated percentage of the construction contract or of the contractor's overall administrative overhead in computing his cost of part performance is a clause attempting to liquidate damages.

29.   *See, e.g.,* Anaheim Citrus Fruit Ass'n v. Yeoman, 51 Cal. App. 759, 197 P. 959 (2d Dist. 1921).

30.   *See, e.g.,* Seid Pak Sing v. Barker, 197 Cal. 321, 240 P. 765 (1925).

31.   *See, e.g.,* Peter Kiewit Son's Co. v. Pasadena City Junior College Dist., 59 Cal. 2d 241, 379 P.2d 18, 28 Cal. Rptr. 714 (1963).

32.   *See, e.g.,* Broderick Wood Prods. Co. v. United States, 195 F.2d 433 (10th Cir. 1952).

33.   *See, e.g.,* Challenge-Cook Bros. Inc. v. Lantz, 256 Cal. App. 2d 536, 64

Other liquidated damages clauses are attempts to refine the applicable legal standards for measuring damages. For example, suppose a contract specifies that, if the performing artists do not perform a concert as promised, they will pay all the expenses incurred by the promoter in advertising the concert. If the promoters sought recovery of their expenses in part performance, they could recover the advertising expenses rendered valueless by the breach. To do this they must show the expenditures were foreseeable by the defaulting performers at the time the contract was made and that the amount of expenditures was reasonable.[34] The clause specifying that these amounts would be recoverable would materially assist the promoters, because it would get them by the foreseeability question and might very well foreclose any showing that the expenditures were not reasonable.

A distinction is frequently made between underliquidation and overliquidation clauses: underliquidation occurs when actual damages are substantially greater than the liquidated amount,[35] while overliquidation occurs when actual damages are substantially less than the liquidated damages. On the whole, courts are less reluctant to enforce underliquidation clauses than overliquidation clauses. Awarding liquidated damages that a court believes to be substantially in excess of actual damages violates the compensation principle, but permitting underliquidation is similar to other legal doctrines that relieve performing parties, such as impossibility, frustration, mistake, and foreseeability. Such relief should encourage contractmaking by protecting enterprises from inordinate risk exposure. Enforcement of underliquidation is less desirable in the personal injury area because it may disturb the rational allocation of loss distribution provided by tort law. Also, in the consumer area underliquidation can frustrate reasonable expectations and give too much power to the dominant contracting party.[36]

## B. Agreed Valuations

It is common to set agreed valuations for corporate acquisitions or buy-out provisions in partnership agreements. Like a formula for determining costs, such a provision for an agreed valuation should not be subject to requirements specified for liquidated damages. Suppose, however, a landlord and tenant agree on valuations for certain items of

Cal. Rptr. 239 (1st Dist. 1967). *But see* Rice v. Schmid, 18 Cal. 2d 382, 115 P.2d 498 (1941).

34. Recovery of expenditures made in part performance would be subject to the performing party's being able to prove the losses would have resulted even if the concert had taken place. *See generally* RESTATEMENT OF CONTRACTS § 333(d) (1932).

35. *See generally* Fritz, *Underliquidated Damages as Limitation of Liability,* 33 TEXAS L. REV. 196 (1954).

36. *See, e.g.,* Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960).

personal property in the lease of an expensive house, so the damages will be fixed in the event these items are not returned to the landlord upon termination of the lease. While such an agreed valuation might be an alternative performance—the tenant can either return the designated personal property or pay the agreed valuation—in most cases agreed valuations of this type are an attempt to control damages if the designated items are not returned. Therefore, they should be considered as liquidated damages clauses.

## C.  Penalty

A penalty is a clause designed to coerce performance rather than to estimate damages. Its enforcement would be punitive in nature and would violate the compensation principle. This principle seeks to give the plaintiff what the defendant's breach has cost him and not put the plaintiff in a better position than he would have been in had there been proper performance. Therefore, penalties in the contract context are not supposed to be enforced.

However, nonenforcement of a penalty has caused some confusion. Even if a clause is a penalty and will not be enforced as such, it can have some operative effect. For example, a penal bond generally limits the liability of the person making the promise. Suppose a surety gives a bond for $10,000, and it is determined that the amount is a penalty. If actual damages exceed $10,000 the surety's obligation is limited to the designated amount.[37] Or, suppose a party promising performance puts up a deposit. If the amount is a penalty, the person retaining the security must return any amount in excess of actual damages. But, the transfer of the deposit is valid in that a garnishing creditor of the depositor would not be entitled to it until its function no longer exists, and then only to the extent the deposit exceeds actual damages.[38]

## D.  Limitation of Liability

Increasingly, performing parties desire to limit the scope of their risk. There are numerous ways to seek to accomplish this. They may give themselves contractual protection by providing clauses that relieve them if certain events occur, by excluding warranties, by specify-

---

37. *See* Los Angeles O.G. Ass'n v. Pacific Sur. Co., 24 Cal. App. 95, 140 P. 295 (2d Dist. 1914); 5 CORBIN § 1056.

38. While there are no cases precisely on this point, in County of Los Angeles v. Margulis, 6 Cal. App. 2d 57, 44 P.2d 608 (2d Dist. 1935), and Weinreich Estate Co. v. A.J. Johnston Co., 28 Cal. App. 144, 151 P. 667 (3d Dist. 1915), the defendants seemed to assert that the bonds were not valid because they were penalties. The bonds were held operative as security deposits even though not valid liquidation clauses.

ing that indirect, remote, or consequential damages will not be recoverable, or by including a clause that attempts to exculpate the performing party from responsibility.

A device closely akin to exculpation is a clause limiting liability to a specified, often minimal, amount.[39] The plaintiff must still prove his actual damage, but the designated sum operates as a ceiling on the performing party's accountability. The important distinction between a liability limitation and liquidation of damages is that, in the former case, there is no attempt to estimate damages while there is, at least in theory, in the latter case. Also, the presence of a limitation-of-liability clause does not relieve the nonperforming party from establishing actual damages. However, courts that may be hesitant to enforce liability limitations because of what they conceive to be public policy sometimes classify such clauses as liquidation of damages.[40] For the same reason, drafters sometimes choose the liquidated damages label when they are fearful of liability-limitation enforcement.[41]

### E. Security Deposits

Security deposits are amounts paid in advance by a performing party to secure the other party in the event of nonperformance by supplying a fund out of which the nonbreaching party can satisfy his actual damages. They are commonly used in purchases of real property, leases, and competitive bids. While some states permit retention of a deposit where courts would not enforce a promise to pay,[42] in California courts generally treat actions to recover liquidated damages and actions to recover deposits in the same manner.[43]

A deposit can, however, serve several functions. Obviously, if it is paid in advance, it can provide security. Furthermore, the amount designated may be an attempt to agree on damages in advance, but

---

39. *See, e.g.,* Nester v. Western Union Tel. Co., 309 U.S. 582 (1940); Better Foods Mkts., Inc. v. American Dist. Tel. Co., 40 Cal. 2d 179, 253 P.2d 10 (1953); Bauer v. Jackson, 15 Cal. App. 3d 358, 93 Cal. Rptr. 43 (4th Dist. 1971).

40. *See* Better Foods Mkts., Inc. v. American Dist. Tel. Co., 40 Cal. 2d 179, 253 P.2d 10 (1953).

41. *See id.*

42. *See* Beatty v. Flannery, 49 So. 2d 81 (Fla. 1950), *criticized in* Note, *Liquidated-Damages Clauses in Real Estate Contracts,* 4 U. FLA. L. REV. 229 (1951). But in Hutchison v. Tompkins, 240 So. 2d 180 (Fla. App. 1970), a defaulting buyer was given a defense when he persuaded the escrow agent to return the deposit to him, the court distinguishing *Beatty* as a deposit made to the seller directly. In view of the frequent use of escrow agents, it is likely that the next case in which a deposit is made to the *seller* will overrule *Beatty*.

43. *See, e.g.,* Freedman v. Rector, 37 Cal. 2d 16, 230 P.2d 629 (1951). McCORMICK § 153 states that the making of the deposit usually is an indication that the amount is not disproportionate. Buyers are likely to think twice before putting up hard cash. For this reason, and because the law hesitates to interfere with possession, deposits are less likely to be recoverable than are promises to pay to be enforced.

because the security deposit commonly can apply to a variety of types of breaches, it is difficult to classify it as genuine liquidated damages.

### F.   Alternative Performances

Sometimes a performing party can discharge his obligation to perform in several ways.   For example, a farmer who purchases 160 acres of land may promise either to cultivate the acreage and pay the seller a percentage of the money he receives from the sale of crops, or if he does not cultivate the acreage, to convey a designated piece of land to the seller.   These may be alternative performances.   If so, the farmer can either cultivate the 160 acres or convey the designated land. Alternative performances can also be a promise to perform or pay a designated sum of money, as when the seller of a small business promises that he will either not compete for a period of time or he will pay the buyer of his business a percentage of any profits he makes if he does compete.

Like most alternative performances, both these situations are ambiguous; they could be alternative performances or they could be devices for avoiding limitations on penalty clauses.   Even more difficult problems of classification can arise.   For example, suppose the buyer of a large machine wishes delivery on January 1 and is willing to pay $1,000,000 for delivery on that date.   The contract specifies that the delivery date will be February 1 and the contract price $900,000, but if the seller delivers the machine by January 1, he will obtain a bonus of $100,000.   If these are found to be genuine alternative performances, the seller can perform by delivery on either January 1 or February 1, and the time of delivery determines the amount he is to receive for the machine.   If, however, the antecedent negotiations demonstrate that the final form of the contract is an attempt to hide a $100,000 penalty for a 30-day delay, a court is likely to hold this a penalty and that the seller is entitled to $1,000,000 less actual damages if he delivers February 1.   Because of its ambiguity, the alternative performances device has been a method frequently used by courts to enforce clauses that they believed they could not enforce as liquidation of damages provisions.

### III

### THE CALIFORNIA CASES

California liquidated damages law is controlled by two sections of the Civil Code.   Section 1670[44] provides:

> Every contract by which the amount of damage to be paid, or other compensation to be made, for a breach of an obligation, is

---

44.   CAL. CIV. CODE § 1670 (West 1970).

determined in anticipation thereof, is to that extent void, except as expressly provided in the next section.

The next section[45] provides:

> The parties to a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage.

While they are phrased in general terms, their application has in fact varied significantly depending on the type of contract involved. Because of this, an analysis of the courts' activities can best be accomplished by separately considering the various specific types of contracts that have employed liquidation clauses.

## A. Land Transactions

For 20 years there has been a constant struggle between the courts and sellers of land relating to the right of a seller to retain deposits made by a buyer if the buyer defaults. Damage liquidation has been one theory sellers have frequently used in their constantly shifting attempts to employ contract language that will make it possible to retain deposits without the necessity of proving actual damages. The struggle has already been well chronicled,[46] but a brief summary is necessary for understanding the role damage liquidation has played in the land contract deposit cases.

Ordinarily the purchase of land is a two-step transaction. The first is the contract to purchase; in California this contract is usually expressed in a document called the "Deposit Receipt" and is accompanied by a cash deposit. The second is the exchange of the balance of the purchase price for the deed.

Suppose the exchange is not made because of default by the buyer. He has committed a breach unless he has conditioned his obligation upon the occurrence of events that did not occur and are not excused. Despite his breach, however, sometimes the buyer will subsequently seek to revive his contract rights. Whether he can do so depends upon the language of the contract to purchase and various doctrines derived from long-term purchase transactions that may relieve him from forfeiture.[47] Alternatively, the buyer may seek to recover

---

45. Cal. Civ. Code § 1671 (West 1970).

46. Alexander, *Liquidated Damages Again—A New Synthesis*, 41 L.A.B. Bull. 419 (1966); Hetland, *The California Land Contract*, 48 Calif. L. Rev. 729 (1960); Smith, *Contractual Controls of Damages in Commercial Transactions*, 12 Hastings L.J. 122 (1960); Comment, 35 S. Cal. L. Rev. 301 (1962).

47. *See* Cal. Civ. Code §§ 1492, 3275 (West 1970). *See also* MacFadden v. Walker, 5 Cal. 3d 809, 488 P.2d 1353, 97 Cal. Rptr. 537 (1971).

his deposit. It is here that damage liquidation has been important; sellers have used contract-specified remedies to justify retention of the downpayment without having to show the actual damages that resulted from the breach.

To understand the cases it is important to review briefly the various remedies the seller has when the buyer defaults. First, he has a right to specific performance, but since the buyer's default usually relates to inability to obtain financing, this remedy is not often practical. Another course open to the seller is to sue for damages. The damages he will seek are of two types: general and special. General damages are those that are usual and flow directly from the breach, while special damages are those that may have been caused by the breach but are not usual or foreseeable. Generally, damages are governed by section 3307,[48] which establishes the measure of recovery for direct damages as the difference between contract and market price at the time of breach.[49] However, section 3307 does not set the exclusive remedy, and a number of recent cases have allowed the seller also to recover special damages.[50]

The seller, however, would like to retain the deposit without the costliness and difficulty of showing damages, even if both general and special damages are recoverable. Sellers have therefore sought to establish damages contractually. Judicial treatment of these attempts has varied. An early case permitted the defaulting purchaser to recover his deposit to the extent it exceeded actual damages,[51] but *Glock v. Howard*,[52] decided in 1898, held that the defaulting purchaser could not recover his deposit, and this case became the established law. Then, between 1949 and 1951 the supreme court, applying section 3275,[53] granted relief from forfeiture to nonwillfully defaulting buyers.[54]

---

48. CAL. CIV. CODE § 3307 (West 1970).

49. *See* Royer v. Carter, 37 Cal. 2d 544, 233 P.2d 539 (1951).

50. *See id.*; Jensen v. Dalton, 9 Cal. App. 3d 654, 88 Cal. Rptr. 426 (1st Dist. 1970) (cost of additional resale commission, added taxes and assessments, commuting expenses for second home, all recoverable); Sutter v. Madrin, 269 Cal. App. 2d 161, 74 Cal. Rptr. 627 (2d Dist. 1969) (vendor allowed an interim expense to offset vendee's claim for restitution). *But see* Allen v. Enomoto, 228 Cal. App. 2d 798, 39 Cal. Rptr. 815 (1st Dist. 1964) (allowing only expenses incurred in accepting home as payment, refinancing expenses, and title insurance premiums).

51. Drew v. Pedlar, 87 Cal. 443, 25 P. 749 (1891).

52. 123 Cal. 1, 55 P. 713 (1898).

53. CAL. CIV. CODE § 3275 (West 1970):
Whenever by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty.

54. Baffa v. Johnson, 35 Cal. 2d 36, 216 P.2d 13 (1950); Barkis v. Scott, 34 Cal. 2d 116, 208 P.2d 367 (1949).

In 1951 the supreme court extended this protection to a willfully defaulting buyer in *Freedman v. Rector*.[55]  There the buyer was permitted to recover his $2,000 deposit because he established that shortly after breach the seller had sold the property for $2,000 more than the contract price.  Since the default was willful and section 3275 thus unavailable, the court relied upon principles of unjust enrichment.  To enforce the contract clause permitting the seller to retain the downpayment in these circumstances, the court argued, would violate the statutory prohibition against awarding punitive damages for breach of contract.[56]

Thus, the court appeared to reverse the *Glock* rule and put California in the camp of those progressive states that permit defaulting plaintiffs under any type of contract to recover the net benefit they have conferred on the other party.[57]  The court then went on to discuss briefly the applicability of California's liquidation legislation, sections 1670 and 1671.  It first said that forfeiture clauses in land sales are "presumptively valid" if the downpayment is reasonable in amount.[58]  The court then held that actual damages in this case were not impracticable or difficult to fix, apparently because the subsequent sale was considered to have established the extent of actual damages.

The *Freedman* case caused many attorneys to fear that the liquidation of damages approach was unavailable as a device to justify retention of downpayments in California land transactions.  Evidently, the belief was that section 3307 gave a remedy that was sufficient and thus precluded the use of section 1671.  The bar therefore attempted to justify retention of the deposits through fictional recitals of various types, such as declarations that the deposits were "earned consideration" or "separate consideration for entering into the contract."  These, however, were unsuccessful.  The separate-consideration recital failed in *Rodriguez v. Barnett*,[59] a case where the buyer was excused because an event that conditioned his obligation to perform did not occur.  The recital was held insufficient to avoid the unjust enrichment concept, so the buyer recovered his payment despite a clause permitting the seller to retain it.  The recital of consideration for entering into the contract proved unsuccessful a few years later in *Caplan v. Schroeder*.[60]  The *Caplan* case, however, was not a total loss for

---

55. 37 Cal. 2d 16, 230 P.2d 629 (1951).
56. *Id.* at 21, 230 P.2d at 632.
57. *See* 5A CORBIN § 1129.
58. 37 Cal. 2d at 23, 230 P.2d at 633.
59. 52 Cal. 2d 154, 338 P.2d 907 (1959).
60. 56 Cal. 2d 515, 364 P.2d 321, 15 Cal. Rptr. 145 (1961).

sellers, because in *Caplan* the court seemingly invited sellers to use section 1671 as a means of retaining the deposit through a suggestion that the seller would have been permitted to retain the deposit in *Caplan* had he relied upon section 1671 rather than the consideration-for-entering-the-contract fiction.

The supreme court's "invitation" and the option approach have resulted in confused and conflicting lower court decisions. In *Greenbach Brothers, Inc. v. Burns*,[61] a seller had to return the deposit despite a clause that seemed to comply with section 1671. While the court of appeal seemed doubtful that damages were difficult to ascertain, it relied on other grounds:

> We see nothing in the record before us to indicate that the parties here made any effort to estimate the actual damages that might be suffered by appellant in the event of respondent's breach. . . . On this state of the record the trial judge could reasonably conclude that the amount of each deposit was arbitrarily arrived at and was not intended to represent damages. . . .[62]

Because the court felt a reasonable attempt to estimate damages is essential to comply with section 1671, the court held for the buyer.

The difficulty with this case is that, as noted by Professor Hetland,[63] the seller, probably out of an abundance of caution to protect his right to the deposit, gave up his right to specific performance. This, says Professor Hetland, shows that an option was actually created and, if there is an ineffective attempt to liquidate damages, the *Freedman* concept applies. This was recognized by the court in *Welk v. Fainbarg*.[64] There was some confusion in that case because one document referred to the $20,000 paid by the buyer as having been paid for an option, while another document referred to it as an advance payment of liquidation damages. Consequently, the court had to resolve whether an option or a bilateral contract was created from the negotiations. The court looked to whether the seller could obtain specific performance from the buyer and, concluding that he could not, held it was an option. Thus, the seller could retain the $20,000. Had this rationale been applied in *Greenbach*, the seller there would also have been able to retain the deposit.

This type of confusion is avoided in most states through the "earnest money" concept, a simple, direct approach that accomplishes the

61. 245 Cal. App. 2d 767, 54 Cal. Rptr. 143 (1st Dist. 1966).
62. *Id.* at 772, 54 Cal. Rptr. at 147.
63. J. HETLAND, CALIFORNIA REAL ESTATE SECURED TRANSACTIONS § 3.50 (1970).
64. 255 Cal. App. 2d 269, 63 Cal. Rptr. 127 (4th Dist. 1967).

necessary purpose. The down payment given at the time the contract to purchase land is made is deemed "earnest money" paid to show that the buyer is "in earnest," that he is serious about the transaction. The payment also shows that the prospective buyer at least has the ability to put up some money, indicating that he is likely to obtain the rest of the money and complete the transaction. Normally, a reasonable earnest money payment is retained by the seller if the buyer defaults.[65]

This approach unfortunately seems precluded in California by the *Freedman* and *Caplan* cases, and no adequate substitute has been found. Recitals that the deposit is earned consideration or separate consideration for entering into the transaction were held insufficient to justify retention in *Rodriguez* and *Caplan*.[66] If an option were really created, it is likely that the seller could retain the deposit were the buyer not to exercise the option. But the parties and courts typically think a bilateral contract is created, not an option.[67]

The validity of the use of a deposit as liquidated damages is less certain. The *Caplan* opinion seems to invite this approach and the most recently drafted standard deposit receipt form uses it.[68] The principal difficulty in enforcing the clause as a true liquidation lies in the failure to comply with the test of *McCarthy v. Tally*;[69] it is not likely that the amount deposited is determined as a reasonable estimation of potential damage. Rather, it is usually a flat amount or a percentage of the contract price. An illustration of this can be seen in the case of *Major-Blakeney Corp. v. Jenkins*.[70] In this case there were two transactions between the same buyer and seller, one for a contract price of $6,700 and one for a contract price of $56,275. The deposit in the smaller contract was for $1,500 and in the larger contract, $1,000, almost certain proof that these amounts were not selected as estimations of the damage that would result if the buyer breached. Furthermore, even if there were a genuine estimation of damages, the difficulty-of-ascertainment test, which usually precludes liquidation where the amount of damages is not difficult to establish,[71] might preclude enforcement of the liquidation clause.

---

65. *See* RESTATEMENT OF CONTRACTS § 357(2) (1932).

66. *But see* Folden v. Lobrovich, 171 Cal. App. 2d 627, 341 P.2d 368 (1st Dist. 1959) (a pre-*Caplan* case).

67. *See* Hetland, *supra* note 46, at 743.

68. *See* Real Estate Purchase and Receipt for Deposit, 42 CAL. ST. B.J. 487, 493 (1967).

69. 46 Cal. 2d 577, 297 P.2d 981 (1956). See text accompanying note 252 *infra*.

70. 121 Cal. App. 2d 325, 263 P.2d 655 (2d Dist. 1953).

71. See text accompanying notes 229-51 *infra*.

One way that some have suggested of avoiding these difficulties is to include recitals of potential special damages.[72]   One can visualize attorneys creating artful declarations of lost opportunities to sell at a higher price between time of contract and breach, unusual profits, incurring expense of maintaining two houses when the seller has relied and purchased another house, immense brokerage commissions, and so forth.   While a number of recent cases have broadened the scope of recovering special damages,[73] it is unlikely that courts will exalt form over substance and hold that these recitals of potential special damages make a retention clause valid.

What is needed is a new approach that would respect sellers' and buyers' intentions on this question in the absence of extreme inequality of bargaining power or an unreasonable stipulated amount.   The parties ought to know where they stand at the time the contract is made and not be left to the uncertainty of the law in this area.   Generally, sellers expect to retain the downpayment without any need to show actual damages; buyers think that their exposure is limited to the amount of the deposit.   There have been a number of cases where the expectation of the buyer as well as that of the seller has been frustrated.[74]   As long as the amount seems reasonable to the court and the parties knew what they were doing, there is no reason to interfere with their autonomy.   In short, what is needed is a simple formula[75] that will enable the seller to keep the deposit or some designated lesser amount without regard to actual damages.   This could most simply be accomplished if California returned to the earnest money concept.   That approach would provide a proper solution for cases involving either a defaulting buyer or a buyer who agrees to forfeit his deposit even if events occur that could terminate his obligation to purchase.

## B.   Leases of Real and Personal Property

Leases have played an important part in the California law relating to liquidated damages; until the advent of the land contract cases, they composed the bulk of California liquidation of damages decisions.  Most concerned the right of a landlord to retain advance deposits upon a tenant breach, without regard to actual damages.   The issues in these cases are similar to those discussed in the land cases, but, at least prior

---

72.   *E.g.*, Alexander, *supra* note 46, at 420-21.
73.   See note 50 *supra*.
74.   *E.g.*, Royer v. Carter, 37 Cal. 2d 544, 233 P.2d 539 (1951); Fleischer v. Cosgrove, 145 Cal. App. 2d 14, 301 P.2d 911 (1st Dist. 1956).
75.   For a method of avoiding the uncertainty of what is reasonable, see note 293 *infra*.

to the 1970 legislation, the issues were resolved quite differently from the land deposit cases.

While most lease cases did not involve true liquidations, they are instructive for a number of reasons: First, they reflect the continued tension between the concepts of party autonomy and unjust enrichment. Also, they demonstrate the intense preoccupation of lawyers and judges with lease language as a means of establishing and determining the validity of liquidation clauses; this contrasts with the modern tendency to look through the language of the contract to determine the clause's validity in terms of its function. Finally, the lease cases demonstrate how half-truths have permeated this area of law; instead of looking at the different types of contract breaches incident to a lease, there has been an unfortunate tendency to take the typical lease cases, which involve attempts to retain deposits, and postulate a general rule that liquidation of damages is not permitted in lease transactions.

Even though the results of many of the cases involving advance payments have become irrelevant due to the legislation in 1970,[76] the principal issues that arose prior to this legislation generally remain. A number of cases established the basic rule that a landlord could retain an advance payment if it was found to be prepayment of rent, or a bonus or consideration for execution of the lease.[77] Often, in determining this issue, courts refused to look beyond the language of the lease.[78]

Some courts, however, have been more helpful to lessees. For example, in *Friedman v. Isenbruck*[79] the court, although recognizing the "harsh but well settled"[80] rule permitting the landlord to retain ad-

---

76. Ch. 89, §§ 1-14, [1970] Cal. Stat. 104-07; ch. 1317, § 1, [1970] Cal. Stat. 2452.

77. *See* Warming v. Shapiro, 118 Cal. App. 2d 72, 257 P.2d 74 (1st Dist. 1953) (bonus); Ace Realty Co. v. Friedman, 106 Cal. App. 2d 805, 236 P.2d 174 (2d Dist. 1951) (prepaid rent); Kuhlemeier v. Lack, 50 Cal. App. 2d 802, 123 P.2d 918 (2d Dist. 1942) (payment for an option to terminate); Parigian v. Citizen's Nat'l Trust & Sav. Bank, 42 Cal. App. 2d 773, 110 P.2d 117 (2d Dist. 1941) (bonus); A-1 Garage v. Lange Inv. Co., 6 Cal. App. 2d 593, 44 P.2d 681 (1st Dist.), *cert. denied,* 296 U.S. 642 (1935) (bonus); Weinreich v. Vernon, 109 Cal. App. 60, 292 P. 651 (2d Dist. 1930) (prepaid rent); Wood v. Hipwill, 107 Cal. App. 680, 290 P. 1040 (4th Dist. 1930) (bonus upheld despite possibility of refund); McArthur v. Kluck, 75 Cal. App. 785, 243 P. 453 (1st Dist. 1925) (prepaid rent); Anderson v. Julius Levin Co., 71 Cal. App. 73, 234 P. 442 (1st Dist. 1925) (consideration for execution of lease) (dictum); Curtis v. Arnold, 43 Cal. App. 97, 184 P. 510 (1st Dist. 1919) (consideration for prepaid rent); Ramish v. Workman, 33 Cal. App. 19, 164 P. 26 (2d Dist. 1917) (bonus).

78. A-1 Garage v. Lange Inv. Co., 6 Cal. App. 2d 593, 44 P.2d 681 (1st Dist.), *cert. denied,* 296 U.S. 642 (1935); Weinreich v. Vernon, 109 Cal. App. 60, 292 P. 651 (2d Dist. 1930); Ramish v. Workman, 33 Cal. App. 19, 164 P. 26 (2d Dist. 1917).

79. 111 Cal. App. 2d 326, 244 P.2d 718 (1st Dist. 1952).

80. *Id.* at 335, 244 P.2d at 723.

vance rental payments and bonuses for executing the lease, held that the prepayment provision did not preclude a partial rent refund where the premises became unusable, because under certain conditions, the rental was refundable. Other courts for various reasons have held the payments to be security deposits based upon contract provisions that might compel the landlord to return part of the deposit to the tenant.[81]  And in *Thompson v. Swiryn*[82] the court held for the tenant despite bonus language because another provision of the lease gave the landlord the option of not rebuilding in the event of destruction; that, according to the court, permitted parol evidence to be admitted to aid in interpreting the intended meaning of the bonus language.

Other courts helped lessees by blurring the distinction between prepaid rent and bonus for entering into the lease. If the landlord evicts the tenant, he should not be able to keep a deposit for prepayment of rent; if, however, it is a bonus, the lease has been executed, and the tenant should have no right to recover the amount even if the landlord unjustifiably evicts him. This distinction was simply ignored in *Graham v. Wood*,[83] a case involving a tenant's attempt to recover a deposit when the landlord defaulted. Disregarding the lease language, "inducement . . . to enter into" the sublease, the court held the advance payment was a security deposit. Furthermore, the court went on to state, even were it a bonus the tenant would be entitled to recover because of the landlord's breach.

These holdings could not be avoided through damage liquidation clauses, because they are not valid as such and advance payments would then become security deposits. This was established in *Jack v. Sinsheimer*,[84] which involved a commercial lease with a provision that, if the tenant defaulted, he would pay $1,000 as liquidated damages.

---

81.  *See* Bacciocco v. Curtis, 12 Cal. 2d 109, 82 P.2d 385 (1938) (amount to be applied to end of term, interest credited to tenant and refundable if premises destroyed); Dicker v. West, 164 Cal. App. 2d 55, 330 P.2d 106 (3d Dist. 1958) (destruction by fire); Friedman v. Isenbruck, 111 Cal. App. 2d 326, 244 P.2d 718 (1st Dist. 1952); Walter H. Sullivan, Inc. v. Johnson, 116 Cal. App. 591, 3 P.2d 72 (1st Dist. 1931) (interest payable and amount applied to end of term); Rez v. Summers, 34 Cal. App. 527, 168 P. 156 (2d Dist. 1917) (returnable if premises destroyed).

82.  95 Cal. App. 2d 619, 213 P.2d 740 (4th Dist. 1950).

83.  8 Cal. App. 2d 451, 48 P.2d 124 (1st Dist. 1935). Butt v. Bertola, 110 Cal. App. 2d 128, 242 P.2d 32 (1st Dist. 1952), involved a clause that specified the advance payment was consideration for executing the lease. The landlord evicted the tenant and the court of appeals held the tenant could recover the deposit. The trial court had held for the landlord but the appellate court felt that clauses permitting the landlord to keep the deposit when he evicted the tenant were utterly repugnant. *Id.* at 136, 242 P.2d at 38. Yet, if the amount is truly a bonus for making the lease, it should *not* be refundable even if there is an eviction. The case shows the confusion created by fictitious labels.

84.  125 Cal. 563, 58 P. 130 (1899).

The court held the provision void as a penalty.[85] In addition to the difficulty-of-ascertainment barrier, this was consistent with the well-accepted principle that because a liquidation provision accompanied by an advance payment typically applies to many breaches of differing gravity, it cannot be a reasonable endeavor to estimate damage.[86]

The recent enactment of chapters 89 and 1317 by the 1970 California Legislature was to reform several aspects of landlord-tenant case law that had proved undesirable.[87] For purposes of this Article, the sections dealing with advance payment and liquidation of damages are most important.[88]

Civil Code section 1951.7(a) combines prepayments of rent, security deposits,[89] and the "substantial equivalent of either"—hopefully including fictional bonuses and consideration for entering into the lease—and calls them "advance payments." The balance of the section provides that a notice of reletting must be sent to the tenant upon his request if advance payments are made and the lease is terminated by default of the tenant. The mechanism for notice is tied with section 1951.4(c), which specifies the duty to relet and the amount of benefit-of-bargain damages.

The unjust enrichment problem is treated in section 1951. Subsection (a) states:

> Any payment or deposit of money the primary function of which is to secure the performance of a rental agreement or any part of such agreement, other than a payment or deposit, including an advance payment of rent, made to secure the execution of a rental agreement, shall be governed by the provisions of this section.

Hopefully, the phrase "primary function" will avoid the fictional recitals of prepayment of rent or bonus for making the lease that have obscured the real function of the deposit. The exception for payments made to "secure the execution of a rental agreement" should not include a bonus to make the lease, but should be limited to a security deposit given to secure the execution of a lease at the time a *contract* to lease is made. Nor should it include an advance payment called a security to

---

85. *See also* Redmon v. Graham, 211 Cal. 491, 295 P. 1031 (1931) (labelled as liquidated damage but returnable if no breach or destruction); Green v. Frahm, 176 Cal. 259, 168 P. 114 (1917).

86. *See* Webster v. Garrette, 10 Cal. App. 2d 610, 52 P.2d 550 (3d Dist. 1935).

87. Ch. 89, §§ 1-14, [1970] Cal. Stat. 104-07; ch. 1317, § 1, [1970] Cal. Stat. 2452. *See generally* Harvey, *A Study to Determine Whether the Rights and Duties Attendant upon the Termination of a Lease Should Be Revised*, 54 CALIF. L. REV. 1141 (1966).

88. It is, however, also noteworthy that the enactment of Civil Code section 1951.2 provided a better benefit-of-the-bargain damage remedy for the landlord when the tenant defaults in the payment of rent.

89. *See generally* Note, *The Rental Security Deposit in California*, 22 HAST. L.J. 1373 (1971) (dealing with security deposits in leases).

enter into the lease if the amount is to be applied to the rent or is refundable for any other reason.

Subsection (d)(2) of section 1951 provides that the landlord will return any excess of the deposit over actual damages set forth in subsection (c). The legislature attempted to reverse cases that permitted the landlord to retain advance payments under the labels of prepaid rent or bonus for entering into the lease; in effect, the *Freedman* concept was legislatively adopted.

The 1970 legislation also enacted section 1951.5, which states that sections 1670 and 1671, relating to liquidated damages, apply to the lease of real property. Evidently, this is designed to permit liquidation in leases where it would otherwise be proper under section 1671. Because liquidation has not worked where the breach relates to a nonpayment of rent,[90] this section will only apply to other types of breaches courts have held may be liquidatable. Illustrations of liquidatable breaches include breach of convenants to return or vacate the rented property in cases where actual damages are difficult to estimate[91] and breach of any covenant—including nonpayment of rent—in a lease that involves goodwill of a business.[92]

It may also be possible that the parties to a lease can contractually provide for benefit-of-the-bargain damages. While there have been

---

90. The principal difficulty in the rent liquidation is the availability of interest as an easily administrable measure of recovery. In fact, in Knight v. Marks, 183 Cal. 354, 191 P. 531 (1920), the court stated that Civil Code section 3302 sets interest as the exclusive measure of recovery for the failure to pay money. *But see* Reichert v. General Ins. Co. of America, 68 Cal. 2d 822, 442 P.2d 377, 69 Cal. Rptr. 321 (1968). In an earlier opinion, subsequently withdrawn, the supreme court had concluded that section 3302 did not set the exclusive measure of recovery. Reichert v. General Ins. Co. of America, 428 P.2d 860, 59 Cal. Rptr. 724 (Cal. 1967). On rehearing, the *Reichert* court held the proper party to bring the law suit was not the insured but the trustee in bankruptcy. As a result, the court did not squarely face the exclusivity of section 3302 problems. *See also* 68 Cal. 2d at 839, 442 P.2d at 386, 69 Cal. Rptr. at 330 (1968) (Peters, J., dissenting).

Because acceleration clauses bear no relationship to the amount of damages, they also have been refused enforcement in California on the ground that they are not genuine attempts to liquidate damages. *See* Ricker v. Rombough, 120 Cal. App. 2d Supp. 912, 261 P.2d 328 (Super. Ct., App. Dep't 1953); Electrical Prods. Corp. v. Williams, 117 Cal. App. 2d Supp. 813, 256 P.2d 403 (Super. Ct., App. Dep't 1953). *But see* La Sala v. American Sav. & Loan Ass'n, 5 Cal. 3d 864, 489 P.2d 1113, 97 Cal. Rptr. 849 (1971) (loan acceleration upon encumbrance).

91. *Compare* Wilmington Trans. Co. v. O'Neil, 98 Cal. 1, 32 P. 705 (1893) *and* Fox Chicago Realty Corp. v. Zukor's Dresses, Inc., 50 Cal. App. 2d 129, 122 P.2d 705 (2d Dist. 1942) *with* Vucinich v. Gordon, 51 Cal. App. 2d 434, 124 P.2d 868 (2d Dist. 1942). *But see* Shady v. Mercantile Arcade Realty Co., 206 Cal. 363, 274 P. 340 (1929). *See also* Eva v. McMahon, 77 Cal. 467, 19 P. 872 (1888) (clause liquidating damages for lessor's failure to deliver premises not enforced because the amount was unreasonable).

92. McCarthy v. Tally, 46 Cal. 2d 577, 297 P.2d 981 (1956).

no cases involving this issue, there is no reason why a landlord and tenant could not contractually establish this measure of damages. And, there may be good reason to do so. Suppose there is a commercial lease for 99 years, and the tenant abandons at the end of five. Under section 1951, the landlord will be entitled to benefit-of-the-bargain damages for the remaining 94 years, but on at least one occasion a court granted damages for only a few years, arguing that the damages in the other years were too speculative.[93]  This could be avoided if the parties agree in advance on some amount—for example, that the difference between contract and market price will be 5 percent for the balance of the lease. In such a case, at both the time of the breach and of the trial, certainty would be a formidable obstacle. Therefore, liquidation should be permitted if the amount has a rational basis.

### C.   Goods Transactions

The general rule is that liquidation clauses are not enforceable in goods-transaction contracts. This rule is usually true whether it is the buyer's or seller's breach that is the subject of the clause. However, in order to discuss the application of the rule to specific situations, it is useful to consider buyer-breach cases separately from seller-breach cases.

### 1.   Seller-Breach Cases

The leading California case on seller breaches, and the source of the general rule of nonenforceability of liquidation clauses in goods contracts, is *Stark v. Shemada*,[94] decided in 1922. The contract—for the sale of used furniture and furnishings of a hotel that the buyer intended to sell at a public auction—specified a price of $1,700 and liquidated damages of $500 if the seller did not deliver any of the goods. The buyer tried to show compliance with section 1671 by alleging that, because he intended to sell the goods at a public sale, there was no way of determining at the time the contract was made what profit he would receive. The court rejected this position:

> [T]his second-hand furniture . . . was an ordinary commodity of personal property to be bought and sold on the open market. It is a matter of common knowledge that second-hand household and hotel furnishings are a commodity of extensive barter and sale, with a market value, according to its condition and quality, readily ascertainable.[95]

The court then concluded that the controlling sections of the sales act, which stated that the buyer's measure of recovery is the difference

---

93.   Hawkinson v. Johnston, 122 F.2d 724 (8th Cir. 1941).
94.   187 Cal. 785, 204 P. 214 (1922).
95.   *Id.* at 788, 204 P. at 215.

between contract and market prices, established the damages.[96]  Only when goods are purchased for a special purpose or have a special value is it possible to liquidate damages validly for breach of a goods contract.  The test is whether there is a reasonably convenient method of computing the damages at the time of breach or at the time of trial.

Apart from cases involving marketing cooperatives[97] and one pre-Civil Code case,[98] only in delivery-delay breaches have liquidation clauses been enforced.[99]  Nonenforcement  has resulted where the liquidation clause is an attempt by the buyer to guarantee himself a certain amount of damages[100] or where the clause is an attempt by the seller to limit the scope of possible liability for breach of warranty.  Such limitations on liability are especially likely to be held invalid if the court believes that actual damages substantially exceed the amount specified.  In *Greenleaf v. Stockton Combined Harvester & Agricultural Works*,[101] for example, a contract for the sale of a harvester specified that the buyer would receive a refund if the machine failed to perform properly.  The court held that even if this was intended to be a liquidation clause, the statutory rules establishing damages for breach of warranty controlled, because the actual damages were neither impracticable nor difficult to ascertain.

## 2.  *Buyer-Breach Cases*

Nineteen years after *Stark* established the general rule that there can be no liquidated damages in seller-breach cases, the supreme court extended the rule to buyer-breach cases in *Rice v. Schmid*.[102]  The seller, a wholesale flour merchant, contracted to sell 6,000 barrels of flour at a designated price per barrel.  After taking approximately half of the flour, the buyer refused to accept any more.  The seller attempted to enforce a standardized liquidated damages provision generally used between millers and flour buyers,[103] which provided that damages would

---

96.  *Id.*

97.  See text accompanying notes 193-99 *infra*.  Even this exception has been narrowly limited.  *See* Olson v. Biola Cooperative Raisin Growers Ass'n, 33 Cal. 2d 664, 204 P.2d 10 (1949) (liquidation not allowed for breach relating to quality of goods delivered to cooperative); Sun-Maid Raisin Growers v. Paul A. Mosesian & Son, Inc., 90 Cal. App. 1, 265 P. 828 (3d Dist. 1928).

98.  Fisk v. Fowler, 10 Cal. 512 (1858).

99.  *See* Consolidated Lumber Co. v. City of Los Angeles, 33 Cal. App. 698, 166 P. 385 (2d Cir. 1917); *cf.* Byron Jackson Co. v. United States, 35 F. Supp. 665 (S.D. Cal. 1940) (applying the federal common law).

100.  Pacific Factor Co. v. Adler, 90 Cal. 110, 27 P. 36 (1891); Sun-Maid Raisin Growers v. Paul A. Mosesian & Son, Inc., 90 Cal. App. 1, 205 P. 828 (3d Dist. 1928).

101.  79 Cal. 606, 21 P. 369 (1889).

102.  18 Cal. 2d 382, 115 P.2d 498 (1941).

103.  The provision had been upheld in cases in other states.  *See* Rice v. Schmid, 108 P.2d 68, 71-72 (Cal. App. 2d Dist.) *rev'd*, 18 Cal. 2d 382, 115 P.2d 498 (1941).

be the sum of three items: a carrying charge, determined by multiplying the unaccepted barrels of flour by a specified amount based upon the time from the date of the contract to the date of termination; a fixed amount per barrel as the cost of sales; and the difference in market price of wheat at the time of contracting and the date of termination times the number of bushels of wheat needed to manufacture one barrel of flour. Applying the liquidated damages clause would have resulted in damages of approximately $13,000. The supreme court, disagreeing with both the trial court and the court of appeals, held the liquidation of damages clause invalid on the basis of section 1671 and *Stark*.[104] The court noted that the absence of an organized market exchange for the sale of flour or price quotations published in newspapers did not mean the damages were difficult to ascertain, since there were price quotations for the sale of flour. This precluded liquidation. The court further held the measure of damages to be the difference between the contract price of flour and the market price at the time of breach, not lost profit.[105]

*Rice* established that nonacceptance of most goods, like nondelivery, is not a liquidatable breach, because there is a clear, well-known, easily administerable measure of recovery. Only where there is a true special damages situation is there the need to permit the parties autonomy to fix the amount of damages in advance.[106] This rule has been applied to invalidate almost every type of liquidation clause in the buyer-breach situation, both those that simply attempt to establish damages at a fixed sum[107] or a fixed percentage of the selling price,[108]

---

104. 18 Cal. 2d at 385-86, 115 P.2d at 499-500. Several other decisions have given special emphasis to California's statutory provisions regulating liquidated damages. *See* Rice v. Schmid, 18 Cal. 2d 382, 115 Cal. 498 (1941); Wilmington Transp. Co. v. O'Neil, 98 Cal. 1, 32 P. 705 (1893); Anaheim Citrus Fruit Ass'n v. Yeoman, 51 Cal. App. 759, 197 P. 959 (2d Dist. 1921); Ricker v. Rombough, 120 Cal. App. 2d Supp. 912, 261 P.2d 328 (Super. Ct., App. Dep't 1955); Electrical Prods. Corp. v. Williams, 117 Cal. App. 2d Supp. 813, 256 P.2d 403 (Super. Ct., App. Dep't 1955). But other cases see the code sections as a codification of common law rules. *See* Better Foods Mkts., Inc. v. American Dist. Tel. Co., 40 Cal. 2d 179, 253 P.2d 10 (1953); Weinreich Estate Co. v. A.J. Johnston Co., 28 Cal. App. 144, 151 P. 667 (3d Dist. 1915).

105. This matter is now dealt with by CAL. COMM. CODE § 2708 (West 1964), which provides that usually the measure of damages is the difference between the market price at the time of breach and the unpaid contract price, plus any incidental damages. However, where this will not provide the seller with the benefit of the original bargain, he is entitled to his net profit plus incidental damages.

106. *See also* Hanna Nielsen S.S. Co. v. Hammond S.S. Co., 32 F.2d 31 (9th Cir. 1929) (sale of ships); Porter v. Gibson, 25 Cal. 2d 506, 154 P.2d 703 (1944) (sale of stock).

107. Stark v. Shemada, 187 Cal. 785, 204 P. 214 (1922); Lightner v. Menzel, 35 Cal. 452 (1868).

108. *Cf.* People v. George, 257 Cal. App. 2d 805, 65 Cal. Rptr. 368 (1st Dist. 1968) (25 percent of contract price to cancel).

and those attempting other types of alteration of the statutory law, such as giving the buyer the remedy of price without his complying with the normal statutory requirements of tender and delivery.[109]   There have, however, been some exceptions.

The first of these is that, as in lease situations,[110] the courts will probably enforce clauses liquidating damages for a buyer's breach if goodwill of a business is affected by the breach.   The only California case to consider this issue was *Bay Shore Motors v. Baker*.[111]   During a grey-market period the defendant purchased a car under a written contract that included a provision that he would not sell the car and that the seller could repurchase it upon payment of the full purchase price.   If the buyer resold the car in violation of the agreement, the contract specified he would pay the seller $500 as liquidated damages. The court was uncertain about whether the clause was valid but reversed to give the buyer a chance to show that no actual damages resulted.   While this case does not determine whether such a clause is valid, another court permitted liquidation of damages because if the clause were not enforced, causation and certainty requirements would preclude recovering damages even though a resale in violation of the contract could damage the seller's reputation.[112]   Despite the nonenforceability of a liquidation clause, it can still operate in some circumstances to limit liability.   This was established in *Horrell v. Lakewood Marina*,[113] where the buyer of a boat initially paid $6,000 down and later paid an additional $5,000 toward the purchase price.   After his own breach, buyer brought an action to recover the second $5,000 payment, claiming it was her understanding that if she did not go through with the purchase she would not lose more than $6,000.   The court held the buyer was entitled to recover the $5,000.

If a clause liquidating damages does not fit within one of these exceptions, not only is the seller required to prove damages to collect from the buyer, but, absent proof of damages, the buyer is entitled to recover any advance payments he has made minus 20 percent of the contract price or $500, whichever is less.[114]

### 3.   The Commercial Code

All the cases that have been discussed arose before the enact-

---

109.   Mente & Co. v. Fresno Compress & Whse. Co., 113 Cal. App. 325, 298 P. 126 (4th Dist. 1931).   *See also* Denkin v. Sterner, 10 Pa. D. & C.2d 203 (Ct. C.P., York County 1956).

110.   See text accompanying note 92 *supra*.

111.   90 Cal. App. 2d Supp. 895, 202 P.2d 865 (Super. Ct., App. Dep't 1949).

112.   Elizabethtown Lincoln Mercury, Inc. v. Jones, 313 Ky. 321, 231 S.W.2d 42 (1950).

113.   3 Cal. App. 3d 506, 83 Cal. Rptr. 701 (4th Dist. 1970).

114.   Cal. Comm. Code § 2718 (West 1964).

ment of the Commercial Code, which seems to encourage the use of liquidation. Section 2718 states:

> Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.[115]

Thus, the test is reasonableness of amount according to the code's criteria, and it appears that the clause will be enforced if the amount is reasonable either at the time the contract is made or at the time of trial. This goes farther than prior California cases in two major respects: First, there is no requirement that the amount selected be a reasonable attempt to estimate damages. Second, section 2718 appears to validate clauses that appear to be reasonable in terms of anticipated damages even where the court may believe that the damages are not difficult to ascertain at the time of trial. What impact these changes will have is uncertain, because no California cases have interpreted this section.

### D. Service Contracts[116]

Few generalizations can be made about service contracts; liquidation clauses in contracts concerning some services are universally enforced, while those in contracts concerning other services are not. It is necessary to consider each type of service contract separately.

### 1. Oil Exploration Contracts

If sales of goods are the prototype transaction where liquidation of damages will not be applied, oil exploration contracts are one of the few areas where it can be confidently predicted that a liquidation clause will be given effect. Without liquidation, because of the difficulty of showing the quantity and quality of oil that would have been extracted had the defendant performed properly, one party who has suffered unprovable damages would not be able to recover anything.[117] This could tempt the performing party not to perform. As a result, the courts have liberally enforced liquidation clauses in this situation.

---

115. *Id.*
116. While some of the cases, such as the water and electric supply cases, could be classified as a type of goods transaction, they are considered service contracts for purposes of this discussion.
117. Ballem, *Some Second Thoughts on Damages for Breach of a Drilling Commitment*, 48 CAN. B. REV. 698, 698-99 (1970). *See* Allen v. Narver, 178 Cal. 202, 172 P. 980 (1918); Comment, *Damages—Measure of Damages for Breach of Contract to Drill Oil or Gas Well*, 13 WASH. & LEE L. REV. 207 (1956).

The leading case involving an oil exploration contract is *Escondido Oil Co. v. Glaser*,[118] involving an oil development sublease with a clause that provided for $500 liquidated damages in the event the developers did not explore as promised. The clause was found to be valid without any discussion of whether the lump sum was a genuine preestimate. The court's only observation was that "the small amount provided in the contract herein involved as liquidated damages is certainly not unconscionable."[119] In *McComber v. Kellerman*,[120] which involved an oil extraction lease with a sliding scale of payments if the defendant did not drill, the supreme court went one step further: the court held that the clause was valid as a liquidation provision without any pleading or proof, simply noting that the normal liquidation requirements "are fully shown by the lease itself."[121] Thus, in oil development cases a rule has been crystallized that enforcement is proper without the necessity of going through the proof requirements imposed on liquidation clause enforcement in other types of contracts.[122]

## 2. Real Estate Brokerage Contracts

Real estate brokerage contracts containing liquidation clauses generally have not been troublesome. The few brokerage cases that have been decided suggest that courts will not enforce these clauses because of the ease with which a court can deal with the particular actual damages question. In *McInerney v. Mack*,[123] for example, a real estate agent took a $1,000 deposit from an owner and was to work out a real estate exchange; the owner defaulted on the exchange and sued to recover his $1,000. The court held he could, arguing that, because it is not "difficult or impossible to establish by evidence the reasonable value of his services,"[124] damages could not be liquidated. This conclusion cannot be changed, as has been tried, by claiming that a damages clause represents "time, trouble and expenses."[125]

---

118.   144 Cal. 494, 77 P. 1040 (1904).

119.   *Id.* at 500, 77 P. at 1042.

120.   162 Cal. 749, 124 P. 431 (1912).

121.   *Id.* at 752-53, 124 P. at 433.

122.   Kelly v. McDonald, 98 Cal. App. 121, 276 P. 404 (3d Dist. 1929), seems to cast some doubt on the ease of enforcing liquidation clauses in oil development contracts. There was no allegation of compliance with section 1671 nor any proof of any actual damages, and the court of appeals held the clause invalid for both reasons. Later McCarthy v. Tally, 46 Cal. 2d 577, 586, 297 P.2d 981, 987 (1956), overruled *Kelly* on the issue of the need for showing actual damages, but the part of *Kelly* that seems contrary to *McComber* on the pleading and proof question has never been overruled.

123.   34 Cal. App. 153, 166 P. 867 (1st Dist. 1917). *See also* Neuer v. King, 276 Cal. App. 2d 461, 478-79, 81 Cal. Rptr. 161, 172-73 (1st Dist. 1969) (dictum).

124.   *Id.* at 157, 166 P. at 869.

125.   Robert Marsh & Co. v. Tremper, 210 Cal. 572, 576, 292 P. 950, 952 (1930).

It is possible, however, to use a system that steers away from damages and yet substantially accomplishes the objective of the brokers. Suppose there is no clause liquidating damages and the lister defaults. To recover, the broker must show that he could have found a buyer ready, willing, and able to purchase the property, which sometimes can be a difficult and formidable bar to recovery.   The solution is to follow *Baumgartner v. Meek*,[126] involving a provision specifying that the broker would get his commission even if the owner sold the property. The owner sold the property and the broker recovered the commission, not because of a breach by the owner in selling, but based upon the provision that sale by the owner would entitle the broker to his commission.   In a sense, such a technique is like the alternative performance used so frequently to enforce clauses not passing the tests for valid liquidation of damages; the lister has a choice of either permitting the broker to find a purchaser or paying the broker when he sells it himself.[127]

### 3. *Legal Services Contracts*

Legal services, like broker's services, are relatively easy to value, and therefore probably cannot be liquidated.   While there have been no cases that have directly involved this question,[128] a few cases have gone into the matter indirectly.   *Eastman v. Sunset Park Land Co.*[129] involved a note negotiable in form stating that the maker would pay attorneys' fees as set by a court.   The maker claimed that such a note was nonnegotiable because of the provision for attorneys' fees.   In holding that the note was negotiable, the court stated that it would not be difficult for a court to set fees.   The court also noted that attorneys' fees could not be liquidated because the requirements of section 1671 would not be satisfied.

Similarly, in *Greenbach Brothers, Inc. v. Burns*,[130] involving a land buyer's attempt to recover a deposit, one contention made by the

---

126.  126 Cal. App. 2d 505, 272 P.2d 552 (3d Dist. 1954).  *But see* Neuer v. King, 276 Cal. App. 2d 461, 478-79, 81 Cal. Rptr. 161, 172-73 (1st Dist. 1969).

127.  Admittedly, such an approach will not work if the owner does not sell the property.  But there is less likely to be litigation where the owner simply changes his mind.  *See generally* Comment, *The Right of a Real Estate Broker to a Commission in California*, 8 U.C.L.A.L. REV. 152 (1961).

128.  In a drafting seminar I conducted several years ago I asked students to draft an attorney's contingent fee contract.  A number of them included clauses that provided that if the client settled the case without consent of the attorney, the client would pay the attorney a specified and, I might add, exhorbitant hourly rate.  When I questioned the professional propriety and enforceability of such a clause, I was informed that they were taken from "reputable" formbooks.

129.  35 Cal. App. 628, 170 P. 642 (2d Dist. 1917). ·

130.  245 Cal. App. 2d 767, 54 Cal. Rptr. 143 (1st Dist. 1966).

seller was that liquidation should be permitted because he would incur legal expenses that would become valueless if the buyer defaulted in his agreement to purchase the hotel. While there were other grounds for not permitting the seller to retain the deposit, the court noted that the value of legal services is not difficult to ascertain.

### 4. Salesman Commission Contracts

The rule as to genuine liquidation clauses in salesman-commission contracts is unclear. The earliest case, *Thomas v. Anthony*,[131] involved a dealer's breach of an agency agreement to sell cars that included a recital that the requirements of section 1671 had been met. In a suit by the dealer to recover a $1,000 deposit, the court held a nonsuit for the defendant was improper since the defendant must submit evidence to prove that the contract fell within the requirements of section 1671, rather than relying on the contract recital. The court looked rather suspiciously at the liquidation clause and did not seem happy at the prospect of permitting the defendant to retain the deposit when it appeared that he was not damaged.

A different attitude, however, was displayed in *Ramsay v. Rodgers*.[132] In this case, an employer breached a contract providing that if the employee salesman was unjustifiably discharged, he would get damages of one year's salary plus 5% of certain income made after his termination. While the holding is not clear, it appears the court felt this liquidation clause was valid. Since it would be difficult to compute the amount of actual sales commissions he would have made had he not been wrongfully discharged, this would seem to be a proper case for liquidation of damages. It is certainly difficult to determine at the time the contract is made what sales he would make, and it is even difficult to determine what sales he would have made at the time of trial.[133]

Whatever the status of genuine liquidation clauses in this situation, it is clear that a liquidation effect can be accomplished by framing a contract in terms of alternate performance. For example, in *Powis v. Moore Machinery Co.*[134] the court enforced a clause providing that the salesman's commission would be reduced if he discontinued working for the employer. The court held that the test for liquidation of damages did not have to be met because, when the salesman left the employer, he was not guilty of any breach; the clause simply determined that in case he left he would not receive the part of the com-

---

131. 30 Cal. App. 217, 157 P. 823 (1st Dist. 1916).
132. 60 Cal. App. 781, 214 P. 261 (1st Dist. 1923).
133. See Twentieth Century-Fox Film Corp. v. Woods Amuse. Corp., 304 F. Supp. 23 (N.D. Ill. 1969) for a rational formula that could be used to liquidate damages.
134. 72 Cal. App. 2d 344, 351-54, 164 P.2d 822, 826-27 (2d Dist. 1945).

1260          CALIFORNIA LAW REVISION COMMISSION

mission based upon future services the salesman was expected to have performed for his customers. The court rejected the contention by the salesman that recitals relating to future services were merely window trimming and a club to keep him in line. This may have been a proper ruling. But, if in fact there was no legitimate justification for the drastic reduction in the salesman's commission when he left the employer, the provision really was a device to keep him in line and should have been classified an unenforceable penalty. However, in these cases courts seem willing to enforce liquidation clauses despite the element of coercion, apparently because they are generally the product of a negotiated contract.[135]

### 5. Agricultural Services Contracts

Usually, cases involving liquidation of damages in the context of an agricultural services transaction concern attempts to liquidate damages for failure to cultivate land or make agricultural improvements. *Seid Pak Sing v. Barker*[136] is typical; it involved an attempt to establish liquidated damages of $40 per acre for failure to prepare, drain, clear, plow, and maintain the levees incident to agricultural land leased. The contract clause designated this amount as damages, but not specifically as liquidated damages. The court held the clause partially invalid under section 1670 on the ground that it was not too difficult to ascertain the damages where existing crops were lost; the court did, however, uphold the clause as to loss of prospective crops because damage for this loss was too difficult to ascertain. The same result has been reached in other cases involving the failure to maintain or improve agricultural land.[137] Even in cases where the breach was the failure to grow crops, the courts have generally believed the damages to be easily ascertainable and have therefore refused to enforce liquidation clauses.[138]

### 6. Utility Service Contracts

Two different situations can arise relating to breach of a utility service contract. The first is the utility's failure to supply the promised electricity or water. Here the courts have consistently held that, be-

---

135. *See also* Buskuhl v. Family Life Ins. Co., 271 Cal. App. 2d 514, 76 Cal. Rptr. 602 (2d Dist. 1969); Bach v. Curry, 258 Cal. App. 2d 676, 66 Cal. Rptr. 220 (1st Dist. 1968).

136. 197 Cal. 321, 240 P. 765 (1925).

137. *See* Ebbert v. Mercantile Trust Co., 213 Cal. 496, 2 P.2d 776 (1931); City of Vernon v. Southern Cal. Edison Co., 191 Cal. App. 2d 378, 12 Cal. Rptr. 701 (2d Dist. 1961) (repossession of plant without compensation).

138. *See* Meer v. Cerati, 53 Cal. App. 497, 200 P. 501 (3d Dist. 1921) (under-liquidation of damages).

cause the amount of actual damages would be difficult to establish, either at the time the contract was made or at the time of trial, liquidation clauses are enforceable. For example, in *Pogue v. Kaweah Power & Water Co.*[139] a farmer conveyed rights of way, water rights, and land in exchange for the utility's promise to supply water to the farmer. The contract specified that the utility would reconvey the water rights and rights of way to the farmer in the event of breach. The court considered the provision a liquidation clause and held that it is valid because damages for failure to supply water are "uncertain and not susceptible of computation."[140]

The second situation involves a contract between a user and the utility for a specified minimum amount of utility service that makes the user liable for an amount of money regardless of actual use. In *Marin Water & Power Co. v. Town of Sausalito*,[141] California's leading case, the court held that a clause of this type was not a liquidation of damages clause, but an alternative performance provision. Clearly it was justified in this case, since the water company had expended a substantial amount of money in building a line to the town, and it is likely the minimum amount reflected the sum necessary to recoup this investment.[142]

### 7. News Service Contracts

The validity of a liquidation clause in a news service contract has been considered by only one California case, *Associated Press v. Emmett*,[143] which involved a membership contract in Associated Press with a provision for a two-year notice of withdrawal. The defendant newspaper gave a short notice to terminate and plaintiff sued for damages. The court upheld the two-year notice provision, which, in effect, required the subscriber to pay for a two-year period whether he wanted to use the services or not, on the ground that supplying news was not like supplying a product like flour. Such services cannot be valued since they are not a market product. Therefore, the court only required that the liquidated "damages . . . [not be] *disproportionate* to the damage they might suffer from breach."[144] Today a court might take a different approach in light of the increasing tendency to

---

139.  138 Cal. 664, 72 P. 144 (1903).
140.  *Id.* at 668, 72 P. at 145. *But see* Hansen v. Vallejo Elec. Light & Power Co., 182 Cal. 492, 188 P. 999 (1920).
141.  168 Cal. 587, 143 P. 767 (1914).
142.  *See also* City of Memphis v. Ford Motor Co., 304 F.2d 845 (6th Cir. 1962), *discussed in* MacNeil, *An Exercise in Contract Damages*, 4 B.C. IND. & COM. L. REV. 331, 335-37 (1963).
143.  45 F. Supp. 907 (S.D. Cal. 1942).
144.  *Id.* at 920.

police contracts with antitrust overtones, but because the news service would have great difficulty establishing actual damages when a subscriber cancels, the court's decision was proper.

### 8. Alarm Service Contracts

The alarm service cases, *Atkinson v. Pacific Fire Extinguisher Co.*[145] and *Better Foods Markets, Inc. v. American District Telegraph Co.*,[146] created a great stir when they were decided in 1953. *Atkinson* involved a contract to supply a fire extinguishing system with a $25 liquidation of damages clause; *Better Foods* involved a contract for a burglar alarm system with a $50 liquidation clause. Because *Better Foods* contains the most significant and most cited argument, the discussion focuses upon that case.

By contract the burglar alarm company installed and agreed to maintain an alarm system for the plaintiff supermarket. A clause in the contract stated that the burglar alarm company was not to be considered an insurer and that, because of the difficulty of fixing actual damages, the parties agreed to $50 as liquidated damages. The burglar alarm company failed to promptly notify the police of a robbery, and the robbers escaped with approximately $36,000. Noting the necessity that the parties know their exposure to liability in this situation, the supreme court upheld the clause. The plaintiff had argued that there was no difficulty in establishing the actual damage because the time for determining the "question of the impracticability and difficulty in fixing the damages is after the loss has occurred."[147] The court rejected this, holding that the important time for determining this question was at the time the contract was made.[148]

This was a proper decision. The burglar alarm system may have involved use of new scientific techniques that, along with human error, could expose the burglar alarm company to high risks. That they thought they had transferred this risk to the user is shown by the clause, the language that the company was not an insurer, and the $15 a month charge. If they could not contract away this risk, they would have to insure; and since it is likely that the user would also insure, this would probably result in overinsurance. Such a clause should be enforced in a high-risk, low-compensation service when enforcement is what the parties expected.[149]

---

145. 40 Cal. 2d 192, 253 P.2d 18 (1953).

146. 40 Cal. 2d 179, 253 P.2d 10 (1953).

147. *Id.* at 185, 253 P.2d at 14.

148. *Id.*

149. *See also* Zurich Ins. Co. v. King Indus., Inc., 255 Cal. App. 2d 919, 63 Cal. Rptr. 585 (2d Dist. 1967).

### 9. Educational Services Contracts

Only one California case, *Stewart v. Claudius*,[150] has concerned the general problem of student attempts to recover tuition paid when they either do not enroll or leave prior to the end of the instruction period. In *Stewart*, a student at a military academy was expelled for being absent without leave. The school attempted to collect the unpaid balance of the tuition under a clause stating that, if the student were dismissed, the unpaid portion of tuition would become payable as liquidated damages. The appellate court held that there was not a breach and, therefore, that the clause was not one for liquidation of damages; it was simply an alternative performance clause under which the parent of the student would pay the entire tuition without regard for any dismissal of the student.

Arguments can be made for making tuition nonrefundable. Schools plan their programs upon an estimated number of attending students; making refunds to students who do not enroll after being accepted or who leave in midterm could hamper fiscal planning. Even if one adopts an unjust enrichment philosophy, the defaulting student's recovery must be diminished by actual damages that result from his breach. One accepted measure of recovery is the promised performance, payment of tuition, less the expenses he saved the school by not enrolling or leaving early. Application of this measure would usually preclude refunds, because rarely does the school save anything by the student's breach. Only if the breaching student's absence enabled the school to admit another student could it be said that, apart from minor administrative expenses, the school was not damaged by the breach.

Yet, it seems unfair that the student should lose his tuition when he is unable to enroll or continue in school. Whether a university should be permitted to retain any of the tuition is not a matter that should be determined by general contract law. A statutory enactment, perhaps one providing for a sliding scale forfeiture, could better fit this specialized problem.

### E. Construction Contracts

Careful lawyering at the drafting, pleading, and proof stages will make a liquidation clause for delay enforceable despite, on occasion, the availability of a recognized measure for actual damages and the lack of a genuine attempt to estimate damages. The enforceability of clauses liquidating damages for other types of breaches in construction contracts is less clear.

---

150.   19 Cal. App. 2d 349, 65 P.2d 933 (1st Dist. 1937).

*1. Owner Breaches*

Liquidation in construction contracts typically concerns breaches by the contractor, because the owner's obligations are fewer in number and principally consist of making payments. There are, however, obligations of the owner that could be the subject of liquidation of damages clauses. For example, the owner might breach by an unexcused delay in furnishing the site to the contractor, by supplying incorrect soil data or by delaying the contractor's performance while on the site. But in construction contracts it is the owner who generally has the superior bargaining position, and he rarely feels the need to underliquidate damages for delay he causes. He uses a more direct approach to relieve himself of this risk, such as a clause permitting the owner to interrupt the contractor's work when in the owner's judgment it is necessary to do so[151] or a clause limiting the contractor to an extension of time without any right to recover delay damages. The majority of courts enforce these "no damage" clauses,[152] and a fortiori such courts should allow an owner to employ a liquidation clause to set the amount of damages.

But delay caused by the owner or misrepresentation of soil data generally increase the cost of doing the work to the contractor, and this is a type of damages that courts are generally able to handle. Since these costs are relatively easy to prove at the time of trial—apart from a possible dispute over causation or foreseeability—it is unlikely that a court would enforce a liquidated damages clause for these breaches. On the other hand, some types of owner breach, such as unjustifiable removal of the contractor from the project site, might create a situation where standardized measures of recovery are not sufficient for the contractor. For example, one standardized measure of recovery for the contractor is the cost of his part performance plus his profits; often contractors attempt to show profit margins by generally accepted profit margins in the construction industry, but a contractor might wish to agree in advance on an accepted profit margin. Such an agreement should be given effect.

---

151. *But see* CAL. CIV. CODE § 1511(1) (West 1970); Sweet, *Extensions of Time and Conditions of Notice: California's Needless Restrictions of Contractual Freedom,* 51 CALIF. L. REV. 720 (1963).

152. Sweet, *Owner-Architect-Contractor: Another Eternal Triangle,* 47 CALIF. L. REV. 645, 681 (1959). In Hawley v. Orange County Flood Control Dist., 211 Cal. App. 2d 708, 27 Cal. Rptr. 478 (4th Dist. 1963), the court considered a "no damage" clause as creating a forfeiture and therefore held that it must be strictly construed, especially where the contract was prepared by the party seeking protection from his delay. The court finally concluded the clause did not apply to unreasonable delay caused by matters not within the contemplation of the parties.

## 2. *Contractor Breaches*

The principal contractor breaches are not entering into the contract when awarded, not constructing the project in accordance with the plans and specifications, unexcused delay in completing the project, and failing to pay subcontractors and suppliers. Of these, the principal areas for liquidation have been failure to enter into the contract when awarded and unexcused delay in completion, but one case has also arisen involving a clause liquidating damages for defective performance.

*a. Defective performance.* A 1909 case, *Sherman v. Gray*,[153] established that damages for a contractor's defective performance cannot be liquidated. The *Sherman* contract had a blunderbuss clause, one lump sum that applied to any breach by either party; it was clearly a penalty, and the court so held. However, the court did not rest its decision exclusively on the penalty aspect; it argued that, because the cost to correct any deficient work by the contractor would be a "simple, [*sic*] matter to ascertain,"[154] the case fits within the general rule against enforcing liquidated damages clauses where the damages are relatively easy to calculate at the trial. Since *Sherman*, no cases have ever arisen attempting to liquidate damages for a contractor's defective performance; the bar seems to have accepted that liquidation is inappropriate in these circumstances.

*b. Failure to enter into a contract when awarded.* At the outset it must be determined whether the parties properly attempted to liquidate damages. In the typical case each bidder must put up a specified percentage of his bid either by a certified check or bid bond. If this is all that is specified, it leaves open the question whether this amount constitutes an attempt to liquidate damages. Certainly if the contract purports to give the owner the option of treating the deposit as liquidated damages or suing for actual damages,[155] the amount should not be considered one of liquidated damages; a genuine liquidated damages clause must control the issue of the amount of damages. To be an unequivocal liquidation clause, the invitation to bidders should state that the amount deposited by the bidder is nonrefundable in the event the successful bidder has no legally sufficient reason for not entering into the contract, and for further safety it should at least recite the statutory language of section 1671 and that the amount is a reasonable endeavor to preestimate damages.

If a properly written clause establishes that the amount deposited

---

153. 11 Cal. App. 348, 104 P. 1004 (1st Dist. 1909).
154. *Id.* at 352, 104 P. at 1005.
155. Sometimes the option is given by law. *See* Kemper Constr. Co. v. City of Los Angeles, 37 Cal. 2d 696, 235 P.2d 7 (1951).

is an attempt to liquidate damages, the courts have disagreed as to whether it will be enforced.[156] However, in the most recent case on this issue, *Petrovich v. City of Arcadia*,[157] the California supreme court authoritatively settled the issue for this state. The action was brought by a successful bidder against the city of Arcadia to cancel his bid to construct sanitary improvements on the grounds of mistake: he had inadvertently omitted a large cost item. The city cross-complained, joined the surety, and asked for forfeiture of the bid bond for $37,500 plaintiff had deposited. The next low bid was some $69,000 higher than the plaintiff's bid. The supreme court's narrow holding in the case was only that, because neither the invitation to the bidders nor the bond explicitly provided for forfeiture, the city had to sue for actual damages.[158]

Nevertheless, the court went on to discuss what would have been the result had the invitation or bond provided for forfeiture. The court concluded that, despite the contrary practice of several other jurisdictions,[159] in California compliance with section 1671 was a question of fact that must be alleged[160] and proved. Therefore in this case, even if the bid had been properly drafted, the city would fail, because there had been no specific showing of the difficulty of ascertaining actual damages or good-faith preestimation. Although this point is dictum, it appears to establish that sections 1670 and 1671 will be strictly applied in this area.[161]

This requirement of strict compliance may mean it will be impossible to liquidate damages for a contractor's failure to enter into the contract. Actual damages are usually not too difficult to determine. If the bidder does not enter into a contract awarded to him, there are at least three possibilities open to the awarding authority: it may award the contract to the next low bidder, it may readvertise and award the contract to the lowest responsible bidder, or it may decide to abandon the project. Unless the project is abandoned, major damages are generally easy to determine; they consist of the difference between the de-

---

156. *Compare* City of Los Angeles v. Shafer, 53 Cal. App. 458, 200 P. 384 (2d Dist. 1921) (enforcement refused) *with* Palo & Dodini v. City of Oakland, 79 Cal. App. 2d 739, 180 P.2d 764 (1st Dist. 1947) *and* Town of Mill Valley v. Massachusetts Bonding & Ins. Co., 68 Cal. App. 372, 229 P. 891 (1st Dist. 1924) (enforcement granted).

157. 36 Cal. 2d 78, 222 P.2d 231 (1950).

158. *Id.* at 84-85, 222 P.2d at 236.

159. *Id.* at 83-84; 222 P.2d at 235-36; *see* 5 CORBIN § 1074.

160. But in Bilardi Constr., Inc. v. Spencer, 6 Cal. App. 3d 771, 86 Cal. Rptr. 406 (1st Dist. 1970), the court held a clause could be enforced despite the failure to plead compliance with section 1671 because the issue of validity was raised by the pretrial order.

161. *See also* CAL. ANN. GOV'T CODE §§ 37933, 37935 (West 1968) (city can retain security deposit, but it must return any portion that exceeds the difference between the bid originally accepted and the next low bid).

faulting bidder's bid and the bid that is ultimately accepted, and in cases where readvertising is necessary, the administrative expense of conducting another competitive bid. Delay in completion of the project, usually caused by readvertising or abandonment of the project, also usually causes major losses to the public, but they are unprovable. In addition there will be minor damages, such as the administrative expense in having to deal with the bidder who is awarded the contract but refuses to enter into it.

The incidental losses, such as administrative expense, and the unprovable losses, such as inconvenience to the public, appear to have .been ruled out as the bases for liquidation by the dictum in the *Petrovich* case. Such losses seem disproportionate to the amount deposited and it would not seem fair to make this the basis for liquidation. The delay caused by readvertising and the inconvenience to the public often caused by abandonment would seem sufficient to justify liquidation, but the *Petrovich* case was an abandonment case, so it appears that that issue has been resolved against liquidation.[162]

*c. Unexcused delay.* Construction contracts frequently liquidate damages for unexcused delay by the contractor. Typically, delay is liquidated by assessing a specified amount or a percentage of the bid price[163] for each day of unexcused delay, although occasionally a lump sum liquidation is employed.[164] While a few cases have refused to enforce clauses setting damages for unexcused delay,[165] it is well settled in California that such clauses are enforceable.[166]

---

162. If the awarding authority is concerned about losing minor damages, it could protect itself at the drafting stage by splitting the deposit into two parts, one for major and one for minor damages. For example, if the deposit would normally be 10%, the bidder would be asked to deposit an amount of 9% of his bid as a security deposit and 1% as liquidation for overhead and the intangible damages that could be caused if the successful bidder does not enter into the contract. In such a case the awarding authority would be able to sue for actual damages, with the 9% as security, and keep the 1% to cover administrative expenses.

163. *E.g.,* Broderick Wood Prods. Co. v. United States, 195 F.2d 433 (10th Cir. 1952).

164. Leslie v. Brown Bros., Inc., 208 Cal. 606, 283 P. 936 (1929); Nash v. Hermosilla, 9 Cal. 584 (1858).

165. Patent Brick Co. v. Moore, 75 Cal. 205, 16 P. 890 (1888) (failure to prove compliance with section 1671 in judgment roll case); Muldoon v. Lynch, 66 Cal. 536, 6 P. 417 (1885) (payment described in the clause as a forfeiture; long delay that did not appear to be the fault of the builder); Nash v. Hermosilla, 9 Cal. 584 (1858) (lump sum clause).

166. *See* Peter Kiewit Son's Co. v. Pasadena City Junior College Dist., 59 Cal. 2d 241, 379 P.2d 18, 28 Cal. Rptr. 714 (1963), *criticized in* Sweet, *supra* note 151 *passim*; Silva & Hill Constr. Co. v. Employers Mut. Liability Ins. Co., 19 Cal. App. 3d 914, 920, 97 Cal. Rptr. 498, 501 (2d Dist. 1971); Nomellini Constr. Co. v. State *ex rel.* Dep't of Water Resources, 19 Cal. App. 3d 240, 246, 96 Cal. Rptr. 682, 686 (3d Dist. 1971); London Guar. & Acc. Co. v. Las Lomitas School Dist., 191 Cal. App. 2d 423, 12 Cal. Rptr. 598 (1st Dist. 1961); Hanlon Drydock & Shipbuilding Co. v.

Most of the cases enforcing such clauses have been state public contracts. In such contracts the courts have been influenced by Government Code section 14376,[167] which provides that each state contract shall contain such a clause and that the clause determines the amount forfeited and paid to the state in the event of unexcused delay. In *Silva & Hill Construction Co. v. Employers Mutual Liability Insurance Co.*,[168] the court of appeals held that, while sections 1670 and 1671 apply generally to contracts between public agencies and private individuals, section 14376 of the Government Code is

> a legislative determination that late charges imposed on a construction company by a state contract fall within the provisions of section 1671 of the Civil Code and as such are valid liquidated damages.[169]

Recognizing that it would be difficult if not impossible to prove actual damages when a public project is not completed on time, the court argued that section 14376 is an attempt to overcome this so that the state will be at least partially reimbursed for additional cost, lost public benefits, and overhead expenses and that the contractor will be encouraged to work toward timely completion of the work.[170]

Arguably, liquidation is less appropriate in commercial construction or public projects that have an establishable commercial use value. While a few cases in other jurisdictions have not enforced liquidation clauses in contracts involving the construction of residences,[171] California's law seems established by *Hanlon Drydock & Shipbuilding Co. v. G.W. McNear, Inc.*,[172] which upheld a *per diem* clause liquidating

---

G.W. McNear, Inc., 70 Cal. App. 204, 210, 232 P. 1002, 1004 (1st Dist. 1924) (ship repair delay).

167. CAL. ANN. GOV'T CODE § 14376 (West 1968).

168. 19 Cal. App. 3d 914, 97 Cal. Rptr. 682 (2d Dist. 1971).

169. *Id.* at 920, 97 Cal. Rptr. at 501.

170. *Id.* at 918, 97 Cal. Rptr. at 500. Similarly, in Bethlehem Steel Corp. v. City of Chicago, 350 F.2d 649, 650 (7th Cir. 1965), the court upheld a liquidated damages clause for delay that contained this recital:

> The work under this contract covers a very important section of the South Route Superhighway, and any delay in the completion of this work will materially delay the completion of and opening of the South Route Superhighway thereby causing great inconvenience to the public, added cost of engineering and supervision, maintenance of detours, and other tangible and intangible losses.

171. *See, e.g.*, Cohn & Conway v. Birchard, 124 Iowa 394, 100 N.W. 48 (1904); Seeman v. Biemann, 108 Wis. 365, 84 N.W. 490 (1900). However, some cases have enforced liquidation clauses that have substantially exceeded rental value when damages other than loss of use were reasonably foreseeable at the time the contract was made. *See* Curtis v. Van Bergh, 161 N.Y. 47, 55 N.E. 398 (1899); *cf.* Brown Iron Co. v. Norwood, 69 S.W. 253 (Tex. Civ. App. 1902). *See also* 5 CORBIN § 1072.

172. 70 Cal. App. 204, 232 P. 1002 (1st Dist. 1924). *But see* General Ins. Co. v. Commerce Hyatt House, 5 Cal. App. 3d 460, 472, 85 Cal. Rptr. 317, 325 (2d Dist. 1970) (liquidated damages are a penalty not favored in equity).

damages for delay in ship repair.  This is reasonable.  Even rental or
use value of a residence or office building, while a well-accepted measure
of recovery, can be difficult to establish.  Also, delayed completion of
a residence can involve damages in addition to loss of use.[173]  More-
over, most contracts of this type are negotiated.  Therefore, if the
amount selected is within the range of likely damages, whether provable
or not, such clauses should be enforced.  While there is no available
data on how liquidation amounts in these contracts are determined,[174]
there is some instructive material by Elliott, a bridge engineer of the
California Division of Highways, who states:

> The sole purpose of a completion assessment is to assure that
> the contract work will be done within the time specified, . . . to
> threaten the Contractor with sufficient monetary loss so that he will
> find it advantageous to apply sufficient men and equipment to the
> work to get it done on time.  Whereas moderate liquidated damages
> such as $100 per day may well be used to insure the completion of a
> normal project having no special urgency, higher amounts are used to
> force faster work on jobs which must be finished in less than a normal
> construction time.  High assessments may be used to emphasize the
> need for haste and should be of sufficient size to make it economically
> desirable that the contractor expedite his work by use of multiple
> shifts or additional equipment.[175]

Although most such construction contract liquidation clauses would
not pass muster as genuine attempts to estimate damages as required
by section 1671, they are usually enforced.  There are a number of
reasons for this.  First, while the liquidation amounts may not actually
be bargained, the contractor can take this into account when he
makes his bid.[176]  Second, most construction contractors are not so
unsophisticated as to merit special protection by the courts.[177]  Third,
courts enforce these clauses as a means of saving themselves from
having to decide difficult fact questions relating to damages.  Finally,
these clauses are enforced because delays do cause  losses, but the ac-
tual loss is often not provable under traditional damage rules, which
require certainty, proof of causation, and foreseeability.

Apart from problems of enforceability, clauses liquidating damages

---

173.  See note 171 supra.

174.  The process was recently claimed to be constitutionally defective.  See Brief
for Contractor's Ass'n as Amicus Curiae, Silva & Hill Constr. Co. v. Employer's Mut.
Liab. Ins. Co., 19 Cal. App. 3d 682, 97 Cal. Rptr. 498 (2d Dist. 1971).

175.  H. JONES, A. FARNSWORTH & W. YOUNG, CASES AND MATERIALS ON CONTRACTS
700 (1965).

176.  Id. at 714.

177.  See Bethlehem Steel Corp. v. City of Chicago, 350 F.2d 649, 651 (7th Cir.
1965); cf. Southwest Eng'r Co. v. United States, 341 F.2d 998 (8th Cir. 1965).

CALIFORNIA LAW REVISION COMMISSION

for contractor delay have caused difficulty because of a number of interpretation questions that have arisen. First, sometimes the delay is caused by the contractor and by the owner or someone for whose acts the owner is responsible. Because a court will not apportion responsibility for the total delay between those causes for which the contractor is responsible and those for which he is not,[178] the liquidated damages clause can be applied only if the parties provide for apportionment by contract.[179]

The second interpretation problem courts frequently face is determining when a project is completed for liquidation purposes. The general answer is that actual, not substantial, completion is required.[180] However, courts will be hesitant to apply this rule where the stipulated damages are high and the project is available for use.[181]

A final interpretation problem that has troubled the courts is what happens when the contractor abandons the project and the liquidated damages clause is silent on abandonment. When this occurs, the owner typically hires another contractor to complete the project. In such a case, there can be two elements of damage. First, the total cost of the project may be increased because of the necessity of hiring another contractor and incurring a greater expense than originally specified in the contract. Generally, the owner is entitled to this additional expense as part of actual damages. Second, the contract will probably be completed by the substitute contractor beyond the contract date. Since two elements of damages are involved in these abandonment and completion-by-a-substitute-contractor cases, it would seem that the owner should be able to recover both his added costs in securing a substitute contractor and liquidation based upon when the project is actually completed, but the two California cases to consider this question have allowed only actual damages.[182] This may be because when both of the items are totaled the damages can be quite formidable.

---

178. General Ins. Co. v. Commerce Hyatt House, 5 Cal. App. 3d 460, 85 Cal. Rptr. 317 (2d Dist. 1970); Aetna Cas. & Sur. Co. v. Board of Trustees, 223 Cal. App. 2d 337, 35 Cal. Rptr. 765 (1st Dist. 1963); Gogo v. Los Angeles County Flood Control Dist., 45 Cal. App. 2d 334, 114 P.2d 65 (2d Dist. 1941). See Pettit & Gleason, *Liquidated Damage in Government Contracts*, 25 Sw. L.J. 264, 273 (1971).

179. Nomellini Constr. Co. v. State *ex rel.* Dep't of Water Resources, 19 Cal. App. 3d 240, 96 Cal. Rptr. 682 (3d Dist. 1971); Sweet, *supra* note 152, at 722.

180. *See* London Guar. & Acc. Co. v. Las Lomitas School Dist., 191 Cal. App. 2d 423, 12 Cal. Rptr. 598 (1st Dist. 1961).

181. *See* Hungerford Constr. Co. v. Florida Citrus Exposition, Inc., 410 F.2d 1229 (5th Cir. 1969).

182. Sinnott v. Schumacher, 45 Cal. App. 46, 187 P. 105 (1st Dist. 1919); Bacigalupi v. Phoenix Bldg. & Constr. Co., 14 Cal. App. 632, 112 P. 892 (1st Dist. 1910). *See also* Six Companies v. Joint Highway Dist. No. 13, 311 U.S. 180 (1940).

LIQUIDATED DAMAGES—STUDY 1271

### F. *Covenants Not to Compete*

Covenants not to compete are one type of breach where liquidation clauses are almost always enforced.[183] This is true whether, as is usually the case, the stipulated amount is a lump sum or a sliding scale based upon the time of breach and other variables.[184] Even stipulated forfeitures of a lump sum equal to the total contract price have repeatedly been enforced in California.[185] While it might be argued that these lump sum amounts are selected as an averaging of potential damages that might result from the various differences in time and geographical location of competition, it is more likely that they are chosen simply by a bargaining process. In any case, contrary to the usual rule,[186] courts have enforced these liquidated damages clauses without pleading or proving compliance with section 1671.[187]

The reasons courts have allowed so much party autonomy in this particular situation are twofold. First, courts have recognized that these contracts are generally negotiated between parties of relatively equal bargaining strength and therefore have refused to relieve a complaining party "from the hardships of an agreement into which he has willingly and knowingly entered."[188] Second, and more important, courts have thought actual damages in this field absolutely incapable of determination,[189] so they have enforced liquidation clauses to avoid making it possible for a breaching party to violate the contract with impunity.

Despite the enforceability of genuine liquidation clauses in covenants not to compete, there seems to be a tendency in some recent cases to use alternate performance instead. For example, the partnership agreement in *Farthing v. San Mateo Clinic*[190] provided that, if the partner should leave, he would receive his share of the accounts receivable at the rate of $400 per month, but if he should relocate in the

---

183. 5 CORBIN § 1071; MCCORMICK § 156, at 621.

184. McCormick states that a graduated amount would increase the chances of enforcement. MCCORMICK § 156, at 621.

185. *See, e.g.,* Potter v. Ahrens, 110 Cal. 674, 43 P. 388 (1896); California Steam Navigation Co. v. Wright, 6 Cal. 258 (1856). *But see* Morris v. Harris, 127 Cal. 2d 476, 274 P.2d 22 (1st Dist. 1954), holding a clause invalid since the negative covenant liquidated was a violation of CAL. ANN. BUS. & PROF. CODE § 16600 (West 1968), which makes trade restraints invalid unless the restraint falls within a statutory exception.

186. See note 292 *infra.*

187. *See* Akers v. Rappe, 30 Cal. App. 290, 158 P. 129 (1st Dist. 1916); Shafer v. Sloan, 3 Cal. App. 335, 85 P. 162 (2d Dist. 1906).

188. *See* Streeter v. Rush, 25 Cal. 67, 72 (1864).

189. Potter v. Ahrens, 110 Cal. 674, 681, 43 P. 388, 389 (1896); California Steam Navigation Co. v. Wright, 6 Cal. 258, 263 (1856); Shafer v. Sloan, 3 Cal. App. 335, 337-38, 85 P. 162, 163-64 (2d Dist. 1906).

190. 143 Cal. App. 2d 385, 299 P.2d 917 (1st Dist. 1956).

same area, he would forfeit his share of accounts receivable since he would be getting a share of the clientele. The trial court finding that this was valid as an alternative performance or a liquidation of damages provision was affirmed by the court of appeals. Classifying this type of clause as possibly one for alternative performance would deny the clinic a right to enjoin the withdrawing partner from competing. However, losing the right to enjoin violation may not matter, because the alternative performance in such a case can be a heavy club over the head of a partner. Often the contract will not provide simply for profits[191] he would have made if he competed but the full amount of fees collected.[192] Since the offending partner would have to expend money to produce those fees, compelling him to turn over his gross fees would indeed be a powerful coercive measure.

### G.   Associational Transactions

Individuals with a common purpose often agree to organize groups and attempt to accomplish their objective by the use of solidarity and group pressures. Violation of such organizational agreements often produces no damages that can be calculated in court, but the prestige of the group can be affected by deviations on the part of members. It is therefore common to attempt to liquidate damages.

The associational arrangement that has caused the most litigation in California relates to marketing cooperatives.[193] The leading case is *Anaheim Citrus Fruit Association v. Yeoman*,[194] where a marketing cooperative sought to enforce a liquidation clause of 50 cents per box against a member who had not marketed his product in accordance with association rules. The court upheld the provision, arguing that it satisfied section 1671 because actual damages would involve some unascertainable effect upon the "prestige and standing of the Association as a marketing concern."[195]

Other market cooperative cases suggest that there may be some

---

191. In Mellor v. Budget Advisors, Inc., 415 F.2d 1216 (7th Cir. 1969), the court seemed apprehensive about enforcing a clause under which the breaching party would pay the profits he earned from competing. Instead of citing the many cases enforcing liquidation in covenant-not-to-compete arrangements, the court cited Uniform Commercial Code section 2-718, which says clauses must be reasonable, and held this was not a proper case for summary judgment.

192. *See* Swenson v. File, 3 Cal. 3d 389, 475 P.2d 852, 90 Cal. Rptr. 580 (1970).

193. Statutes have validated liquidation clauses in certain marketing cooperative agreements. *See, e.g.,* CAL. ANN. AGRIC. CODE § 54264 (West 1968) (nonprofit associations).

194. 51 Cal. App. 759, 197 P. 959 (2d Dist. 1921).

195. *Id.* at 763, 197 P. at 961. *See also* Colma Vegetable Ass'n v. Bonetti, 91 Cal. App. 103, 267 P. 172 (1st Dist. 1928) (lump sum for *any* violation upheld); Poultry Producers, Inc. v. Murphy, 64 Cal. App. 450, 221 P. 962 (1st Dist. 1923) (lump sum for failure to deliver eggs upheld).

limitations on the enforceability of liquidation clauses in these con-
tracts. *Nakagawa v. Okamoto*,[196] a case decided by the supreme court
prior to *Anaheim*, involved an agreement between members of the Ja-
panese Farmers Association under which all members would take their
business to a new market. The members signed notes for $500 "in
order to show their good faith." The court concluded that the purpose
of these provisions "was apparently to furnish a club to be used to
prevent any person signing the agreement from returning to the Third
Street Market, by making him liable to a penalty or fine of five hundred
dollars if he so did, absolutely irrespective of any question of dam-
age,"[197] and therefore refused to enforce the notes. It is uncertain
why the court decided *Nakagawa* as it did. One probable reason is
that the *Nakagawa* amount was a lump sum unrelated to the extent
of the breach; in *Anaheim* the amount was a certain sum per box.
Also, one suspects that the court may have been somewhat sympathetic
to the Japanese farmers, many of whom may not have entered into such
a group voluntarily.

Another limitation on liquidation in market cooperative contracts
is shown by the supreme court decision in *Olson v. Biola Corp.
Raisin Growers Association*,[198] which refused to enforce a clause li-
quidating damages for defects in quality of raisins supplied by an
association member to the association. In this situation the prestige
of the association is not affected, so the courts treat the situation like
any other goods transaction and follow the general rule that liquidation
of damages in goods transactions will not be enforced.[199]

The problem of liquidation clauses in association contracts has
also arisen in connection with labor relations. For example, in *Dyer
Brothers Golden West Iron Works v. Central Iron Works*,[200] there was
an agreement between employers who were dealing with the same
unions. Each member gave a promissory note to the association, in an
amount based upon the member's business volume, that would be
forfeited if he dealt with the unions individually rather than through
the association. One member breached, and the association brought
an action on the note. Without deciding the ultimate issue, the su-
preme court held that the validity of the clause was a fact question and
could not be determined by a demurrer. Also, the court noted that
the amount that would be forfeited bore a rational relationship to the

196. 164 Cal. 718, 130 P. 707 (1913).
197. *Id.* at 723-24, 130 P. at 709.
198. 33 Cal. 2d 664, 204 P.2d 10 (1949).
199. See text accompanying notes 94-215 *supra.* While one would think a breach
of quality would affect association prestige, the case seems to have been one where
no actual damage occurred.
200. 182 Cal. 588, 189 P. 445 (1920).

actual damage and that at least the facts alleged did not indicate that this was solely a club. Because of the uncertain damage the association would suffer if a single member breached, the clause probably should be enforced.

A recent case, *California State Council of Carpenters v. Superior Court*,[201] involved a different sort of labor relations problem. Here a collective bargaining agreement provided that employers would not pay based upon piece work and specified that the employer would forfeit $250 per employee per week as long as he failed to pay wages in accordance with the agreement. The clause stated:

> The parties recognize and acknowledge that proper payment of wages is essential to the maintenance of the Agreement, the health and safety of workmen, and fairness to all employees in the industry, and that it would be extremely difficult if not impracticable to fix the actual expense and damages to the workmen and the industry from any failure to pay wages in accordance with the provisions of this Agreement. Therefore, the amount of damage resulting from such failure shall be presumed to be the sum of Two Hundred and Fifty Dollars ($250.00) for each infraction for each employee, for each week in which the infraction occurs. . . .[202]

The court referred the validity of this provision to the arbitrator because it involved a question of fact; it could not be stated as a matter of law whether the requirements of section 1671 were met. Again, because one can visualize damage of an unascertainable amount to the union and workers if employers deviate from the collective bargaining agreement, it probably should be enforced.

The result in cases like *Dyer* and *California State Council of Carpenters* cannot, however, be predicted solely on the basis of liquidation law; undoubtedly, they depend to some degree on the court's view of the desirability of the objectives sought by the association. In a period when employers dominate unions, a court might not be so solicitous toward employer association provisions that place heavy controls over employer association members. Also, the results in these cases may depend upon the court's attitude toward free trade and economic concentration of power. Certainly if, as in *Carl N. Swenson Co. v. E.C. Braun Co.*,[203] the association agreement violates an antitrust act, it will not be enforced. The type of harm involved may justify enforcement of a liquidation clause, but antitrust policies are more

---

201. 11 Cal. App. 3d 144, 89 Cal. Rptr. 625 (4th Dist. 1970).

202. *Id.* at 150, 89 Cal. Rptr. at 629.

203. 272 Cal. App. 2d 366, 77 Cal. Rptr. 378 (1st Dist. 1969); *cf.* Pacific Factor Co. v. Adler, 90 Cal. 110, 27 P. 36 (1891); Morris v. Harris, 127 Cal. App. 2d 476, 274 P.2d 22 (1st Dist. 1954) (violation of CAL. ANN. BUS. & PROF. CODE § 16600 (West 1968)).

LIQUIDATED DAMAGES—STUDY                   1275

important than party autonomy, even in very-hard-to-calculate-harm cases. Thus, as policies of fostering competition are stronger, chances of upholding liquidation clauses in such cases grow weaker.

### H.   Contracts to Lend Money

Two early supreme court cases, *Thompson v. Gorner*[204] and *Finger v. McCaughey*,[205] held that, because late payment charges are not penalties but alternative methods of performance, there is no breach in such cases and therefore no need to apply sections 1670 and 1671. In recent cases debtors have sought to change this rule and apply the *Freedman* doctrine to lending situations, but these attempts have been unsuccessful. The leading recent case, *Hellbaum v. Lytton Savings & Loan Association*,[206] held that a prepayment penalty does not fall within the *Freedman* doctrine, because it is not a breach but an alternative method of performance. Two other recent cases similarly held that late payment charges do not fall within the prohibition of section 1670 since they too are alternative performances.[207]

There is, however, some uncertainty. While *Los Angeles City School District v. Landier Investment Co.*[208] did not involve a lending transaction, it is a case concerning contractual remedies for non-payment of money where the court refused to use the alternative performance technique to uphold a late payment penalty, and it must therefore be considered. Landier entered into an illegal contract for bus transportation of pupils of the Los Angeles City School District. When the facts became known, the school district brought an action for the total payments illegally made, about $1,500,000. Prior to trial, the school district and Landier entered into a stipulation settlement suggested by Landier under which he agreed to pay $264,000 in eight installments over a period of time, but if he did not pay any installment within 30 days of a due date, the school district would take a judgment for double the outstanding amount remaining. Landier paid $99,000 and then defaulted, and the school district sought a judgment of double the outstanding remaining balance, about $320,000.

---

204.  104 Cal. 168, 37 P. 900 (1894).

205.  114 Cal. 64, 45 P. 1004 (1896).  See note 90 *supra* for a discussion of the measure of recovery for a failure to pay money.

206.  274 Cal. App. 2d 456, 79 Cal. Rptr. 9 (1st Dist. 1969).  *Hellbaum* also held a due-on-sale clause was not an invalid restraint on alienation.  But La Sala v. American Sav. & Loan Ass'n, 5 Cal. 3d 863, 489 P.2d 1113, 97 Cal. Rptr. 849 (1971), held a due-on-further-encumbrance clause was valid only if it were necessary to protect the lender's security interest.

207.  Walsh v. Glendale Fed. Sav. & Loan Ass'n, 1 Cal. App. 3d 578, 81 Cal. Rptr. 804 (2d Dist. 1969);.O'Connor v. Richmond Sav. & Loan Ass'n, 262 Cal. App. 2d 523, 68 Cal. Rptr. 882 (1st Dist. 1968).  *See* La Sala v. American Sav. & Loan Ass'n, 5 Cal. 3d 864, 489 P.2d 1113, 97 Cal. Rptr. 849 (1971).

208.  177 Cal. App. 2d 744, 2 Cal. Rptr. 662 (2d Dist. 1960).

The court of appeals affirmed a judgment for the school district upon the procedural grounds that relief from the stipulation had not been sought promptly enough. Then, in extended dictum, the court went on to consider the validity of the double-the-outstanding-balance clause. Citing *Freedman*, the court stated that such a double-damage provision is an unenforceable penalty, especially when, as here, at the time the contract is made the actual damages for nonperformance are known and the stipulated amount is not a genuine attempt to preestimate. It would have been better had the court emphasized the settlement aspect of the case and avoided the dictum relating to liquidation for breaches of promises to pay money.

## *I. Miscellaneous Contracts*

A number of situations do not fit conveniently in any of the above categories. They are briefly discussed in this section.

### *1. Litigation Settlement Agreements*

Two cases have been decided that involved litigation settlements providing for stipulated damages. One, *Los Angeles City School District v. Landier Investment Co.*,[209] has been discussed earlier;[210] while in lengthy dictum the court declared it would normally refuse to enforce a stipulated remedy, for procedural reasons the court enforced the agreement. The second case, *Daddino v. Builders Concrete, Inc.*,[211] involved a settlement agreement incident to nuisance litigation. In an action brought by a farmer, a cement plant was found to be a nuisance; the trial court awarded damages and permanently enjoined the plant from operation. In exchange for being given the right to continue production until October, the cement company agreed to pay plaintiff $50 a day for each day past October 17, 1956, that the factory operated. When the plant operated beyond the deadline, the farmer sued and won a judgment for $2,750 under the liquidation provision. The appellate division of the superior court affirmed, noting how difficult it would have been to estimate damages, that the amount seemed within reason, and that it was arrived at by the negotiations of counsel.

### *2. Partnership Contribution Agreements*[212]

The pattern established by the few cases on liquidation in part-

---

209. *Id.*
210. See text accompanying note 208 *supra.*
211. 168 Cal. App. 2d Supp. 781, 334 P.2d 1067 (Sup. Ct., App. Dep't 1959).
212. Covenants not to compete incident to partnership agreements are discussed in text accompanying notes 190-92 *supra.*

nership contribution agreements is that if the agreement is reasonable, it will be enforced. For example, the agreement in *Hill v. Hearron*[213] contained a blunderbuss penalty clause providing that if a partner did not perform in accordance with the agreement he would forfeit his interest in the partnership. The appellate court applied the *Freedman* concept to the transaction and held that the defaulting partner was entitled to the net benefit he conferred upon the partnership and his breach, though willful, did not automatically cause a forfeiture of his entire partnership interest.

In contrast, the agreement in *Feiger v. Winchell*[214] gave a partner , the option of either meeting the call for more capital or having his profit-or-loss percentage adjusted. In effect, the court held that this was a case of alternative performances,[215] and therefore it did not have to comply with section 1670; the partner could either pay or have his profit ratio reduced. However, the court declared that even if it were a liquidation provision it would be upheld, because at the time the partnership agreement was made, the

> transaction . . . was very highly speculative and it was almost impossible at the time of entering into the partnership to foresee with any degree of accuracy the amount of profits or losses there might be. At the time of entering into the partnership agreement it was impractical and extremely difficult to fix the actual damages that might result in case of a breach.[216]

This may be true; perhaps the enterprise could not borrow additional money and would collapse without the contribution. But it still appears to be a promise to pay money, and liquidation is generally not allowed in this situation.[217]

### 3. *Insurance Contracts*

Usually, the insured does not promise to pay premiums, and forfeiture is prevented by other doctrines, but *Kelly v. Great Western Accident Insurance Co.*[218] involved the execution of a five-year note by the insured for premiums of $60 a year. The insured did not make the second payment after demand and then killed himself. The beneficiary attempted to collect on the policy, arguing that a provision providing for forfeiture in the event of nonpayment came under sections 1670

---

213. 113 Cal. App. 2d 763, 249 P.2d 54 (3d Dist. 1952).<br>
214. 205 Cal. App. 2d 123, 22 Cal. Rptr. 901 (2d Dist. 1962).<br>
215. Corbin agrees. 5 CORBIN § 1070.<br>
216. 205 Cal. App. 2d at 130, 22 Cal. Rptr. at 905. See text accompanying notes 220-26 *supra*.<br>
217. *See* 5 CORBIN § 1065 (arguing that a promise to pay money cannot be liquidated unless there are consequential damages).<br>
218. 46 Cal. App. 747, 189 P. 785 (1st Dist. 1920).

and 1671. The court agreed and held for the beneficiary when the insurance company failed to establish compliance with section 1671.

### 4. Goodwill

Where the breach in question relates to and affects goodwill, courts typically enforce liquidated damages clauses, as is shown by the many cases that permit even lump sum liquidation clauses to be enforced in covenants not to compete—even without the necessity of pleading and proving compliance with section 1671.[219]   Goodwill considerations have also led courts to enforce liquidation clauses in other situations where liquidation is not generally permitted.[220]

## IV

### CRITERIA FOR ENFORCEABILITY

#### A.   Type of Harm

The most important criterion for enforceability is whether damages for the type of harm that is contemplated are "impracticable or extremely difficult to fix" as required by section 1671. This is sometimes referred to as the "difficulty of ascertainment" test. This statutory language leaves unanswered two principal questions: First, at what time must the actual damages be difficult to ascertain? Second, precisely how much uncertainty is necessary? The section discusses the courts' reactions to these problems.

#### 1.   Contract Orientation or Trial Orientation?

One possibility is to focus attention upon the time when the contract is made—the look-forward rule. The court must put itself in the position the parties were in and try to determine whether the anticipated harm would be impracticable or extremely difficult to fix. This emphasis upon the situation at the time the contract was made often obscures an important differentiation. Does the required difficulty relate to (1) the amount of damages that will actually be suffered or (2) to the difficulty of establishing the amount even after the facts surrounding the breach are established? If (1) is the standard, there is almost open-ended autonomy to control damages, because the facts that establish the amount will not, as a rule, be known until breach. If enforceability requires compliance with (2), the "look-forward" means that even with the benefit of the facts surrounding the breach, damages

---

219. See text accompanying notes 183-87 supra.
220. See, e.g., McCarthy v. Tally, 46 Cal. 2d 577, 297 P.2d 981 (1956).

must be difficult to establish because of the absence of a well-recog-
nized and easily workable measure of recovery.

The principal justifications for (1) are either to reward the con-
tracting party who guesses best or to provide a means of letting the
parties know what a breach will cost the breaching party at the time the
contract is made.   This is certainly desirable when contract breach
can potentially be open ended.   Undoubtedly, this was the principal
reason for enforcement of the liquidation clause in the *Better Foods*
case.[221]   Yet, the same justification can be given to a clause limiting
liability.

Even if emphasis is upon the difficulty of establishing damages
at the time of the trial, we are still concerned with letting the parties
know their exposure at the time they make the contract.   However,
we do not need to give them autonomy unless they are entering into a
transaction where damages will be difficult to establish at the time of
trial.

The other possibility is to emphasize the time the breach occurred
or, more realistically, the time of trial.[222]   The rationale for this rule
is that it restricts the use of liquidation to those times when the court
cannot do a decent job of assessing actual damages.   Thus, it avoids
potential unjust enrichment and the seeming injustice of enforcing a
clause when actual damages are much different from the liquidated
sum.   While theoretically these time references are mutually exclusive,
in practice the differences are not absolute.   The issue is one of em-
phasis:   A look-forward court emphasizes the situation that existed at
the time the contract was made but does not ignore actual damages;
a trial-oriented court is primarily concerned with the clause as a means
of making "possible a definite and adequate remedy in place of a more
doubtful and inadequate one offered by the law,"[223] but it may also
consider the situation at the time the contract was made.   The look-
forward test has been adopted in California.   The leading recent
case is *Better Foods Markets, Inc. v. American District Telegraph Co.*[224]
This case involved a contract for the furnishing of burglar alarm serv-
ices with a $50 liquidation figure.[225]   After quoting the statutory
test, the court unequivocally stated:

> The plaintiff argues that there is no difficulty in the present
> case in fixing the actual damage and that the amount of money stolen

221. Better Foods Mkts., Inc. v. American Dist. Tel. Co., 40 Cal. 2d 174, 253
P.2d 10 (1953).
222. Note, *supra* note 42, at 235-36.
223. 5 CORBIN § 1058, at 339.
224. 40 Cal. 2d 174, 253 P.2d 10 (1953).
225. See text accompanying notes 146-48 *supra*.

should be the actual damage. Its contention is that the time for the determination of the question of the impracticability and difficulty in fixing the damages is after the loss has occurred. This is not the rule. In determining this question the court should place itself in the position of the parties at the time the contract was made and should consider the nature of the breaches that might occur and any consequences that were reasonably foreseeable.[226]

Unfortunately the court used "look-forward" in sense (1) rather than sense (2). At the time the contract was made, the facts surrounding the breach could not be known, so the amount of damage was impracticable or extremely difficult to fix. But the amount of damage could be determined at the time of trial. The only justification for the court's "look-forward" analysis would be problems of causation; even at trial time it would be difficult to determine whether the alarm company's breach caused the loss.

A later supreme court case, *McCarthy v. Tally*,[227] and several early lower court cases[228] concur in this holding, although in all but *Better Foods*, taking aside the difficult causation question, the courts' statements on this issue were gratuitous in that it is likely in those cases that damages would have been difficult to establish even at the time of trial. In fact, even *Better Foods* did not raise the issue squarely; there the court was dealing with a limitation of liability that should have been upheld as such. Nevertheless, the look-forward rule is clearly established in California.

## 2. What Damages Are "Impracticable or Extremely Difficult to Fix"?

The second important question in the difficulty-of-ascertainment area relates to determining what is "impracticable or extremely difficult." A few cases have attempted to elaborate upon the statutory language, stating that liquidation would be allowed where damages are "absolutely uncertain"[229] or "uncertain and not susceptible to computations,"[230] but would not be allowed if the damages were "a simple matter to ascertain"[231] or "readily computable."[232] Taken together,

226. 40 Cal. 2d at 184-85, 253 P.2d at 14.
227. 46 Cal. 2d 577, 297 P.2d 981 (1956).
228. Starr v. Lee, 88 Cal. App. 344, 263 P. 376 (1st Dist. 1928); Hanlon Drydock & Shipbuilding Co. v. G.W. McNear, Inc., 70 Cal. App. 204, 232 P. 1002 (1st Dist. 1924).
229. Potter v. Ahrens, 110 Cal. 674, 681, 43 P. 388, 389 (1896).
230. Pogue v. Kaweah Power & Water Co., 138 Cal. 664, 668, 72 P. 144, 145 (1903).
231. Sherman v. Gray, 11 Cal. App. 348, 352, 104 P. 1004, 1005 (1st Dist. 1909).
232. Robert Marsh & Co. v. Tremper, 210 Cal. 572, 576, 292 P. 950, 952 (1930).

these emphasize that liquidation will not be permitted when the actual damages or the anticipated damages can be computed by application of a well-established damage measure that can furnish a solution without great difficulty.

More valuable than these verbal formulations is a review of what the courts have done. First, there are certain situations in which courts usually will not enforce a liquidation clause. For example, liquidation clauses have not been enforced where the breach relates to furnishing legal services[233] and in contracts involving brokers' services.[234] Courts have also generally refused to enforce liquidation clauses in goods contracts[235] and leases.[236] Second, courts have frequently refused to allow liquidation where an explicit provision of the Civil Code establishes damages for a particular type of breach. In *Greenleaf v. Stockton Combined Harvester & Agricultural Works*,[237] for example, the court refused to enforce a provision claimed by appellant to liquidate damages for breach of warranty because the Civil Code set the measure of recovery and therefore it was not impracticable or difficult to fix damages. Similarly in *Drew v. Pedlar*,[238] a defaulting-plaintiff-land-contract case, the court stated that section 3307, which provides "a rule by which the damage, in all cases of this kind, may be measured and definitely fixed,"[239] precluded liquidation. And in *Knight v. Marks*,[240] a case involving a 10-year lease, the court refused to enforce a purported liquidated damages clause because section 3302 set the amount due on the obligation plus interest as the measure for failure to pay money.[241]

Courts that refuse to enforce liquidation clauses because they find the measure of recovery sufficiently easy to work with sometimes indicate liquidation is possible where special damages are contemplated at the time the contract is made.[242] For example, in *Stark v. Shemada*,[243] the court stated:

> Circumstances may arise where, when the property is purchased for a special purpose, or has a special value, special damages may be allowed, but the facts as here pleaded . . . [do] not take the case out of the general rule.[244]

---

233. See text accompanying notes 128-30 *supra*.
234. See text accompanying notes 123-27 *supra*.
235. See text accompanying notes 94-115 *supra*.
236. See text accompanying notes 76-93 *supra*.
237. 78 Cal. 606, 21 P. 369 (1889).
238. 87 Cal. 443, 25 P. 749 (1891).
239. *Id.* at 450, 25 P. at 751.
240. 183 Cal. 354, 191 P. 531 (1920).
241. But see note 90 *supra*.
242. *But see* Greenbach Bros., Inc. v. Burns, 245 Cal. App. 2d 767, 54 Cal. Rptr. 143 (1st Dist. 1966).
243. 187 Cal. 785, 204 P. 214 (1922).
244. *Id.* at 788, 204 P. at 216.

A similar exception might be appropriate in another type of case. Many measures of recovery, such as those for defaults in sales of goods or land, are based upon the difference between contract and market prices at the time of breach.[245]   However, subject to the rules relating to foreseeability, there may be additional damages, such as unusual resale profits.   In such a case, it may be permissible to liquidate damages for that particular risk.

There are also certain types of cases where courts have typically enforced liquidation clauses, such as covenant-not-to-compete cases[246] and contracts to explore for oil.[247]   A liquidation clause would also very likely be enforced where a breach by an employer in the payment of wages to a union member would do irreparable harm to the prestige of the union,[248] where a marketing cooperative association member injures the reputation of the association by not delivering as promised,[249] or where the liquidated breach affects goodwill.[250]   Finally, liquidation is permitted for construction delay.[251]

The clearest distinction is that, in each of the cases where liquidation was allowed, it was relatively clear that there was some damage, but the amount would have been very difficult to prove, even at the time of trial.   The prediction of the parties is just as good as the court's at the time of trial.   On the other hand, in cases where liquidation has not been permitted, while proof of the amount of damages is not always clear cut—attorneys may differ in valuing legal services, experts may differ in valuing broker services, and there may be questions as to the proper market and whether the price obtained or paid was reasonable—valuing the actual damages is not beyond the skill and expertise of a court; therefore, the need for contract-specified amounts is not as pressing.   This distinction is the best predictive guide in this field:   Courts are likely to validate clauses where the actual damages are difficult to measure even at the time of trial and are unlikely to validate clauses where the measures of recovery for actual damages are relatively simple to work with and can produce a reasonably rational solution.   Corbin sums it up this way:   Clearly, the harm is liquidatable where the evidence would be too uncertain to go to a jury; the harm should also be liquidatable where there is enough evidence to go to a jury, but

---

245.   See CAL. CIV. CODE §§ 3306-07 (West 1970); CAL. COMM. CODE §§ 2708, 2713 (West 1964).

246.   See text accompanying notes 183-92 supra; 5 CORBIN § 1062.

247.   See text accompanying notes 117-22 supra; 5 CORBIN § 1062.

248.   California State Council of Carpenters v. Superior Court, 11 Cal. App. 3d 144, 89 Cal. Rptr. 625 (4th Dist. 1970).

249.   Seid Pak Sing v. Barker, 197 Cal. 321, 240 P. 765 (1925).

250.   McCarthy v. Tally, 46 Cal. 2d 577, 297 P.2d 981 (1956) (dictum).

251.   See text accompanying notes 163-77 supra; 5 CORBIN § 1062.

the difficulty of proof . . . may be . . . such as it make estimation impossible by mathematical processes or by the use of established market prices or by any other definite standard of valuation.[252]

Thus, though the announced test is look-forward, what counts is the convenience and efficiency by which actual damages can be measured at trial.

### B. Process By Which Stipulated Amount Is Determined

No requirement that the amount specified as liquidated damages be determined in any particular way appears in section 1671, but case law clearly has added such a requirement for enforcing a liquidation clause. Again, the leading cases are *Better Foods* and *Tally*. In *Better Foods* the supreme court stated that the amount "must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained."[253] Similarly, in *Tally* the court declared there must be a "reasonable endeavor to ascertain what such damages would be."[254] The supreme court cases emphasize a reasonable *process* to predict damages, although the reasonableness of the amount or formula chosen is also likely to be crucial. This is because the probable injury the parties had reason to foresee largely determines whether they made any attempt to predict damages, let alone a reasonable one.[255] It is perhaps because of this that the lower courts that have considered the problem have shifted from a broad standard of honesty and good faith to a somewhat narrower standard of reasonableness.[256]

In most cases there is little evidence of the process by which the stipulated amounts are determined, but a few cases have touched upon the problem of applying the abstract standard to actual facts. One, *Leslie v. Brown Brothers, Inc.,*[257] went directly into the question of how the amount was determined. The performing party had put up a note and security for $7,500 that was to be forfeited if he did not make certain agricultural improvements by a given date. A witness for the nonperforming party was asked:

[The note and security] were simply put up, as I understand it, as a penalty in the event he didn't complete the contract, is that right?

---

252. 5 CORBIN § 1060.

253. 40 Cal. 2d at 187, 253 P.2d at 15.

254. 46 Cal. 2d at 586, 297 P.2d at 987.

255. 5 CORBIN § 1072. Corbin favors reasonableness as the standard. *Id.* § 1063.

256. *See* People v. Central Pac. R.R., 76 Cal. 29, 36, 18 P. 90, 94 (1888); Hanlon Drydock & Shipbuilding Co. v. G.W. McNear, Inc., 70 Cal. App. 204, 218, 232 P. 1002, 1008 (1st Dist. 1924).

257. 208 Cal. 606, 283 P. 936 (1929).

The witness answered yes to this question and then was asked:

> In other words, you were not going to pay him anything for those notes and mortgages, but would keep them. if he didn't comply with the contract within the time mentioned. A. That is the idea.[258]

While the court seemed to base its refusal upon the absence of a process to estimate damages, it is likely that the real reason was the ease with which actual damages can be established.

In *Daddino v. Builders Concrete, Inc.,*[259] the court, after noting the difficulty in estimating damages caused to a farmer by an adjacent factory, emphasized that the amount was determined by the negotiations of counsel for both parties. Because the potential damages were extremely difficult to estimate and the parties were represented by counsel, the court paid little attention to the process by which the liquidation amount was selected.

Clearly, *Daddino* is typical of what courts normally do. While we have little data on how liquidation amounts are determined, what data we do have shows that, even in fields where liquidation clauses are generally upheld, the process of selecting a liquidation figure does not meet the articulated test. For example, courts generally enforce liquidation clauses when a contractor on a public project fails to meet deadlines; yet, as noted earlier, a California highway engineer has explained that the amount selected for liquidated damages provisions in roadbuilding contracts is not an attempt to estimate damages but simply a device to ensure that the contractor takes his completion date seriously in projects of urgency.[260] Even when, as in land contracts, the parties actually engage in bargaining, they do not bargain over damage estimates. For example, in *Caplan v. Schroeder*[261] the $15,000 deposit was bargained out but represented what the parties thought a six-month right to purchase, which caused a tie-up of the land, was worth; it was not their estimation of damages. Similarly, it is likely that the customary flat amount or percentage deposit is not based upon an evaluation of actual damages over many transactions but is selected without any attempted estimation of damages.[262] As noted in *Caplan v. Schroeder,*[263] generally both parties think that the land will rise in value, and, if this is so, the amount selected cannot possibly be an estimate of damages. With the emergence of more mass-

---

258. *Id.* at 617, 283 P. at 940.

259. 168 Cal. App. 2d Supp. 781, 334 P.2d 1067 (Super. Ct., App. Dep't 1959).

260. See the discussion of the work of engineer Elliott in H. Jones, A. Farnsworth & W. Young, *supra* note 175.

261. 10 Cal. Rptr. 399, 401 (Cal. App. 4th Dist.), *rev'd,* 56 Cal. 2d 515, 364 P.2d 321, 15 Cal. Rptr. 145 (1961). *See also* Smith v. Royal Mfg. Co., 185 Cal. App. 2d 315, 8 Cal. Rptr. 417 (1st Dist. 1960).

262. *See* 5 Corbin § 1058.

263. 56 Cal. 2d 515, 520, 364 P.2d 321, 324, 15 Cal. Rptr. 145, 148 (1961).

produced forms created by the dominant party, we can expect even fewer stipulated damages that are actually a jointly determined estimate of actual damages.

Although it is rare that a liquidation amount is selected in a process that is a reasonable endeavor by the parties to estimate the damages for any loss that may be sustained, liquidation clauses are nevertheless enforced when the actual damages are difficult or impossible to ascertain. It therefore seems that, despite the courts' contrary protestations, it really does not matter what process is used to select liquidation amounts as long as the amount selected is within the realm of reason.

### C.   Actual Damages

Frequently, the party seeking to invalidate a liquidation clause wishes to show that the actual damages suffered, if any, were substantially less than the stipulated liquidation damages. Less frequently, a party may seek to avoid enforcement of a liquidation clause by arguing that actual damages were substantially greater than the stipulated liquidation damages. When faced with these problems, a court must reconcile its function of awarding only compensatory damages with rules that often make it appear that the award exceeds actual damages.[264]

While an occasional court has bluntly stated that actual damages are not relevant,[265] it is generally accepted that actual damages are relevant for certain purposes. For example, the actual damages may help determine whether the liquidation amount was established as the result of a reasonable endeavor to estimate the damages.[266] However, despite an early case taking the contrary view,[267] it is now well established that the plaintiff need not allege nor prove any actual damages.[268] Yet, if the defendant can show that there have been no actual damages, the court may rely on this factor to support a holding denying enforcement of the liquidation clause. For example, in *Eva v. McMahon*[269] the court stated:

> Here the plaintiff had sustained no damage at all, and it would seem to violate all rules of honesty and fair dealing to allow him to take from the defendants the large sum claimed.

---

264. Comment, *Liquidated Damages and the "No Harm Rule,"* 9 STAN. L. REV. 381, 386 (1957).

265. *E.g.,* Streeter v. Rush, 25 Cal. 67 (1864).

266. *See* Wilmington Transp. Co. v. O'Neil, 98 Cal. 1, 32 P. 705 (1893); 5 CORBIN § 1063.

267. Kelly v. McDonald, 98 Cal. App. 121, 276 P. 404 (3d Dist. 1929).

268. McCarthy v. Tally, 46 Cal. 2d 577, 297 P.2d 981 (1956). *But cf.* London Guar. & Acc. Co. v. Las Lomitas School Dist., 191 Cal. App. 2d 423, 425-26, 12 Cal. Rptr. 598, 599-600 (1st Dist. 1961).

269. 77 Cal. 467, 472, 19 P. 872, 874 (1888).

Professor McCormick, an advocate of autonomy, objects to these cases; he would ignore actual damages and enforce a liquidation clause if the amount is "reasonably proportioned to probable loss" judged at the time of the contract.[270]   This conclusion would do violence to the compensation principle, but the compensation principle is not inviolate and in contract law, despite what courts often say, punishment is a factor.[271]   Furthermore, strong positive arguments, such as assumption of risk and encouragement of the use of liquidation clauses, support McCormick's view.   Nevertheless, when directly faced with the question, most American courts will not *knowingly* enforce a liquidated damages clause where there is no actual damage.[272]

### D.   Other Criteria for Enforceability

In addition to these generally recognized criteria, some other factors may regularly tend to influence whether a liquidation clause will be enforced.   This section considers these miscellaneous factors.

Surprisingly, one of these factors has not been the presence of an adhesion context; the cases have paid little explicit attention to the distinction between a negotiated contract and one of adhesion.   Perhaps this is due to the relatively recent recognition of this distinction and the paucity of recent cases involving attempts to prescribe stipulated damages in an adhesion context.

A greater recognition of this dichotomy may be presaged by the recent case *Bauer v. Jackson.*[273]   A contract for the shipment of horses by a common carrier specified an agreed valuation of $200 per horse; some horses were injured due to the negligence of the carrier, and the carrier claimed the contract limited his obligation to the agreed valuation of $200 each.   At common law a carrier could not limit his

---

270.   McCormick §§ 149-50.

271.   In some special cases, punitive damages can be recovered. *See* Simpson, *Punitive Damages for Breach of Contract*, 20 Ohio St. L.J. 284 (1959). Willfulness may deprive a party of forfeiture protection. *See* Cal. Civ. Code § 3275 (West 1970). The measure of recovery for breach by a seller is affected by the existence of bad faith. *Id.* § 3306. It is sometimes asserted that a willfully breaching contractor cannot use substantial performance. 3A Corbin § 707. *See also* Restatement of Contracts § 275(c) (1932) (listing willfulness as a factor in determining materiality of breach).

272.   Caplan v. Schroeder, 56 Cal. 2d 515, 364 P.2d 321, 15 Cal. Rptr. 145 (1961); Freedman v. Rector, 37 Cal. 2d 16, 230 P.2d 629 (1951); Petrovich v. City of Arcadia, 36 Cal. 2d 78, 222 P.2d 231 (1950); Olson v. Biola Cooperative Raisin Growers Ass'n, 33 Cal. 2d 664, 204 P.2d 10 (1949); Webster v. Garrette, 10 Cal. App. 2d 610, 52 P.2d 550 (3d Dist. 1935); White v. City of San Diego, 126 Cal. App. 501, 14 P.2d 1062 (4th Dist. 1932); Meate & Co. v. Fresno Compress & Whse. Co., 113 Cal. App. 325, 298 P. 126 (4th Dist. 1931); Jakovich v. Romer, 74 Cal. App. 333, 240 P. 39 (1st Dist. 1925).

273.   15 Cal. App. 3d 358, 93 Cal. Rptr. 43 (4th Dist. 1971).

liability, but in *Bauer* the carrier had filed a tariff schedule pursuant to the Carmack Amendment,[274] which permits limitation if the amount is reasonable, a tariff is filed with the Interstate Commerce Commission, and the shipper is given the choice of an increased valuation for a higher shipping charge.   The court of appeals reversed a trial court holding that the shipper was conclusively bound because he signed a form with the agreed valuation contained in it, arguing that there must be an *understanding* consent:

> In the present case . . . the carrier's agent inserted in the shipping contract a "declared value" of $200 per horse without discussing value or choice of rates with the shipper's agent.   The shipper's agent testified he had no opportunity to read the document because it was not handed to him until after the horses had been loaded and the truck was ready to leave.   An inference can be reasonably drawn that he thought he was merely signing a delivery receipt.   He testified he was [not] apprised of the fact that the contract limited recovery for loss or damage to $200 per horse . . . .[275]

The court held that consent is a factual question, as is the question of whether the shipper had been given reasonable notice of an alternate rate based on valuation.

There are various other factors courts have suggested that may influence enforceability.   One court noted the presence of an attorney for each party in the negotiations leading to a contract containing a liquidation clause and suggested that this factor aids enforceability.[276] Indeed, one suspects that one reason the *Freedman* doctrine evolved in the land-purchase-deposit cases is that buyers, especially buyers of residences, are not often represented by an attorney.[277]   Other courts have declared that it aids enforceability if the "amount provided in the contract . . . as liquidated damages is  . . . not unconscionable"[278] and is "in good faith inserted in the contract,"[279] suggesting, as would be expected, that a court will not enforce a liquidation clause that offends its sense of justice.   This may be why courts are reluctant to enforce a liquidation clause against a party who has good cause, but not

---

274.   49 U.S.C. § 20(11), (12) (1970).

275.   15 Cal. App. 3d at 370, 93 Cal. Rptr. at 50.

276.   Daddino v. Builders Concrete, Inc., 168 Cal. App. 2d Supp. 781, 784, 334 P.2d 1067, 1069 (Super. Ct., App. Dep't 1959).

277.   *Compare* Freedman v. Rector, 37 Cal. 2d 16, 230 P.2d 629 (1951) *with* Better Foods Mkts., Inc. v. American Dist. Tel. Co., 40 Cal. 2d 179, 253 P.2d 10 (1953) *and* Atkinson v. Pacific Fire Extinguisher Co., 40 Cal. 2d 192, 253 P.2d 18 (1953).

278.   Escondido Oil & Dev. Co. v. Glasser, 144 Cal. 494, 500, 77 P. 1040, 1042 (1904).

279.   Hanlon Drydock & Shipbuilding Co. v. G.W. McNear, Inc., 70 Cal. App. 204, 218, 232 P. 1002, 1008 (1st Dist. 1924).

legal excuse, for nonperformance.[280] Finally, it appears that a party who determined the amount of the liquidation and put the clause into the contract will find it more difficult to avoid enforcement of the stipulated damages than the other party.[281]

### E. Alternative Performances

Because sections 1670 and 1671 do not apply if the contract is interpreted as providing for alternative performances rather than liquidation, one technique for obtaining enforcement of contract-stipulated damages is to meet the test for alternative performances. McCormick states that the test is whether the promisor reasonably believes he has a rational choice of course to pursue.[282] If there are true alternatives, performance of either will discharge him.

The cases have not probed deeply into the alternative performance question: an insurance salesman may not have a rational choice as to whether he will continue working or lose his renewal commission;[283] a debtor may not have a real choice as to whether to pay on time or pay slightly later at a much higher rate; a buyer may not really decide to purchase the land or lose his downpayment. As a result, the alternative performance doctrine has become a useful tool to enforce a reasonable remedy clause without showing compliance with section 1671.

### F. Availability of Specific Performance

In California it is clear that the availability of a valid liquidation clause does not affect the right to specific performance; Civil Code section 3389 provides that specific performance can be obtained in a proper case even if there has been a valid liquidation of damages.[284]

### V

### LEGISLATIVE REFORMS

Sections 1670 and 1671 have been California law for almost one hundred years; they have stood without amendment since 1872. Plainly, any proposal for changing these statutes or adding others to limit their authority must be preceded by the finding that the existing statutory scheme is deficient in some significant way. While the statutes could have been better drafted, one can argue that they are working.

---

280. See text accompanying note 24 *supra.*
281. Horrell v. Lakewood Marina, Inc., 3 Cal. App. 3d 506, 83 Cal. Rptr. 701 (4th Dist. 1970); Hanlon Drydock & Shipbuilding Co. v. G.W. McNear, Inc., 70 Cal. App. 204, 232 P. 1002 (1st Dist. 1924).
282. MCCORMICK § 154.
283. Bach v. Curry, 258 Cal. App. 2d 676, 66 Cal. Rptr. 220 (1st Dist. 1968).
284. For a case in a jurisdiction without such a statute, see Bauer v. Sawyer, 8 Ill. 2d 351, 134 N.E.2d 329 (1956).

There is no present outcry for reform, and the areas of principal difficulty (advance payments of rent and the deposits made incident to contracts to purchase land) are quiescent: the worst aspects of the advance deposits in leases were minimized by legislative change in 1970[285] and the land-purchase-contract problem seems to have been taken care of by the dictum in *Caplan v. Schroeder*[286] discussed above.[287]

But sections 1670 and 1671 do not state the whole law. First, they do not explain whether the test should be applied at the time the contract is made or at the time of breach. Also, the phrase "impracticable or extremely difficult to fix" is so ambiguous it fails to provide guidance to contracting parties. Thus, attorneys must look to the case law to find that the statutory test should be applied at the time of contracting and that liquidation clauses will be enforced where there is no generally accepted and easily applied measure of recovery. In addition, the second articulated principal test—that there be a reasonable endeavor to estimate actual damages—is not even suggested in the code; it is found only in the *Better Foods*[288] and *Tally*[289] cases. One possible legislative reform is to amend sections 1670 and 1671 to express the entire law as articulated by the courts.

A second possible avenue for legislative change is to restructure sections 1670 and 1671 to make them conform to what is actually being done in the cases, rather than the articulated standards there expressed. Courts enforce liquidated damage clauses when it is reasonable to do so. Because reasonableness depends principally on the difficulty of determining actual damages at the trial, liquidation clauses are usually enforced only when the trial court needs help: when there are no clear, easily administered formulas for determining actual damages.

A third, and the most desirable, alternative for legislative change would, like the second, make the standard one of reasonableness but would allow more autonomy than the present case law permits. Judicial and legislative limitation on party autonomy to control the amount of damage recognizes that extreme inequality of bargaining power can lead to oppression, violate the compensation principle, create unjust enrichment or undesirable liability limitation, and punish those who breach contracts. However, sections 1670 and 1671 go farther; they reflect 19th-century hostility to almost all liquidation clauses ex-

285. See text accompanying notes 86-92 *supra.*
286. 56 Cal. 2d 515, 364 P.2d 321, 15 Cal. Rptr. 145 (1961).
287. See text accompanying note 60 *supra.*
288. Better Foods Mkts., Inc. v. American Dist. Tel. Co., 40 Cal. 2d 174, 187, 253 P.2d 10, 15 (1953).
289. McCarthy v. Tally, 46 Cal. 2d 577, 584, 297 P.2d 981, 986 (1956).

cept where it is likely that the amount selected by the parties is as accurate an estimation of actual damages as a court could make. If the contract is negotiated, the parties should be given more leeway to determine damages for breach.

Generally the bargaining process will itself act as a check upon oppression and unjust enrichment, but even in negotiated contracts courts should examine liquidation clauses to assure that they are reasonable. To determine reasonableness, a court should look at the parties and the facts and circumstances surrounding the making of the contract and its breach, and it should estimate the range of actual damages. If the amount specified in the contract falls within the judge's estimation of actual damages, the clause should be enforced. Otherwise, only in those rare cases where the trial judge is confident that the evidence will clearly establish the actual damages with a minimal expenditure of judicial effort should the clause not be enforced.

Suppose it appears to the judge that a loss has been suffered but that evidence of actual damages would not be sufficient to sustain a damage award because of the proof requirements of foreseeability, causation, or certainty. A clause incorporated in a negotiated contract should be enforced if the risk was assumed, proper performance is very important, and the amount is reasonable in light of the compensation being paid for performance. Enforcement of liquidation clauses under these circumstances means that reasonable penalties in negotiated contracts will be enforced, much like what is already done in public contracts where there is delay.[290]

To give this maximum effect to liquidation clauses in negotiated contracts and to avoid the expenditure of unnecessary judicial energy, California pleading and procedure rules should be changed. Rather than require the party relying on the clause to plead and prove compliance,[291] the party seeking to avoid the clause should be required

---

290. See text accompanying notes 168-70 *supra.*

291. While a few cases [McComber v. Kellerman, 162 Cal. 749, 124 P. 431 (1912); Shafer v. Sloan, 3 Cal. App. 335, 85 P. 162 (2d Dist. 1906)] have enforced liquidation clauses despite failure to plead compliance with section 1671, generally the party relying on the liquidation clause must plead and prove compliance with that section. Caplan v. Schroeder, 56 Cal. 2d 515, 364 P.2d 321, 15 Cal. Rptr. 145 (1961). However, the court in Bilardi Constr. Inc. v. Spencer, 6 Cal. App. 3d 771, 86 Cal. Rptr. 406 (1st Dist. 1970), permitted a pretrial order to substitute for the usual requirement that the issue be raised by pleading.

While there have been decisions that seem to require that the specific facts relating to the transaction itself be pleaded, pleading the statutory language and that the amount is a reasonable endeavor to fix the actual damages has been held to be sufficient. *See generally* 3 B. WITKIN, CALIFORNIA PROCEDURE § 795 (2d ed. 1971). Many cases state that the validity of the clause is a question of fact. *See, e.g.,* Caplan v. Schroeder, *supra;* McCarthy v. Tally, 46 Cal. 2d 577, 297 P.2d 981 (1956). But in a few cases, demurrers have been sustained. Better Foods Mkts., Inc. v. American

to persuade the court that the amount selected will not fall within the range of estimated actual damages and that the requirements for enforcement of a reasonable penalty clause have not been met before any evidence is received on the damages question.   In addition, if evidence concerning damages is received, the party seeking to avoid the clause should have the burden of showing that actual damages are different from the stipulated amount.

But in adhesion transactions there is great risk of oppression and abuse of autonomy.   Since there is no bargaining process, we should not accord even prima facie reasonableness to the amount selected. However, we should not automatically deny even the dominant party in an adhesion contract the power to control damages.   Rather, we should scrutinize liquidation clauses in adhesion contracts with great care to determine their fairness, with the burden of showing fairness being upon the proponent of the clause—in most cases, the stronger party.[292] Moreover, in this situation the clause should be enforced only if the court needs this help in establishing the amount of damages.

This third legislative solution could be adopted by enacting a statute such as the following reworking of Commercial Code section 2718:

> Where reasonable, a contractual stipulation of damages for contract breach is valid.   Reasonableness may take into account:
>
> 1.   The contract terms;
> 2.   The facts and circumstances surrounding the making of the contract and its breach;
> 3.   The anticipated harm;
> 4.   The actual harm caused by the breach;
> 5.   The difficulty of proof of loss; and

---

Dist. Tel. Co., 40 Cal. 2d 174, 253 P.2d 10 (1953); Zurich Ins. Co. v. Kings Indus. Inc., 255 Cal. App. 2d 919, 63 Cal. Rptr. 585 (2d Dist. 1967).

As for satisfying the burden of proof, clearly courts look beyond labels to the surrounding facts and circumstances. See, e.g., Parigian v. Citizens Nat'l Trust & Sav. Bank, 42 Cal. App. 2d 773, 110 P.2d 117 (2d Dist. 1941); Mente & Co. v. Fresno Compress & Whse. Co., 113 Cal. App. 325, 298 P. 126 (4th Dist. 1931). While the intention of the parties usually has not been significant in determining validity, where there is evidence that the clause was intended to coerce the other party such evidence is considered and can often be persuasive. See, e.g., Leslie v. Brown Bros., Inc., 208 Cal. 606, 283 P. 936 (1929); Los Angeles City School Dist. v. Landier Inv. Co., 177 Cal. App. 2d 744, 2 Cal. Rptr. 662 (2d Dist. 1960).

The party relying on the clause need not plead or prove actual damages. McCarthy v. Tally, supra.

While the case law is not clear, it appears that the question of validity will be determined by the judge. See Sun-Maid Raisin Growers v. Paul A. Mosesian & Son, Inc., 90 Cal. App. 1, 265 P. 828 (3d Dist. 1928).

292.  See La Sala v. American Sav. & Loan Ass'n, 5 Cal. 3d 864, 489 P.2d 1113, 97 Cal. Rptr. 849 (1971).

6.  The inconvenience or nonfeasibility of otherwise obtaining an adequate remedy.

In addition, the legislature should isolate those transactions that generate oppression or need a more precise standard than reasonableness and provide specialized treatment for those cases.  Illustration of such transactions would be land purchase deposits,[293] education tuition forfeitures,[294] and late payment charges.[295]

## CONCLUSION

Relatively certain enforcement of clauses controlling the amount of damages in negotiated contracts should encourage both contractmaking and performance and should relieve the already overburdened courts of the frustrating and difficult process of determining the amount of damages for contract breach.

---

293.  The earnest money cases are an area where it may be particularly desirable to have a precise standard for determining validity.  The legislature could provide that use of a statutory schedule specifying a liquidation amount based upon the purchase price ensures validity.  A forfeiture based upon the schedule should be valid even if the buyer has a legitimate excuse for nonperformance, because the parties should be permitted to set an amount that the buyer will lose if the contingency that conditions his obligation does not occur.  *See* Rodriguez v. Barnett, 52 Cal. 2d 154, 338 P.2d 907 (1959).

To make certain that the parties give understanding consent, such a statutory plan could require that both buyer and seller initial the paragraph in the contract where the amount is designated and write in the amount by hand.

The statutory schedule should be permissive.  If buyer and seller wish to use an amount that deviates from the schedule, validity would be determined in the same way as any other liquidation clause.

294.  See text accompanying note 150 *supra.*

295.  See text accompanying notes 204-08 *supra.*

(1293–1300 blank)

# EXHIBIT B



*6521712*

SUPERIOR COURT OF CALIFORNIA

COUNTY OF ALAMEDA

RAMZY AYYAD, et al.,                    )    Case No. RG03-121510
                                        )
              Plaintiffs,               )    STATEMENT OF DECISION [C.C.P §
                                        )    632, CRC § 232]
      v.                                )
                                        )    F I L E D
SPRINT SPECTRUM, L.P.,                  )    ALAMEDA COUNTY
                                        )
              Defendant.                )    DEC – 4 2008
                                        )
                                        )    CLERK OF THE SUPERIOR COURT
                                        )    By_____
                                                                  Deputy
_____

SUMMARY.

      Sprint has not met its burden of demonstrating that the Early Termination Fee

("ETF") in its consumer contracts is a lawful liquidated damages provision under Civil

Code § 1671(d).  On the class's claims, the Court finds that Sprint charged the class

$299,473,408 in ETFs and that the class paid $73,775,975 to Sprint.  The class is entitled

to recover the $73,775,975 in ETFs its members paid to Sprint but has no right to recover

the amounts that were charged but not paid.  Because the liquidated damage provision is

invalid, the Court enjoins Sprint from attempting to collect the unpaid flat ETFs and

requires Sprint to provide this decision to third parties owners of Sprint's accounts

receivable that might include ETFs.

      Sprint prevailed on its cross-claim against the class for breach of contract and the

jury found that Sprint's actual damages caused by the termination of the class members'

contracts was $225,697,433.  The Court sets off the class's monetary recovery of

1

$73,775,975 against Sprint's actual damages of $225,697,433 and Sprint's resulting net recovery of $151,921,458 is reduced to zero based on Sprint's prior statement that it will not seek an affirmative recovery from the class. The setoff does not affect the injunctive relief.

PROCEDURAL BACKGROUND

This case was tried to the Court and a jury. The Court set out the respective responsibilities of the Court and the jury in the Orders of March 17, 2008, April 17, 2008, and May 30, 2008. The Court decides (1) whether federal law preempts the claims; (2) whether the ETFs are an alternative means of performance; (3) whether the ETFs are a lawful liquidated damages provision under Civil Code § 1671(d), and (4) the monetary relief, if any, under the UCL and the claim for unjust enrichment. The jury determined (1) the amount of early termination fees paid by all class members; (2) whether the members of the class breached their contracts with Sprint; and (3) the amount of Sprint's actual damages (lost contract revenue less avoidable costs) caused by class members' contract breaches. The Court then calculates the amount of setoff, if any, based on the amount awarded to the class and the amount of actual damages awarded to Sprint.

FINDINGS OF FACT.

Sprint's business before 2000. In the late 1990s, most of Sprint's contracts with its customers were month-to-month contracts. Pryor Depo. at 8. In 1999, Sprint began to study the concept of term contracts and ETFs. Sprint tested term contracts with ETFs

2

1  in selected local markets.  Pryor Depo. at 28-30; *see also* Exhibit 909A1 (Dippon

2  database showing $2100 in ETFs charged in 1999).

3       In 2000 Sprint decided to offer term contracts with a $150 ETF.  Sprint's goal in

4  offering term contracts with ETFs was to decrease the number of customers who leave

5  (churn), Pryor Depo. at 29.  Sprint considered three factors when setting the amount of

6  the ETF: what its competitors were doing; how term contracts with ETFs would

7

8  financially impact Sprint; and customer inputs, including customer acceptance.  Pryor

9  Depo. at 28; 32-33.

10       The amount that Sprint would charge as an ETF was set from a competitive

11  standpoint—between $150 and $200.  Pryor Depo. at 30:23 to 31:11; 32:7-10.  Sprint

12  explored consumer reaction through market testing to determine whether its customers

13  would enter into term contracts with ETFs if they received offsetting benefits such as

14

15  handset subsidies and lower monthly rates.  Exhibits 606-608, 617, 621 at SPR-W

16  000041643, 626, 629.  Sprint analyzed different pricing scenarios in the $150 and $200

17  range through a Customer Lifecycle Value model ("CLV") that evaluated the impact of

18  various pricing decisions given different assumptions and inputs, including average costs,

19  revenues and customer tenure.  Pryor Depo. at 43:1-7; 44:2-13; 46:9 to 47:2; 63:19 to

20  65:2; TR at 1115:13-1116:14 (Souder); Trial Exhibit 600 (CLV spreadsheet).

21

22       Sprint did no analysis that considered the lost revenue from contracts, the

23  avoidable costs, and Sprint's expected lost profits from contract terminations.  Sprint's

24  early evaluations of the ETF assumed that Sprint would not collect any money from the

25  ETFs.  Exhibit 866.  Sprint's later evaluations of the ETF assumed that Sprint would

26  collect 50% of the ETFs charged.  Exhibit 306.

27

3

1         In 2006 Sprint merged with Nextel and increased its ETF to $200. On August 12,

2   2005, Sprint merged with Nextel to form Sprint/Nextel. Sprint thereafter increased the

3   amount of the early termination fee to $200.

4         Sprint's $200 post-merger ETF was based on Nextel's pre-merger ETF. Mr.

5   Wiener, Nextel's Vice President of Strategic Pricing, testified that in 2000 Nextel

6   adopted term contracts with ETFs after considering the competition, its customers, and

7   the costs to the company. Weiner Depo. at 36:3 to 39:16; 40:25 to 43:10; 47:11 to 49:4;

8   80:12 to 81:3. Nextel's ETF was also implemented primarily as a means to discourage

9   customers from leaving. There was no evidence at trial that Nextel did any analysis that

10   considered the lost revenue from contracts, the avoidable costs, or Nextel's expected lost

11   profits from contract terminations. Mr. Wiener's trial testimony, presented only by way

12   of deposition, was in some respects narrower than his summary judgment declaration

13   testimony. The Court relies only on the trial record.

14         Mr. Souder, Sprint's Vice-President of Pricing, testified that following the merger

15   

16   Sprint decided to use a single ETF amount because it simplified the business. Sprint's

17   rationale for setting the ETF at $200 was that Nextel's handsets were more expensive

18   than Sprint's handsets and that a higher ETF would offset Nextel's higher handset

19   subsidies. TR at 1084:3-14.

20   

21         The relevant contract terms. The specific language of Sprint's Terms and

22   Conditions changed throughout the class period. At all times, however, the relevant

23   language was contained under the heading "Termination – Term Contracts" and in a

24   single paragraph. Exhs. 279-292; 630. Although the ETF condition is stated in

25   somewhat different language in the contract variations over the years, all the ETF

26   

27

1    provisions state that the subscriber is required to pay an ETF if the subscriber terminates

2    a term service plan before the end of the term or if Sprint terminates services for cause

3    before the end of the term.  Some contracts refer to the ETF as a "liquidated damage and

4    not a penalty" (Exhs. 279 – 285), while others make no reference to "liquidated damages"

5    (Exh. 286 – 292).

6        Sprint's business during the class period.  The evidence established that Sprint

7

8    charged ETFs each time a subscriber terminated a contract before the completion of a

9    term contract.  Sprint did not, however, charge a single ETF each time a subscriber

10   terminated a single contract.  Sprint charged a separate ETF for each phone line that was

11   terminated early, irrespective of whether or not the customer received a Sprint phone at

12   the time of contracting.  A subscriber with a contract for a $100/month low monthly

13

14   minute family plan with four phones would be subject to $700 in ETFs for terminating

15   the contract early, whereas another subscriber with a contract for a high monthly minute

16   $100 a month plan with one phone would be subject to a $175 ETF for terminating the

17   contract early.  Despite the fact that ETFs were linked to phone lines and not to

18   subscribers or to accounts, almost all the evidence was presented in the context of the

19   number of subscribers, the revenue per subscriber, and cost per subscriber.

20

21       Sprint's business changed during the class period.  The evolution of Sprint's

22   calling plans affects the relevance of Sprint's nationwide network.  At the start of the

23   class period most calling plans were regional in nature with extra fees imposed for calls

24   outside the regional calling area, whereas at the conclusion of the class period most of

25   Sprint's plans were national in nature without extra charges for long distance calls.  Exhs

26   739, 816, 844-45, 847, 853, 923.  This suggests that early in the class period the Court

27

5

should analyze class member expectation and Sprint's costs on a regional basis whereas

later in the class period the Court should analyze class member expectation and Sprint's

costs on a nationwide basis.  The evolution of technology also presumably decreased

Sprint's cost to provide each minute of service as the class period progressed.  Dr.

Selwyn testified that data on the cost per minute for use of a wireless network varied

from $0.004/minute to $0.05/minute.  TR at 447-448.

Effect of the ETF - basic facts.  The evidence established these undisputed basic

facts:

The class included 1,986,537 persons.

Sprint charged $299,473,408 in ETFs to the entire class.

Sprint collected $73,775,974 in ETFs from class members.

Sprint billed, but did not collect, $225,697,433 in ETFs from class members.

Sprint's lost revenue.  The evidence established two ways to calculate Sprint's

lost revenue as a result of early terminations – Monthly Recurring Charge ("MRC") and

Average Revenue Per Unit ("ARPU").  MRC revenue does not include any optional

charges for features such as text messaging, ring tones, and e-mail access.  Sprint's

average California lost MRC revenue per customer per month was $49.16.  TR at

1389:21 to 1391:14 (Dippon).  ARPU revenue is the MRC revenue plus charges for

optional features.  Sprint's average national lost ARPU revenue per customer per month

was approximately $64.74.  TR at 513 (Selwyn).  The average customer terminated with

13.25 months remaining on the contract.

Cost Avoidance – Plaintiffs' evidence.  Plaintiffs presented Dr. Lee L. Selwyn as

their expert witness on economic issues.  Dr. Selwyn examined financial data from

6

Sprint's 10-Ks and 10-Qs from 1999 to 2006 and derived information that permitted him

to opine on the costs that Sprint avoided when a class member terminated early.  Using a

regression analysis, Dr. Selwyn identified a correlation between both Sprint's operating

expenses ("opex") and its expenses for plant, property and equipment ("PPE") and its

number of customers.  TR at 429.  Dr. Selwyn also observed that the class members

represented a significant percentage of Sprint's California subscriber base.  TR at 435 and

1372.  From this information, Dr. Selwyn concluded that beyond a fixed cost base

number of $7-8 billion per year, opex and PPE were each avoidable costs.  TR at 432-

437; 504-05.  Dr. Selwyn concluded that for each customer-month of MRC revenue

($49.16) Sprint had a net loss of $0.70.  TR at 512-13 and 1020.  Stated otherwise, Dr.

Selwyn concluded that when a customer terminated early, Sprint could avoid costs

representing 98.6% of the lost MRC revenues.

An integral part of Dr. Selwyn's analysis was his observation that roughly 30% of

Sprint's income was from optional services and his conclusion that Sprint's profit margin

on optional services was 90%.  Dr. Selwyn concluded that Sprint's profit margin on

optional services was 90% by estimating that Sprint's cost per minute of voice service

throughout the class period was $0.04 and that Sprint's charge per minute for optional

voice service throughout the class period was $0.40. Dr. Selwyn concluded that Sprint

made little to no profit (1.4% on the dollar) on MRC for providing basic services and

made most of its profit (90% on the dollar) from charges for optional services.

Dr. Selwyn then calculated Sprint's avoidable costs.  Dr. Selwyn multiplied the

weighted average monthly lost profit per subscriber for MRC services ($0.70) by the

average number of months remaining on the contract term (13.25 months), calculating

1   that Sprint's lost profits averaged $9.24 per class member. TR at 451-52. Dr. Selwyn

2   determined that Sprint charged the class $299,470,408 in ETFs even though Sprint's

3   actual lost profit was $18,425,130. TR at 1468-70.

4        Cost Avoidance – Sprint's evidence.  Sprint expert Mr. Baliban examined Sprint's

5   costs on a category-by-category basis to determine the costs that Sprint avoids when a

6   class member terminates early. TR at 1291:25-1292:12; 1297:21-1299:7. In determining

7

8   whether a cost was avoidable, Mr. Baliban considered the early termination of the class

9   (California only) in relation to Sprint's national subscriber base. TR at 1298. Then,

10  using financial data from Sprint for the third quarter of 2006, Baliban classified each

11  category of expenses as either "avoidable" or "not avoidable" based on his judgment as to

12  whether Sprint would avoid the costs nationwide if it were to lose California subscribers

13  equal to 5% of its nationwide subscribers. TR at 1325. Baliban determined that when a

14

15  customer terminated early that Sprint can avoid costs representing 18.13% of MRC

16  revenues. *Id.* at 1279.

17       Sprint expert Dr. Taylor then calculated Sprint's avoidable costs. Dr. Taylor

18  started with the average MRC ($48.75) (fn1), subtracted what Baliban determined to be

19  avoidable costs ($8.84 or 18.13%) and concluded that lost MRC profits averaged $39.31

20  per month per class member. Multiplying that by the number of months remaining on the

21  contract term (13.25 months), Dr. Taylor found that the lost MRC profits per customer

22

23  averaged approximately $525.00 per class member. TR at 1429. Using MRC figures,

24

25  _____

26  1 The parties initially used Sprint only data without post-merger Nextel data, then later in the trial
    used Sprint data combined with post-merger Nextel data.  As a result, the numbers used vary
27  depending on when in the trial an expert was testifying.  The distinctions are ultimately not
    material.

8

1   Dr. Taylor determined that Sprint charged the class $299,470,408 in ETFs even though

2   Sprint's actual lost profit was approximately $987 million. TR. at 1432:25-28.

3        Sprint's actual damages.   The jury found Sprint's actual damages to be

4   $225,697,433. This amount is significantly higher than the $18,425,130 asserted by the

5   class and significantly lower than the approximately $987,000,000 asserted by Sprint.

6   The jury is not required to explain how it arrived at the amount of damages. After the

7   close of evidence and argument, *Hoopes v. Dolan* (November 12, 2008) 2008 WL

8   4868623, held that where the Court and the jury consider the same evidence that the

9   findings of the first fact finder bind the second fact finder. The Court is bound by the

10  jury's factual findings because the jury issued its verdict before the Court issued its

11  statement of decision. As a result, the Court finds that Sprint's actual damages were

12  $225,697,433.

13

14

15

16  CATEGORIZING THE ETF.

17       Sprint argues that the ETF was designed to be part of its rate structure, was treated

18  by Sprint and its customers as an alternative means of performance if a customer chose to

19  terminate early, and was treated as a liquidated damage provision if a customer failed to

20  pay his or her bills.

21       The Court categorizes and analyzes the ETF by looking at its true nature, which

22  the Court discerns by looking at its objective effect on commerce generally and its effect

23  on the majority of Sprint's customers specifically. *Ghirardo v. Antonioli* (1994) 8

24  Cal.4th 791, 802 (addressing difficulty of categorizing settlement note as a loan or as a

25  modification of a credit sale); *In re Marriage of Frahm* (1996) 45 Cal.App.4th 536, 543

26

27

9

1   (addressing difficulty of categorizing severance payment as individual or community

2   property).

3          The Court finds that Sprint's ETF operated primarily as a liquidated damages

4   clause. For those customers who were never charged an ETF, the ETF was a dormant

5   contract provision. Of those customers who were charged an ETF, 80% were terminated

6   by Sprint and experienced the ETF as the imposition of liquidated damages, whereas only

7   20% paid the ETF voluntarily. When imposed on customers, the ETF limited Sprint's

8

9   damages to the agreed amount and relieved Sprint of the need to calculate and pursue its

10  actual damages.

11

12  PREEMPTION.

13         The factual nature of the ETF determines the legal standard to be applied in the

14  preemption analysis. If the ETF concerns a matter that the states have traditionally

15  occupied and regulated, then there is a presumption against federal preemption. *Smith v.*

16  *Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1475-1476. If, on the other hand,

17  the ETF concerns a matter where there is a history of significant federal regulation, then

18  there is no presumption in favor of or against preemption. *In re Wholesale Electricity*

19  *Anti-Trust Cases I & II* (2007) 147 Cal.App.4th 1293, 1304-1305. The Court has found

20  that Sprint's ETF operated primarily as a liquidated damage clause. Civil Code

21  § 1671(d) is a consumer protection statute of general application and regulates liquidated

22  damages in consumer contracts. Consumer protection is a traditional state function.

23  *Smith, supra,* 135 Cal.App.4[th] at 1475 ("The states' historic police powers include the

24  regulation of consumer protection in general"). Therefore, in determining whether

25

26

27

10

1  federal law preempts Civil Code § 1671(d) as applied to Sprint's ETF, the Court applies
2  the presumption against preemption.

3       The Federal Communications Act (FCA), 47 U.S.C. § 332(c)(3)(A), states, "No
4  state … shall have any authority to regulate … the rates charged by any commercial
5  mobile service …, except that this paragraph shall not prohibit a state from regulating the
6  other terms and conditions of commercial mobile services." The FCA does not have the
7  unique preemptive force of statutes such as the LMRA and ERISA. 47 U.S.C. § 414;
8
9  *Smith v. GTE Corp.* (11th Cir. 2001) 236 F.3d 1292, 1313. The FCA's legislative history
10  suggests that Congress intended to remove state regulations about the setting of rates but
11  intended that state law would apply to the interpretation and enforcement of consumer
12  contracts and continue its traditional role in consumer protection matters. H.R. Rep. No.
13  103-111, 1993 U.S.C.C.A.N. 378, 588.
14
15       California case law does not provide substantial guidance on whether early
16  termination fees are "rates" under the FCA. *Ball v. GTE Mobilnet* (2000) 81 Cal.App.4th
17  529, reads the FCA literally and suggests that "rate" is defined as a cost per unit of
18  service. 86 Cal.App.4th at 538. In contrast, *Spielholz v. Superior Court* (2001) 86 Cal.
19  App. 4th 1366, suggests that the word "rates" in section 332 refers to any direct price
20  controls and is the mirror image of the word "charges" in section 205(a). 86 Cal.App.4th
21  at 1373-1374. Neither *Ball* nor *Spielholz* concern early termination fees. *Pacific Bell*
22  *Wireless, LLC v. Public Utilities Com.* (2006) 140 Cal. App. 4th 718, concerns a PUC
23  decision that itself concerned the lack of a cancellation grace period and the adequacy of
24  disclosures, and the PUC decision did not concern whether early termination fees were
25  rates.
26
27

11

1    Sprint has not met its burden of demonstrating that the FCA preempts Civil Code

2  § 1671(d) as applied to Sprint's ETF.  The Court concludes that "rates charged" is best

3  defined as what a cellular carrier charges its customers for the services it provides.  This

4  definition of "rates charged" is consistent with the plain language of the statute, the

5  legislative history, *Ball v. GTE Mobilnet* (2000) 81 Cal.App.4th 529, 538, and *In re*

6  *Southwestern Bell*, 14 FCCR 19898, para 19.  The legislative history states clearly that

7  state law would apply to the enforcement of consumer contracts and consumer protection

8  matters.  Civil Code § 1671(d) regulates the amount of damages that Sprint can recover

9  for breach of contract.  This regulation of damages is a traditional state function.  In

10  addition, in the absence of an ETF, if a consumer terminated a contract and Sprint

11  brought an action for breach of contract then the amount of Sprint's actual damages

12  would be decided under California contract law.  Civil Code §§ 3300 and 3358.  A

13  contractual agreement to replace a calculation of actual damages with liquidated damages

14  does not transmute the calculation of contract damages (a traditional state function) into a

15  wireless carrier's "rate" (a federal concern).

16

17  ALTERNATIVE MEANS OF PERFORMANCE.

18    In determining whether Sprint's ETF is a liquidated damages clause or an

19  alternative means of performance, the Court must "look to substance rather than form in

20  determining the 'true function and character'" of the parties' arrangement.  *Ridgley v.*

21  *Topa Thrift & Loan Ass'n* (1998) 17 Cal.4th 970, 979.  The Court has found that the ETF

22  operated primarily as a liquidated damages clause.  Sprint has not met its burden of

23  establishing that the predominant effect of the ETF provisions was to provide consumers

12

1   with an alternative means of performing their contracts.  Therefore, the following

2   discussion of whether a consumer at the inception of a term contract might have

3   considered the ETF to be an alternative means of performance is in the nature of dicta.

4        In determining whether the payment of a fee is an alternative means of

5   performance, the Court considers whether at its inception the contract offered the

6   terminating party "a 'realistic and rational choice in the future' between two alternative

7   performances." *Blank v. Borden* (1974) 11 Cal.3d 963, 971.  See also *Morris v. Redwood*

8   *Empire Bancorp* (2005) 128 Cal. App. 4th 1305, 1314. 971.

9

10        Under each ETF provision in Sprint's various contracts, the ETF could be

11   triggered by one of two events - either (1) a customer could terminate early by notifying

12   Sprint that he or she wanted to terminate the contract or (2) Sprint could terminate a

13   contract early for cause based on the customer's breach, and then impose an ETF.  If this

14   case concerned a Sprint clause that stated customers could terminate term contracts early

15   by paying a fee, then that fee might well be an alternative means of performance.  The

16   contract clauses at issue, however, also permitted Sprint to terminate contracts early and

17   then charge the ETF.  In that circumstance, the ETF did not give customers a rational

18   choice of paying the ETF or completing the contract - Sprint declared contracts breached,

19   terminated service, and imposed ETFs as liquidated damages resulting from the asserted

20   breaches.  The existence of a contract breach precludes a finding that the ETF was an

21   alternative means of performance.  Compare *Blank,* 11 Cal.3d at 970 (alternative means

22   of performance where "terms in no sense contemplate a "default" or "breach" of an

23   obligation by the owner upon whose occurrence payment is to be made"); *Morris,* 128

24

25

26

27

13

1   Cal. App. 4th at 1314 ("to constitute a liquidated damage clause the conduct triggering

2   the payment must in some manner breach the contract").

3          Sprint argues that the Court should treat the jury's verdict as an advisory verdict

4   on whether Sprint's contracts provide for an alternative means of performance.  The

5   Court will not do so.  The Court is responsible for deciding this issue.  Order of 4/17/08

6   at 2:8-16; Statement of the case filed 5/9/08 at 2:14-25.  The Court did not instruct the

7
    jury on the law related to alternative means of performance and the parties made no
8
9   arguments to the jury on that issue.  Order of 5/1/08 (Non-expert MIL # 7); Order of

10  5/6/08 (Non-expert MIL #2).  The jury did not provide the Court with an advisory verdict

11  on a matter not addressed to it.

12

13
    LIQUIDATED DAMAGES UNDER CIVIL CODE § 1671(d) – LEGAL TESTS
14
15         There is a statutory test and a judicial test for determining whether a liquidated

16  damages provision in a consumer contract is valid.  The statutory test is based on the text

17  of Civil Code § 1671 and the judicial test has developed in case law.  Sprint must meet

18  both tests.  *Hitz v. First Interstate Bank* (1995) 38 Cal. App. 4th 274, 292, fn 13.

19         Statutory Test - Impracticability.  It must be impracticable or extremely difficult
20
    to fix the amount of actual damages.  Civil Code § 1671(d).  The inquiry is focused at the
21
22  inception of the contract.  *United Sav. & Loan Assn. v. Reeder Dev. Corp.* (1972) 57 Cal.

23  App. 3d 282, 299.  In the impracticability analysis, "the "proper focus is on actual

24  damage" caused by a breach, "not average damage."  *Hitz*, 38 Cal.App.4th at 292, fn. 13.

25         Judicial Test – Reasonable Endeavor.  Recent and controlling case law holds that

26  under Civil Code § 1671(d) Sprint must prove that it made a genuine and non-pretextual

27

14

effort to estimate a fair average compensation for the losses anticipated to be sustained.

*Hitz*, 38 Cal.App.4th at 291, citing *Garrett v. Coast Southern Fed. Sav. & Loan Assn.*, (1973) 9 Cal. 3d 731, 739. The reasonable endeavor analysis considers the motivation and purpose at the inception of the contract in imposing the charges. *Hitz*, 38 Cal.App.4th at 289. *In re Cellphone Termination Fee Cases*, Case No. A11547 (June 9, 2008 Cal. Ct. App. 1st Dist.) ("*In re Cellphone*"), states, "[T]he focus is not ... on whether liquidated damages are disproportionate to the loss from breach, but on whether they were *intended* to exceed loss substantially – a result of which is to generate a profit." Following *Hitz*, *Garrett* and *In re Cellphone*, the Court focuses on Sprint's motivation and purpose; i.e., its reasonable endeavor at the inception of the contract. (fn2)

LIQUIDATED DAMAGES UNDER CIVIL CODE § 1671(d) - EVIDENCE

<u>Impracticability of fixing the amount of actual damages.</u>  Sprint's actual damage resulting from each class member's early termination is the amount of its lost revenue less the amount of its avoidable costs.

Sprint's lost revenue could be based on the Monthly Recurring Charge ("MRC") or the Average Revenue Per Unit ("ARPU").  MRC is the appropriate measure of Sprints' lost revenue because that is the measure of revenue that the Court would use in determining Sprint's actual damages.  First, the use of MRC is suggested by Sprint's

---

2 Because Civil Code § 1671(d) focuses on a defendant's motivation and purpose at the inception of the contract, a liquidated damages clause could potentially be void under Civil Code § 1671(d) even though the resulting cross-claim for actual damages resulted in a net monetary judgment in favor of the defendant. *In re Cellphone* at 8 ("If a liquidated damages provision is declared void under section 1671(d), the consumer is still liable for the actual damages caused by his or her breach of the contract."). Compare *Trujillo v. First American Registry, Inc.* (2007) 157 Cal.App.4th 628, 637-638 (no liability under statute unless there is an aggrieved party with an actual injury).

15

terms and conditions, which states "If Services are terminated before the end of your current billing cycle, (1) the MRC is not prorated to the date of termination...." and limits Sprint's liability to consumers with reference to the MRC.  Exh 630 at 000093 and 97. Second, Sprint could calculate lost revenue on ARPU only if Sprint demonstrated that its customers should have reasonably contemplated or foreseen paying for optional services at the time of contracting. *Archdale v. American Intern. Specialty Lines Ins. Co.* (2007) 154 Cal.App.4th 449, 469 (citing Civil Code § 3300 and *Hadley v. Baxendale*.).  Sprint demonstrated that it expected that consumers would incur optional charges, but there was no evidence that Sprint's customers signed up for plans expecting to incur overage and other optional charges.  It is not relevant for the impracticability test that Sprint has many different term plans over the class period – for any given customer with any given plan it would be simple to calculate the customer's MRC due for the remaining months in the contract.

For the individual customer, Sprint's avoidable costs are the costs it can avoid when that individual consumer terminates after the initiation of a contract.   Sprint can and does plan for the average termination rate of its subscribers, but it cannot predict and plan for the early termination of any single customer. *Hitz*, 38 Cal.App.4th at 292, fn. 13 ("the "proper focus is on actual damage" caused by a breach, "not average damage.""). As the expert evidence in this case demonstrates, the avoidable cost analysis is complicated and expensive.

At the initiation of any given consumer contract with an ETF, it would have been practicable for Sprint and the customer to determine a means to calculate Sprint's lost MRC revenue in the event of a breach, but impracticable for Sprint and the consumer to

16

1   determine Sprint's avoidable costs.  Because revenue and avoidable costs are both part of

2   the damage analysis, Sprint has demonstrated that it was impracticable for it to fix the

3   amount of actual damages at the inception of the contracts.

4         Reasonable endeavor (motivation and purpose).  There are three relevant decision

5   points in this case - Sprint's adoption of the $150 ETF in May 2000; Nextel's adoption of

6   the $200 ETF in approximately 2000; and Sprint/Nextel's post merger decision to

7   implement the $200 ETF companywide.

8

9         Sprint did not prove that its motivation and purpose in adopting an ETF in 2000

10   was to determine what losses it would sustain from breach by the early termination of its

11   contracts, nor did Sprint prove it made any effort to estimate a fair average compensation

12   for such losses.  Rather, the evidence established that Sprint's motivation and purpose in

13   imposing the ETF was an attempt to have a negative effect on the practice of its

14   customers taking their cell service to Sprint's competitors, and thus preventing a

15   substantial loss in revenue to Sprint.  Sprint did not consider in its analysis what losses it

16   would sustain from breach, or whether or not the amount of the ETF was proportionate or

17   disproportionate to contract damages resulting from contract termination.  Instead, as

18   noted above, Sprint considered whether the competition had similar contracts and ETFs,

19   whether customers would sign up with contracts with ETFs, and how different amounts

20   of ETFs would impact Sprint financially.  Regarding the financial impact on Sprint,

21

22   Sprint analyzed different scenarios and considered Sprint's profitability resulting from

23   the proposed pricing change.

24         Sprint did not prove that Nextel's motivation and purpose in 2000 was to estimate

25

26   the losses that Nextel would suffer from an early termination.  Nextel's analysis was

27

1    essentially the same as Sprint's, considering whether the competition had similar

2    contracts and ETFs, whether customers would sign up with contracts with ETFs, and how

3    different amounts of ETFs would financially impact Nextel's profits.  As with Sprint,

4    Nextel did not do any analysis of losses it would sustain from breach by the early

5    termination of its contracts, nor did Sprint prove Nextel made any effort to estimate a fair

6    average compensation for such losses. Weiner Depo at 65.

7

8        Sprint did not prove that its motivation and purpose in 2005 in increasing the ETF

9    from $150 to $200 was to estimate the damage that Sprint would suffer from early

10   terminations.  The only evidence on this decision suggests that it was motivated by a

11   desire to establish a uniform ETF, with no consideration given to whether the amount of

12   the ETF was justified by the losses that Sprint would suffer from an early termination.

13

14       Sprint did not prove that it made a reasonable endeavor to have the ETF estimate

15   its actual damages.

16       Sprint argues the Court should follow *Utility Consumers' Action Network, Inc. v.*

17   *AT&T Broadband* (2006) 135 Cal. App. 4th 1023 ("*UCAN*") and thereby use a different

18   legal standard that would lead to a different result.  The Court will not do so.   *UCAN*

19   does not address directly the judicial test under Civil Code § 1671(d) and expressly

20   avoided a direct conflict with *Hitz.* 135 Cal.App.4th at 1038 fn 9.  *UCAN* concerned

21   whether a provision in a consumer services contract was invalid simply because the

22   corporate defendant did not negotiate the late fee amount individually with each

23   customer.  In *UCAN* the parties stipulated that the Defendant, AT&T Broadband, did an

24   analysis to determine its actual damages, and Plaintiff UCAN conceded that the late fee

25   charged was reasonable. 135 Cal.App.4th at 1026.  Therefore, the legal argument now

26

27

18

1  advanced by Sprint was expressly not addressed by *UCAN* and the major factual issues in

2  this case were not even disputed in *UCAN*.

3  The Court is not required to use Sprint's proposed *UCAN* analysis because the

4  Court used that analysis in prior orders. Trial court orders do not establish law of the

5  case. *People v. Sons* (2008) 164 Cal.App.4th 90, 100. In addition, "the doctrine of 'law

6  of the case' does not apply where the controlling rules of law have been altered or

7

8  clarified by a decision intervening between the first and second judicial determinations."

9  *Provience v. Valley Clerks Trust Fund* (1984) 163 Cal.App.3d 249, 256. This Court will

10  follow *In re Cellphone* rather than this Court's prior orders.

11  Sprint's analysis of *UCAN* is, however, worthy of discussion because *UCAN*

12  thoroughly discusses the legislative history and case law and implicitly suggests a

13  different approach to considering claims under Civil Code § 1671(d). *UCAN* considered

14

15  the origin of the judicial "reasonable endeavor" requirement in *Rice v. Schmid* (1941) 18

16  Cal.2d 382, 385-386. After a review of three sources in *Rice*, *UCAN* states, "All three

17  sources demonstrate that the focus had been more on the *amount* of liquidated damages,

18  and not the process by which that amount was derived," and "we believe the reasonable

19  endeavor test they prescribed had more to do with the result and effect of a liquidated

20  damages provision and nothing to do with whether both parties to the contract negotiated

21

22  the amount of liquidated damages." *UCAN,* 135 Cal. App. 4th at 1034 and 1035.

23  *UCAN*'s suggestion that "amount" or "effect" is a proper factor to consider is

24  supported by the purpose of Civil Code § 1671(d), which is "to prevent a liquidated

25  damages provision from being used oppressively against a consumer with little or no

26  bargaining power." *In re Cellphones*, Case No. A11547, at 8. This statement of purpose

27

19

1   suggests a focus on how a liquidated damage provision is "used." By making sure that

2   liquidated damages reasonably approximate actual damages, the statute prevents coercion

3   before the termination and punitive payments after the termination. The efforts or

4   subjective intent of the parties at the time of contracting concerns whether the parties

5   expected a liquidated damage clause to serve as a penalty, not whether it actually

6   functioned as a penalty. *McCarthy v. Tally* (1956) 46 Cal.2d 577, 585 fn 4.

7

8       *UCAN*'s suggestion that the judicial test consider factors other than the reasonable

9   endeavor at the inception of the contract is supported by older case law. (fn3)  In *Dyer*

10  *Bros. Golden West Iron Works v. Central Iron Works* (1920) 182 Cal. 588, 593 the Court

11  looked first to "the entire agreement," and then deduced whether there was an intent to

12  estimate just compensation. In *Smith v. Royal Mfg. Co.* (1960) 185 Cal.App.2d 315, 324,

13  a case with facts similar to those here, the Court considered the objective terms of the

14  contract and held that because the contract imposed the same fixed sum as liquidated

15  damages without regard to whether the termination was at the start or the end of a

16  contract term, the Court could infer that a penalty was intended.(fn4)  These cases

17  support *UCAN's* suggestion that the focus of the judicial test is, or should be, on

18  "reasonableness" rather than on "reasonable endeavor."

19      One explanation for *UCAN*'s different focus is that the claim arises in the context

20  of a mass consumer contract. Where a negotiated or two-party contract is at issue, as in

21  *Rice, McCarthy, Dyer Bros. Golden West Iron Works v. Central Iron Works* (1920) 182

22

23

24

25  3 *UCAN,* 135 Cal. App. 4th at 1029 ("Because the current law governing liquidated damages in
    consumer contracts is a continuation of prior law on the subject, decisions interpreting former

26  section 1671 apply with equal force.").
    4 When considering reasonableness in the context of non-consumer contracts, "All the

27  circumstances existing at the time of the making of the contract are considered." *Weber, Lipshie
    & Co. v. Christian* (1997) 52 Cal.App.4th 645, 654.

1   Cal. 588, 593, or *Better Food Markets, Inc. v. American Dist. Tel. Co.* (1953) 40 Cal. 2d

2   179, the available evidence has included the motivation and purpose of the parties at the

3   inception, the liquidated damages amount, and a calculation of the actual damages in that

4   single situation.(fn5)  With a two-party contract there is usually no evidence about what

5   "average" actual damages might be, so these cases necessarily focus on the efforts of the

6   
7   parties at the inception of the contract to estimate actual damages.  In contrast, where a

8   mass consumer contract is at issue, as in *UCAN*, *Garrett*, or *Hitz*, the parties can, as here,

9   collect and present information about the average timing and average damage associated

10   with contract breaches.  That information permits the Court to consider as a factor

11   whether the contractual liquidated damages are significantly above the actual average

12   damages and therefore an unlawful penalty.

13   
14         The Court does not, however, find that Sprint's suggested *UCAN* analysis reflects

15   the current state of the law.  The current state of the law is that Civil Code § 1671 focuses

16   on the intent of the parties at the inception of the contract.  *Hitz, supra; Cellphone*

17   *Termination Fees, supra*.  If the Court were to interpret section 1671(d) and the case law

18   to permit Sprint to use data compiled years after the ETF was implemented to establish

19   that the amount of the ETF was reasonable, and the Court did not consider Sprint's intent,

20   motivation, and purpose at the time of contracting, then Sprint might prevail.  The law,

21   however, requires the Court to focus on Sprint's endeavor at the initiation of the contract.

22   
23   The evidence establishes that when Sprint implemented the ETF in 2000 and increased it

24   in 2005 it made no endeavor, reasonable or otherwise, to determine what losses it would

25   sustain from breach or to estimate a fair average compensation for such losses.

26   _____

27   5 *Rice* and *Better Food* concerned standardized form contracts, but arose in the context of two
party cases where there was apparently no evidence of how the contracts affected non-parties.

21

THE REMAINING CLAIMS.

The class prevails on its CLRA claim under Civil Code §§ 1770(a)(14) and (19) because Plaintiffs have demonstrated that the ETF is a violation of Civil Code § 1671(d).

The class prevails on its claim for a violation of the unlawful and unfair prongs of the UCL because Plaintiffs have demonstrated that the ETF is a violation of Civil Code § 1671(d).

The class prevails on its claim for unjust enrichment because Plaintiffs have demonstrated that the ETF is a violation of Civil Code § 1671(d), and, as a result, Sprint is not entitled to keep the ETFs it collected.

The class prevails on its claim for money had and received because Plaintiffs have demonstrated that the ETF is a violation of Civil Code § 1671(d) and any monies paid to Sprint for ETFs must be returned to Plaintiffs.

THE CLASS'S REMEDIES.

The Court must examine the status of the ETFs charged to determine the nature of the class's remedy. Sprint charged the class a total of $299,473,408 in ETFs. Of that amount, the class paid $73,775,975 to Sprint and the class has not paid the balance of $225,697,433. Of the unpaid amount, Sprint's ordinary course of business is to try to collect the money internally for 60 days and then to retain primary, secondary, and possibly tertiary collection agencies to pursue collections for 18 months. During this process Sprint still owns the debt but pays a commission on any amounts collected. Since 2004, Sprint has typically collected 20%-25% of the gross amount of ETFs billed.

22

1    Exh 866.  After 18 months, Sprint typically sells any remaining uncollected debt to third

2    parties for pennies on the dollar.   Franklin testimony 6/2/08.

3         Sprint has collected $73,775,975 in ETFs.  The class is entitled to recover as

4    restitution and damages the $73,775,975 in ETFs the class paid to Sprint.  This will

5    provide full relief to the class  regarding the amounts that the class actually paid to Sprint.

6

7         Sprint is still trying to collect some unknown amount of ETFs from the class.

8    Given that Sprint typically pursues collection activities on an account for 18 months and

9    that the class period expired on 3/18/07, Order of 5/9/08, Sprint is probably not still in

10   possession of many class member accounts or trying to collect the ETFs in those

11   accounts.  For the accounts still in Sprint's possession, the Court orders that Sprint must

12   reverse the charges to class members for any charged put unpaid flat ETFs and is

13   enjoined from attempting to collect the unpaid flat ETFs from class members.  This is full

14

15   relief for the class regarding the ETFs that Sprint might still be attempting to collect.

16        Sprint has sold accounts receivable including an unknown amount of ETFs to

17   third parties.  For the class members accounts sold to third parties, the Court orders that

18   Sprint must inform the third parties of this decision.  Directing Sprint to provide

19   notification to the third party assignees will provide substantial relief for the class.  See

20   Cal. Comm. Code § 9404 ("the rights of an assignee are subject to both of the following:

21   … (1) All terms of the agreement between the account debtor and assignor and any

22   defense … arising from the transaction that gave rise to the contract.").  See also

23   Restatement (Second) of Contracts § 336 (1981) ("By an assignment the assignee

24   acquires a right against the obligor only to the extent that the obligor is under a duty to

25   the assignor; and if the right of the assignor would be voidable by the obligor or

26

27

23

1  unenforceable against him if no assignment had been made, the right of the assignee is

2  subject to the infirmity.").(fn6)

3

4

5  SPRINT'S CONTINGENT CROSS-CLAIM AGAINST THE CLASS.

6        "If a liquidated damages provision is declared void under section 1671(d), the

7  consumer is still liable for the actual damages caused by his or her breach of the

8  contract." *In re Cellphone* at 8.  Sprint's cross-claim addressed whether the class

9  breached their contracts with Sprint and, if so, the amount of Sprint's actual damages.

10       The jury in this case was asked to answer three questions:

11

12       (1)  What was the amount of ETFs paid by the class?  $73,775,975.

13       (2)  Did the class breach their contracts?  Yes

14       (3)  What was the amount of Sprint's actual damages?   $225,697,433.

15       In summary, the jury found that the class members made ETF payments totaling

16  $73,775,975, breached their contracts by terminating early, and that Sprint's actual

17  damages as a result of that breach were $225,697,433.(fn7)

18

19

20

21

22  _____

23  6 The Court will not declare that the third parties cannot pursue collection of the assigned
    contracts, as that would directly affect the property rights of the third parties without providing
24  them an opportunity to present evidence or argument.
    7 The jury was instructed to calculate the actual damages by calculating the lost contract revenue
25  and subtracting Sprint's avoidable costs from that amount. The amount of actual damages
    determined by the jury is an amount that appears, based on the evidence presented at trial, to
26  suggest that the jury might have treated the ETFs as valid and found that Sprint's actual damages
    were the amount of ETFs owed but not collected. If that is the case, then validity of the verdict
27  might be questionable. For purposes of this Statement of Decision, the Court presumes that the
    jury made its calculation of actual damages as they had been instructed.

24

THE SETOFF.

The goal of a setoff is to "eliminate a superfluous exchange of money between the parties." *250 L.L.C. v. Photopoint Corp.* (USA) (2005) 131 Cal.App.4th 703, 727-728. A setoff should not place a party in a better position than it would otherwise be in with cross-judgments. *Jess v. Herrmann* (1997) 26 Cal.3d 131, 142-143. Because this is a class action where different class members might be differently situated with regard to whether the ETF exceeded Sprint's actual damages, this Court's predecessor, Judge Ronald Sabraw addressed how the setoff would work in the class context. Judge Sabraw, considered several alternative approaches and described Approach No. 5 as follows:

> Plaintiffs would pursue their class action and Defendants could assert class cross-claims, but the affirmative recovery of the class as a whole would be set off against the actual damages the class as a whole owed to the Defendant and a Defendant could not obtain a net positive recovery against the class as a whole. As with approach #4 the cross claims would have the effect of cross-demands for payment under C.C.P. 431.70. This approach refocuses the intra-class conflict, but does not eliminate it. Instead of a conflict where some class members would recover money from Defendants and other class members might have to pay money to Defendants, the conflict would be that class members with net positive recoveries would subsidize the class members who owed money to Defendants. This approach would provide Defendants with greater due process than Approach #4 because they could assert claims for their total actual damages against the class up to the total amount that the class might recover against the Defendants. At the hearing on December 7, 2006, Verizon and Sprint/Nextel stated that if the Court adopted this approach those Defendants would waive their right to affirmative recovery against the members of the class and the class as a whole.

Order of 12/27/06 at 5:9-26. The Court then concluded:

> The Court will follow Approach #5. This approach permits Plaintiffs to use the class mechanism for their claims, permits Defendants [to] use the class mechanism for their cross claims, resolves all the claims in a single case, minimizes the potential harm to the absent class members by precluding Defendant from obtaining any affirmative recovery from any class member, permits the Defendants to offset their total actual damages against the total amount of any liability to the class on the ETF claims, and

25

1   is procedurally faster and simpler than most of the alternatives.  Approach
    #5 does not eliminate the intra class conflict, but minimizes it while still
2   maintaining the class mechanism.

3   Order of 12/27/06 at 6:24-7:7.

4       This Court determines the setoff in keeping with the 12/27/08 Order.  The Court

5   found that the class prevailed on their claims and that Sprint must return the $73,775,974

6
    to the class.  The jury found that Sprint prevailed on its cross-claim for breach of contract
7
8   and the class must pay Sprint's actual damages of $225,697,433.  Calculating the setoff

9   pursuant to the Order of 12/27/06, the Court sets off the class's monetary recovery of

10  $73,775,975 against Sprint's actual damages of $225,697,433 and Sprint's resulting net

11  recovery of $151,921,458 is reduced to zero.  The setoff of monetary relief does not

12  affect the injunctive relief.

13

14
    CONCLUSION.
15

16      The Court will enter judgment in favor of Plaintiffs on their claims, and in favor

17  of Sprint on its cross-claim.  After the set off of the monetary relief neither the class nor

18  Sprint is entitled to any monetary recovery.  The Court orders that for those class member

19  accounts still in the possession of Sprint that Sprint must reverse the charges for any

20  charged put unpaid flat ETFs and is enjoined from attempting to collect the unpaid flat
21
    ETFs.  The Court orders that for those class member accounts sold by Sprint to third
22
23  parties Sprint must inform the third parties of this order.

24

25

26

27

26

1    The Court directs Plaintiffs to prepare and submit a judgment consistent with this

2    Statement of Decision.

3    **DEC – 4 2008**

4    Dated: ~~November ___, 2008~~

5    

6    Judge Bonnie Sabraw (Ret.)
     Sitting on Assignment by Appointment
7    Of the Chair of the Judicial Council

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Case Title/No.:    **AYYAD VS. SPRINT RG03121510**

### CLERK'S CERTIFICATE OF MAILING
### (CCP §1013a)

I certify that the following is true and correct:

I am a Deputy Clerk employed by the Alameda County Superior Court. I am over the age of 18 years. My business address is 1221 Oak Street, Oakland, California. I served this STATEMENT OF DECISION [C.C.P. § 632, CRC § 232] by placing copies in envelopes addressed as shown below and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Oakland, California, following standard court practices.

Alan R. Plutzik
L. Timothy Fisher
BRAMSON, PLUTZIK, MAHLER &
BIRKHAEUSER, LLP
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598

Dominic Surprenant
A. Brooks Gresham
Michael L. Fazio
Kristen A. Savelle
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543

Jacqueline F. Mottek
Aelish Baig
COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111

Scott A. Bursor
LAW OFFICE OF SCOTT A. BURSOR
500 Seventh Avenue, Floor 10B
New York, NY 10018

Dated: December 4, 2008

Executive Officer/Clerk of the Superior Court

By _____

*Elizabeth Opelski-Erickson, Deputy Clerk*